# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

|  |  |
|---|---|
| CUTTING EDGE VISION, LLC<br><br>     Plaintiff,<br><br>v.<br><br>TCL TECHNOLOGY GROUP<br>CORPORATION, TCL ELECTRONICS<br>HOLDINGS LIMITED, TCL<br>COMMUNICATION TECHNOLOGY<br>HOLDINGS LIMITED, and<br>TCL COMMUNICATION LIMITED<br><br>     Defendants. | Case No. 6:22-CV-00285-ADA<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

TMO_CEV_CC_000001

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  OVERVIEW OF THE PATENTS IN SUIT .................................................... 1

III. LEGAL STANDARD ....................................................................................... 2

IV.  DISPUTED CONSTRUCTIONS ..................................................................... 3

     A.   "controller" ('761 Patent, Claim 1; '472 Patent, Claims 1, 5) ................... 3

          1.   Section 112 ¶6 Does Not Apply ......................................................... 3

          2.   The Specification Discloses Structure to Perform the Claimed Functions ........ 5

     B.   "instructs" ('761 Patent, Claim 1; '472 Patent, Claims 1, 5) .................... 6

     C.   "the device" ('761 Patent, Claim 1) .......................................................... 7

     D.   "periods without potential cellular network access fees" ('761 Patent, Claim 1) ... 10

     E.   "upload … pictures …" ('761 Patent, Claim 1; '472 Patent, Claims 1, 5) ............. 14

     F.   "indication from the local memory" ('761 Patent, Claim 1) ................... 15

     G.   "group of … pictures" ('761 Patent, Claim 1; '472 Patent, Claims 1, 5) ............... 16

     H.   "periods without potentially increased cellular network access fees"
          ('472 Patent, Claims 1, 5) ....................................................................... 18

V.   CONCLUSION ............................................................................................... 20

i

TMO_CEV_CC_000002

# TABLE OF AUTHORITIES

**Cases**

*Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*,
    No. 2:18-CV-28, 2019, U.S. Dist. LEXIS 20394 (E.D. Tex. Feb. 7, 2019) .......................... 2

*CBT Flint Partners, LLC v. Return Path, Inc.*,
    654 F.3d 1353 (Fed. Cir. 2011) ............................................................................. 3

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
    435 F.3d 1366 (Fed. Cir. 2006) ............................................................................. 7

*Flypsi, Inc. v. Dialpad, Inc.*,
    No. 6:21-CV-642-ADA, 2022 U.S. Dist. LEXIS 149866 (W.D. Tex. 2022) ....................... 2

*Grp. One, Ltd. v. Hallmark Cards, Inc.*,
    407 F.3d 1297 (Fed. Cir. 2005) ............................................................................. 3

*Hologic, Inc v Smith & Nephew, Inc.*,
    884 F.3d 1357 (Fed. Cir. 2018) ............................................................................. 10

*In re Downing*,
    754 F. App'x 988 (Fed. Cir. 2018) ......................................................................... 7

*In re Gardner*,
    427 F.2d 786 (C.C.P.A. 1970) ............................................................................... 17

*Maxell, Ltd. v. Amperex Tech. Ltd.*,
    No. 21-CV-347-ADA, 2022 U.S. Dist. LEXIS 204753 (W.D. Tex. Nov. 10, 2022) .......... 15

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ....................................................................................... 2, 7

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    783 F.3d 1374 (Fed. Cir. 2015) ............................................................................. 9

*Pavo Solutions LLC v. Kingston Tech. Co.*,
    35 F.4th 1367 (Fed. Cir. 2022) ............................................................................. 3

TMO_CEV_CC_000003

*Rain Computing, Inc. v. Samsung Electronics America, Inc.,*
    989 F.3d 1002 (Fed. Cir. 2021) ............................................................................ 3, 4

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.,*
    844 F.3d 1370 (Fed. Cir. 2017) .................................................................... 2, 12, 19

*True Chem. Sols., LLC v. Performance Chem., Co.,*
    No. 18 Civ. 00078 (W.D. Tex. Sep. 25, 2019) ...................................................... 2

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.,*
    587 F.3d 1339 (Fed. Cir. 2009) .............................................................................. 3

*Williamson v. Citrix Online, LLC,*
    792 F.3d 1339 (Fed. Cir. 2015) ......................................................................... 2, 3

TMO_CEV_CC_000004

## PLAINTIFF'S LIST OF EXHIBITS

1. **Exhibit A** - Expert Declaration of David W. Hughes Dated December 12, 2022, including CV and list of Publications ("Hughes Decl.").

2. **Exhibit B** - Declaration of Justin J. Lesko Dated December 12, 2022.

3. **Exhibit C** - U.S. Patent No. 10,063,761 ("'761 Patent"), Plaintiff's Exhibit 4.

4. **Exhibit D** - U.S. Patent No. 11,153,472 ("'472 Patent"), Plaintiff's Exhibit 4A.

5. **Exhibit E** - Portions of the File History of U.S. Patent No. 10,063,761 ("'761 F.H.").

6. **Exhibit F** - Portions of the File History of U.S. Patent No. 11,153,472 ("'472 F.H.").

7. **Exhibit G** - Portions of the File History of U.S. Patent No. 9,936,116 ("'116 F.H.").

8. **Exhibit H** - Rough Draft of the Deposition Testimony of Dr. Ryan Garlick, Ph.D., taken on December 2, 2022 ("Gar. Dep.").

9. **Exhibit I** - Steven M. Kaplan, *Wiley Electrical And Electronics Engineering Dictionary*, John Wiley & Sons, Hoboken, New Jersey, 2004; bearing Bates numbers CEV-0035871 through CEV-0035880.

10. **Exhibit J** - Rudolf F. Graf, *Modern Dictionary Of Electronics*, Seventh Edition, Butterworth-Heinemann, Woburn, Massachusetts, 1999; bearing Bates numbers CEV-0035602 through CEV-0035608.

11. **Exhibit K** - Michael Agnes, *Webster's New World College Dictionary*, Fourth Edition, Wiley Publishing, Cleveland, Ohio, 2004; bearing Bates numbers CEV-0035859 through CEV-0035870.

12. **Exhibit L** - Bryan Pfaffenberger, *Webster's New World Computer Dictionary*, Ninth Edition, Hungry Minds, New York, New York, 2001.Bryan Pfaffenberger, *Webster's New World Computer Dictionary*, Ninth Edition, Hungry Minds, New York, New York, 2001.

13. **Exhibit M** - Jane Radatz, *The IEEE Standard Dictionary Of Electrical And Electronics Terms*, Sixth Edition, 1996; bearing Bates numbers CEV0035609 through CEV0035614.

14. **Exhibit N** - U.S. Patent No. 6,021,278, Plaintiff's Exhibit 12.

15. **Exhibit O** - Computer Processor History, Computer Hope (2022), Plaintiff's Exhibit 10.

16. **Exhibit P** - RSC-164/ RSC-164i Data Book, Sensory Inc. (1996) Plaintiff's Exhibit 11.

TMO_CEV_CC_000005

## I.      INTRODUCTION

The constructions proposed by the Defendants ("TCL") are incorrect. None of the disputed claim terms are means-plus function elements, and none are indefinite. Seven of the terms should be given their plain and ordinary meaning, with no construction necessary. One term, "the device," refers to the "camera system" according to the '761 Patent claim 1 in view of the intrinsic record.

## II.     OVERVIEW OF THE PATENTS IN SUIT

The '761 and '472 Patents are two of a 14-patent portfolio owned by Cutting Edge Vision, LLC ("CEV"). The CEV Patents all share the same specification,[1] originally filed October 17, 2005, which is also the relevant date for a person skilled in the art ("POSITA").

The CEV Patents describe and claim new and convenient ways for a user to control camera settings, camera menus, and the automatic upload of stored pictures. Dkt. #1 at pp. 6-7. The CEV Patents are licensed to eleven major camera/smartphone manufacturers. Dkt. #1 at p. 8.

The asserted system claims relate to automatically uploading stored pictures over a cellular network to a picture hosting site during periods when certain conditions are met. The claims provide an option that the user can select to confine automatic uploads to periods without potential ('761 Patent claim 1) or potentially increased ('472 patent claims 1 and 5) cellular network access fees, and the system monitors data from its cellular interface to determine if it is in one of those periods. Thus, the system can be instructed to avoid familiar potential fees (such as data roaming) that may be associated with uploading pictures.

The specification recognizes that uploads over a cellular network (e.g., from camera-enabled cell phones) can potentially incur upload fees.[2] While additional revenue from uploads

---

[1] During prosecution of the '472 Patent, Figure 3 was amended to conform to the specification, without adding new matter. '472 Patent Fig. 3 element 46b, '472 F.H. at CEV-0015417.

[2] 14:32-41. CEV will cite to the '472 Patent unless an issue is unique to the '761 Patent.

1

benefits service providers, it is a downside for users. Thus, the specification states at 13:3-7 (emphasis added.): "the inventive camera system is *preferably operable* so that the automatic connection is made only at certain times of the day or weekends, etc.**,** so as to confine picture transmission to periods of low network usage or *periods of cheaper network access*, etc."

## III.    LEGAL STANDARD

CEV recognizes the Court is familiar with claim construction law and forgoes a lengthy recitation of legal authorities. CEV highlights below legal standards ignored by Defendants in their Opening Brief ("Def. Brief") and accompanying Declaration of Dr. Garlick ("Gar. Decl.").

**Indefiniteness:** A claim, viewed in light of the intrinsic evidence including the prosecution history, must inform the POSITA as to the scope of the invention "with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910-11 (2014). "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

**Means-Plus-Function**: Unless "means'" is used regarding a term at issue, a rebuttable presumption arises that the term is not means-plus-function. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). Defendants ignore several cases (including from this Court) holding that a "controller" is a known class of structures to a POSITA and not a "nonce" word over periods from 1999 through to 2017. *See Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*, No. 2:18-CV-28, 2019 U.S. Dist. LEXIS 20394, at *60-62 (E.D. Tex. Feb. 7, 2019); *True Chem. Sols., LLC v. Performance Chem., Co.*, No. 18-CV-78-ADA at 11-13 (W.D. Tex. Sep. 25, 2019); *Flypsi, Inc. v. Dialpad, Inc.*, No. 6:21-CV-642-ADA, 2022 U.S. Dist. LEXIS 149866, at *18 (W.D. Tex. 2022).

TMO_CEV_CC_000007

**Judicial Correction**: "A district court may correct 'obvious minor typographical and clerical errors in patents.'" *Pavo Solutions LLC v. Kingston Tech. Co.,* 35 F.4th 1367, 1373 (Fed. Cir. 2022). "Correction is appropriate 'only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'" *Id.* The error must be "evident from the face of the patent," *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005), and the determination "must be made from the point of view of one skilled in the art," *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009). "The court 'must consider how a potential correction would impact the scope of a claim and if the inventor is entitled to the resulting claim scope based on the written description of the patent.'" *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1359 (Fed. Cir. 2011).

## IV.     DISPUTED CONSTRUCTIONS

### A.  "controller" ('761 Patent, Claim 1; '472 Patent, Claims 1, 5)

#### 1.  Section 112 ¶6 Does Not Apply

The term "controller" in the asserted claims is presumed to ***not*** be means-plus-function because the word "means" is not used with it (or anywhere in the asserted claims). *Williamson*, 792 F.3d at 1348. That presumption is further backed by many cases analyzing "controller" in parallel situations, each time declining to apply §112 ¶6, and concluding instead that a "controller" is a well known class of structures to a POSITA. *See*, Section III, above; Hughes Decl. at ¶¶ 46-48. Dr. Hughes also identifies relevant definitions for "controller" (including those relied upon by the courts) supporting the same conclusion for a POSITA. *Id.* at ¶45, 48.

TCL not only ignores the existing case law, it also mischaracterizes *Rain Computing, Inc. v. Samsung Electronics America, Inc.,* 989 F.3d 1002, 1006 (Fed. Cir. 2021) by asserting in its

TMO_CEV_CC_000008

parenthetical characterization that *Rain* held "there is no substantive difference between 'controller configured to' perform certain functions and 'controller for performing certain functions.'" *See*, Def. Brief at 5. In fact, the term "controller" was not at issue in *Rain*, and instead, the court held that the word in that claim "'*Module*' is a well-known nonce word that can operate as a substitute for 'means.'" *Rain*, 989 F.3d at 1006 (emphasis added).

In support of its argument that the operations performed by the controller are "functions," TCL relies on ¶40 of the Gar. Declaration. However, in ¶40, Dr. Garlick cropped from his "quotation" of the claim the very hardware items that, by their plain language, confirm that the "controller" is structure. Specifically, for claims 1 and 5 of the '472 Patent Dr. Garlick and TCL ignore both that the controller is "coupled to the cellular interface, the non-volatile local memory and the touch sensitive display" and that those structures are recited as interacting with the controller in the allegedly "functional" claim operations. Likewise, the '761 Patent recites in the operations (alleged by TCL to be purely functional) that the "controller" is configured to communicate with the touch sensitive display, memory, and cellular interface. *See* Hughes Decl. at ¶37. Dr. Hughes confirms that a POSITA would understand just from the plain language of the claims that a controller coupled to and communicating with those other well-known hardware components is itself a hardware component. *Id.*

The patent specification also describes the controller as a hardware component coupled to other hardware. The '472 Patent states at 12:39-41 that "the inventive camera system's camera controller … is preferably a microprocessor." This statement confirms that "controller" is structural: both CEV's and TCL's experts agree that microprocessors were known by the POSITA to be specific hardware devices. *See* Hughes Decl. at ¶¶38-39. Further, while TCL unfairly characterizes the controller in Figure 3 as being nothing more than a "black box," Figure 3 actually

4

shows in a block diagram interconnected components that are individually well-known to be structural *hardware* devices, with the controller being a key hardware component at its center. *See,* '472 Patent, Figure 3.[3]

CEV also expressly stated during prosecution that it did *not* intend for any claim elements to be interpreted as means-plus-function. With its initial claims submission (of the exact claims that issued) in the '472 Patent, CEV said ('472 F.H. at CEV-0015418):

> "In addition, Applicant has taken care to prepare the claims in a manner that does not fall within 35 U.S.C. Section 112, Para. 6. Specifically, Applicant has undertaken to draft the claims in a manner that recites structure, material, or acts in support of the various operations. Applicant requests that the Examiner inform Applicant if he believes that any claim falls within 35 U.S.C. Section 112, Para. 6, so that appropriate amendments can be made."

CEV submitted the same statement with its initial claims submission in the '761 Patent.[4]

CEV thus gave notice in the intrinsic record to both the public and the examiner that its claims should not be interpreted as means-plus-function. The examiner did not label "controller" (or any element) means-plus-function, even when he issued a (later withdrawn) written description rejection in the '472 Patent. '472 F.H. at CEV-0010981-991. If the examiner believed the claims were means-plus-function, he would have said so in that Section 112 rejection.

In sum, the case law, the claims, the specification, and the intrinsic and extrinsic evidence all point to only one conclusion: the term "controller" is not a means-plus-function element.

### 2. The Specification Discloses Structure to Perform the Claimed Functions

CEV submits that, because the term "controller" refers to well-known structure and is not a "nonce" word, this Court need not address means-plus function analysis. However, should this

---

[3] The specification further guides the POSITA by incorporating by reference a specific line of microprocessors. *See,* Hughes Decl. at ¶¶40-44.

[4] '761 F.H at CEV-0030933. Hughes Decl. at ¶¶35. The pending claims recited a "controller configured." The examiner did not identify any means-plus-function language.

5

TMO_CEV_CC_000010

Court disagree, the disclosure specifies the structure which performs the functions and sufficiently ties the structure to that function. Hughes Decl. at ¶49.

As explained above, the specification describes a microprocessor, a known structural element, as one example of a "controller" ('472 Patent at 12:39-41). The operations in element (f) of the claims further specify that the touch sensitive display, the non-volatile memory, the cellular interface, and the camera system all work together with the "controller" to carry out the purported "functions" that TCL challenges. Hughes Decl. at ¶49.b. TCL and its expert Dr. Garlick carefully avoid discussing those hardware devices, which demonstrate that the claims are not pure software claims for which a special algorithm may be required.

Thus, the disclosure specifies the structure (including at least a microprocessor, the touch sensitive display, the non-volatile memory, the cellular interface, and the camera system) that performs the purported "functions" and sufficiently ties the structure to those functions.

## B. "instructs" ('761 Patent, Claim 1; '472 Patent, Claims 1, 5)

TCL asserts the term "instructs" is indefinite, stating "[t]he word 'instructs' appears only in the claims, not in the specification." Def. Brief at 8. TCL also argues that the specification is "devoid of (1) any disclosure whatsoever to indicate what the instructions might be, and (2) any description of any structure that 'instructs.'" *Id.* TCL is again wrong.

In fact, the specification does use "instructed" and "instruct," in each case consistent with the plain meaning of "instructs" in the claim. *See*, Hughes Decl. at ¶¶59-62. And, it is established that *in haec verba* disclosure of the exact word "instructs," is not required.[5]

---

[5] CEV also confirmed the ordinary use of the term "instructs" during prosecution (in overcoming a written description rejection), when it established that this element is fully supported by the disclosure. '472 F.H. at CEV-0010972-974.

6

TCL's main argument misreads "option that instructs," by arguing (Def. Brief at 8) "A POSITA would be left to wonder how something that is passively being chosen [an option] can actively instruct others to perform." However, in an attempt to support its argument that "an option is … passive, generally meaning something being chosen," TCL relies on an inapplicable dictionary definition of "option" that is inconsistent with the context of the claim language.[6] Def. Brief at 8. Both experts explained that an option is not passive, but instead is something that is selected by pressing the appropriate place on a touch-sensitive display to allow the user to interact with a system to perform a function. Hughes Decl. at ¶¶56-59, 62-64. Thus, the basic premise for TCL's argument, that options are "passive," is simply wrong, and "option that instructs" is definite.

## C. "the device" ('761 Patent, Claim 1)

CEV agrees that the claim term "the device" technically lacks antecedent basis. However, "the lack of an antecedent basis does not render a claim indefinite as long as the claim apprises one of ordinary skill in the art of its scope, and therefore, serves the notice function required by § 112 ¶ 2." *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018). Whether a claim, "despite lack of explicit antecedent basis … nonetheless has a reasonably ascertainable meaning *must be decided in context.*" *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006). Context, for purposes of indefiniteness, includes the intrinsic evidence. *Nautilus*, 572 U.S. at 910.

Here, the claim language and intrinsic evidence lead the POSITA to only one possible conclusion: the phrase "the device" refers to the "camera system." Hughes Decl. at ¶¶69, 73, 75.

Addressing the claim language first,'761 Patent claim 1 recites "*the* device" and not "a device," so that element is intended to refer to a "device" recited elsewhere in the claim. Also, the recited operation for "the device" is "to confine automatic picture upload to periods without

---

[6] TCL failed to mention that '472 Patent claim 5 does not say "option" and refers instead to "a user-selectable *input* that instructs," so TCL's "option" argument does not apply to that claim.

TMO_CEV_CC_000012

potential cellular network access fees," and the user selection of an upload option "*instructs* the device" to carry out that operation.

That particular claim language "to confine automatic picture upload…" can be linked to the '761 Patent at 12:64-13:1[7] which states (emphasis added): "the inventive *camera system* is preferably operable so that the automatic connection is made only at certain times of the day or weekends, etc., so as *to confine picture transmission to periods* of low network usage or periods *of cheaper network access*, etc." The disclosure here describes the "camera system" as *the* device tied to the claimed operation "to confine automatic picture upload." Hughes Decl. at ¶¶70-73. And TCL does not deny that the "camera system" is a device (*see*, Def. Brief at 9).

Next, the specification's consistent use of the verbs "instruct" and "instructed" confirms again that "*the* device" (used with the word "instructs") in the '761 claim 1 is "the camera system." The specification repeatedly uses "instruct" and "instructed" only in connection with the nouns "the camera system" or "the camera." It does not describe any other device in connection with "instruct," "instructed" or "instructs."

Specifically, the '761 Patent describes: "the *inventive camera system can be instructed* to automatically send the pictures" (13:17-22); "the *inventive camera system is operable for being instructed* to automatically initiate a connection to the internet, … etc. whenever the predetermined conditions are met" (12:57-62); "*instruct the camera* to take the picture" (5:26-32); and "*instruct the camera* that this is also a picture taking command" (5:58-64). A POSITA reading the claim language "instructs the device" and the patent's description of instructing only the camera system would conclude that "the device" in the claim is the camera system. Hughes Decl. at ¶¶74-75.

---

[7] CEV cited 12:64-13:1 as "[0038]" before allowance of the related '116 Patent (examined by the same examiner in parallel with the '761 Patent) as support for the *exact* claim limitation, also lacking formal antecedent basis but allowed by the examiner. '116 F.H. at CEV-0031287-291.

8

The prosecution history also supports that "the device" is the camera system. Specifically, CEV referred to "the claimed system" as "the device" in response to an enablement rejection (that was subsequently withdrawn):

> "[A POSITA] would immediately see the disclosure of menu options in Applicant's specification and the various functions of *the device claimed*, and recognize how to include those claimed functions as part of menus in *the device*."

'761 F.H. at CEV-0030680 (emphasis added). The pending claims said "A camera system comprising…." Thus, during prosecution, CEV described the claimed "camera system" as "the device claimed." Hughes Decl. at ¶¶76-78; *Nautilus, Inc. v. Biosig Instruments, Inc.*, 783 F.3d 1374, 1382 (Fed. Cir. 2015) (patent not indefinite based on inventor statements in prosecution).

Also, related '472 Patent claims 1 and 5 use parallel language with the phrase "the camera system" instead of "the device," confirming the proper construction of "the device" is "the camera system": '472 Patent claim 1 recites "a user selection of an upload option that instructs *the camera system* to confine automatic picture upload…" and claim 5 recites "a user-selectable input that instructs *the camera system* to confine automatic picture upload…." Hughes Decl. ¶¶79-82.

While TCL lists "devices" that *exist* in the intrinsic record (*See*, Def. Brief at 9), it fails to identify any evidence to support a conclusion that a device on its list (other than "the camera system") actually *is* "the device" recited in '761 Patent claim 1.

Finally, TCL (Def. Brief at 10) argues:

> "If 'the device' were the 'camera system' as CEV alleged, claim 1 of the '761 patent would require the 'device'/'camera system' to include a 'cellular interface.' ... But, there is no cellular interface (or any networking interface) in the functional block diagram of the claimed camera system in Figure 3 of the '761 patent or anywhere else in the specification. Garlick Decl., ¶48."

However, CEV is not required to show in Figure 3 the "cellular interface" because it is sufficiently described elsewhere in the specification. In that circumstance, "[t]he written description does not

9

require that every claimed element be illustrated in the figures, particularly in predictable arts and where the element not depicted is conventional and not 'necessary for the understanding of the subject matter sought to be patented.'"[8]

The '761 Patent repeatedly discloses that the "inventive camera system" uses cellular networks or is part of a cell phone and therefore includes a cellular interface (*see, e.g.*, 12:28-31, 13:10-16, 14:26-31). In view of these disclosures (which TCL ignores), the "camera system" can include a "cellular interface" and therefore can be "the device."

In short, A POSITA in view of the intrinsic record, would understand that "the device," in '761 Patent claim 1 is "the camera system."

In the alternative, CEV requests that the Court correct the clerical error of the '761 Patent claim 1 by replacing "the device" with "the camera system." As explained, the phrase "the device" meant "the camera system" in view of the claim language, the specification, and file history. Indeed, the issuance of the '472 Patent with the same language ("instructs the camera system") points unequivocally to the conclusion that the inventor is fully entitled to the resulting claim scope. Thus, the legal conditions are met for this Court to correct the patent.

## D. "periods without potential cellular network access fees" ('761 Patent, Claim 1)

TCL has not met its burden to prove that "periods without potential cellular network access fees" is indefinite. The claim is definite, and the intrinsic record confirms it.

Claim 1 provides as one element an option to "confine automatic picture upload to periods without potential cellular network access fees." It is important to consider that claim 1 is a system claim that is infringed by the sale of a configured device – before the device is ever turned on.

---

[8] *See Hologic, Inc v Smith & Nephew, Inc.*, 884 F.3d 1357, 1362-63 (Fed. Cir. 2018) (citations omitted). Indeed, in the later '472 Patent, the examiner allowed Figure 3 to be amended to show the cellular interface without issuing a new matter rejection. '472 Patent Fig. 3 element 46b, '472 F.H. at CEV-0015417.

TMO_CEV_CC_000015

CEV has not asserted that a user infringes the claims. A device manufacturer cannot know whether *every* user will be charged cellular network access fees for an upload. Thus, the claimed *system* conditions the upload based upon *potential* cellular network access fees that may (or may not) be incurred from automatic uploads.

The claim describes the controller is configured to "automatically connect to a remote picture hosting service and cause an upload of one or more pictures stored in the non-volatile memory to the remote picture hosting service via the cellular interface, after receiving: (1) data from the cellular interface used by the controller to determine that the upload is allowed based on the selected *upload option*." Thus, the controller is configured to determine, before an automatic upload takes place, that the upload is allowed based on the selected "upload option" (i.e, because the device is in an appropriate period without potential cellular network access fees).

The '761 Patent claim 1 thus recognizes that for any given user on any network there *may* be certain periods for the device where "*potential* network cellular network access fees" exist that a user may desire to altogether avoid. So, the system provides an option to avoid them.

A POSITA was well aware of such potential fees. Data roaming fees are one well-known example of "*potential* network cellular network access fees" expressly mentioned in the intrinsic record. Hughes Decl. at ¶¶89-92. At the time of the invention, it was well known that uploads during data roaming potentially (but do not certainly) result in cellular network access fees incurred from sending data over the roaming network. *Id.* at ¶91. Both experts agree that data roaming fees are "possible" but not always charged for uploads during roaming. *Id.* at ¶¶91-92.

Consistent with that understanding, during prosecution, CEV expressly identified data roaming charges as an example to help explain the meaning of the claim language and distinguish the art. CEV explained to the examiner that monitoring network upload conditions in claim 1

11

distinguishes the art by providing the user with an option to "prevent *roaming or other network charges that can be incurred during photo upload*s." '116 F.H. at CEV-0031291, Hughes Decl.at ¶¶89-90. The examiner allowed the claims of the '116 Patent (and subsequently, the '761 Patent) for that reason, and did not object to the provided example or find the claim language to be unclear in any way. *Sonix Tech. Co.*, 844 F.3d at 1379-80 (the examiner, by withdrawing rejections "did not express any uncertainty as to the scope of the disputed claim term," which "provide[d] evidence that a skilled artisan did understand the scope of this invention with reasonable certainty.").

TCL makes two arguments alleging "periods without potential cellular network access fees" is indefinite, but both are meritless. First, TCL argues (Def. Brief at 10):

> "On the one hand, the plain meaning of 'without . . . fees' seems to require that there be no cellular network access fees at all….On the other hand, though, the specification [at 12:64-13:1] only refers to decreased cellular access fees rather than the complete absence of such fees…."

TCL's reference to "no cellular network access fees at all" mischaracterizes the claim language and ignores "periods" and "potential." The term "potential cellular network access fees" in context does not encompass every fee already in existence or imply that a user's data plan must be completely free of all charges.

Dr. Hughes explains that "*periods* without *potential* cellular network access fees" refers to upload-related fees that exist only in certain *periods* (but not others). Hughes Decl. at ¶84. A fixed monthly plan charge on a provider plan does not vary from one upload *period* to the next or depend on information received via the cellular interface, which is what the claim requires, and thus the claim is specifically referring to fees resulting from uploads. *Id.* at ¶84.b-c.

Furthermore, contrary to TCL's statement, the claim language is consistent with the specification. The '761 Patent at 12:64-13:1 describes "confin[ing] picture transmission to …periods of cheaper network access." The word "cheaper" encompasses periods in which the

12

potential upload fee is zero. When the potential upload fee is zero, it is "cheaper" (consistent with the specification) than every other potential fee for an upload.

Indeed, during prosecution of the '116 Patent (where the relevant claim language of the '761 Patent first appeared), CEV cited the same portion of the specification at 12:64-13:1 (referenced as "[0038]") in remarks with the amendment introducing the claim language. '116 F.H. at CEV-0031284. The examiner indicated agreement with CEV by allowing the claims of the '116 Patent (and later, the claims of the '761 Patent with similar language).

Second, TCL complains that "the exact same system to perform the exact same steps will have a different outcome for each different user which makes the terms indefinite." Def. Brief at 11-12. However, as explained above, the claim is a system claim, not a method claim directed to user steps. Indeed, the claim refers to "an upload option that instructs the device to confine automatic picture upload to periods without potential cellular network access fees." The claimed *system* provides "an upload option" specifically so that each unique user has the ability to choose to select the option or choose not to select it as desired. Hughes Decl. at ¶100.

Furthermore, TCL ignores that the claim recites "*potential* network cellular network access fees." That phrase is completely understandable to a skilled artisan without any need to know the context of "a user's cellular network plan." *Id.* at ¶99. In certain periods/device states, "*potential* network cellular network access fees" exist, and a POSITA would be well aware of such fees, but TCL does need to know the data plan for each user that buys its device. As the examiner agreed, data roaming fees are one example of well-known "*potential* network cellular network access fees." A system that includes an option to confine uploads to periods without those *potential* fees infringes the claim regardless of an end user's data plan. In short, the word "potential" in context makes clear that the claim is user and plan *independent*. *Id.* at ¶¶98-99.

13

Finally, TCL (Def. Brief at 11-12) misleadingly edits language 14:31-35 of the '761 patent. The actual text says, "Cellular service providers typically charge a fee for internet access or emailing and so an automatic feature to connect to the net or send email for the purposes of transmitting pictures can improve revenue generation for these companies." Contrary to TCL's edits, this sentence does not acknowledge "a fixed-price cellular network plan" but instead simply refers to the fact that more transmitting of pictures means more revenue for service providers. The word "typically" necessarily acknowledges something other than "always," which shows that the word "potential" is consistent with the specification.

For the above reasons, TCL has not met its burden to prove that "periods without potential cellular network access fees" is indefinite by clear and convincing evidence.

**E. "upload … pictures …" ('761 Patent, Claim 1; '472 Patent, Claims 1, 5)**

TCL argues: "The 'upload … pictures' term is indefinite because a POSITA would not be able to ascertain with reasonably certainty [1] what specific pictures are uploaded [and 2] under what scenarios." Def. Brief at 12. TCL is incorrect.

Section G below explains that the "group of pictures…to be uploaded" is well-defined in the plain language of each claim. Simply put, the pictures in the "group" (described in Section G below) are what gets uploaded. Also, the "scenarios" for upload are abundantly clear: (i) in '761 Patent claim 1, the upload occurs "after" three events, and (ii) in claims 1 and 5 of the '472 Patent, the upload occurs "during any period detected by the controller in which" certain conditions are met (three conditions for claim 1, and four conditions for claim 5).

TCL (Def. Brief at 13) argues that the '761 Patent at 11:64-12:1 "at best only supports uploading the designated pictures, but not uploading all or any pictures that have not been designated for uploading." Here, TCL is misdirecting with a written description argument, which

14

TMO_CEV_CC_000019

is not a claim construction issue. *See*, *Maxell, Ltd. v. Amperex Tech. Ltd.*, No. 21-CV-347-ADA, 2022 U.S. Dist. LEXIS 204753, at *46-47 (W.D. Tex., Nov. 10, 2022) (declining to address an argument "appearing to be directed towards written description" and finding "there is no ambiguity in the claim language itself."). Moreover, the disclosure describes that the "group to be uploaded" can be formed in many ways, not just the way defined in one element of these claims. Hughes Decl. at ¶¶142-46.

In sum, the group to be uploaded is clearly defined as explained in Section G, as are the upload scenarios. The term "upload … pictures …" is definite.

### F.   "indication from the local memory" ('761 Patent, Claim 1)

TCL starts its argument about "indication" by complaining that the specification does not use the words "indication," "indicate," and "indicating" in connection with "local memory." Def. Brief at 13. Again, in *haec verba* disclosure is not required under section 112. The plain and ordinary meaning of "indication" applies, and the question is whether the use of the word "indication" in the claim is reasonably clear. It certainly is. Hughes Decl. at ¶¶148-60.

The word "indication" is used twice in '761 Patent claim 1, each time requiring simply that the "indication" is "received" by the controller. The first "indication" is that the "system is connected to the internet via the cellular interface," which TCL does not assert is indefinite. The second is an "indication from local memory that a user has elected an option to designate" at least one picture stored in the local memory to be uploaded. Here, TCL asserts that: "Memory is like a digital storage system whose contents can be retrieved, but a storage system does not provide indications. A POSITA would wonder what, exactly, is that 'something' from a passive memory storage that can serve to indicate." Def. Brief at 14. However, TCL's assertion is purely attorney argument that is unsupported by *any* evidence, not even TCL's expert.

TMO_CEV_CC_000020

TCL's own definition for "indication" (i.e., "something (as a signal sign, suggestion) that serves to indicate") does not say an indication is "active" or "passive." Likewise, '761 Patent claim 1 does not state *how* the indication is received by the controller (whether actively or passively). Hughes Decl. at ¶159. And, Dr. Hughes explains that data stored in a memory meets TCL's own definition because it acts as "a signal, sign, suggestion that serves to indicate." *Id.* at ¶¶156-158.

Still further, TCL ignores that CEV clearly explained its understanding of the word "indication" during prosecution of the '761 Patent in response to an enablement rejection, stating, "the fact that an 'indication' (i.e, some sort of proof in the form of an electronic signal) of a met condition was received would immediately be understood by a skilled artisan without the need for undue experimentation." '761 F.H. at CEV-0030681. The examiner withdrew the enablement rejection and later allowed the '761 Patent. Any POSITA reading the above passage would understand the "indication" in the claim.[9] Hughes Decl. at ¶¶153-54.

In sum, contrary to TCL's unsupported argument, a memory can provide indications, and TCL fails to meet its burden to prove that the term is indefinite by clear and convincing evidence.

### G. "group of … pictures" ('761 Patent, Claim 1; '472 Patent, Claims 1, 5)

TCL's argument regarding "group" attempts to create confusion where none exists. TCL argues that "a POSITA has no way of knowing what constitutes the 'group of … pictures' recited in the claims: whether all of the pictures stored in the memory (which the claims say might be only a single picture) or an unspecified subset of those stored pictures." Def. Brief at 14.

At the same time, TCL's expert understands that the "group" in the claims is a group of pictures to be uploaded containing at least one picture that has been selected, stating: "Both

---

[9] Dr. Garlick described that "an electrical signal … sent to a microprocessor indicat[es] the current state of the switch," consistent with CEV's explanation. Gar. Dep. at 140:22-24.

TMO_CEV_CC_000021

[patents] seem to indicate that selecting an image from a "group" is sufficient to condition the upload of the "group" of images." Gar. Decl. ¶56. Dr. Garlick confirmed at deposition that he reached this conclusion from the plain language of the claims. Gar. Dep. at 194:6-195:3. Dr. Garlick's statement is mostly correct.

Put simply, the claims in both asserted patents use the word "group" in its ordinary parlance and describe the group as a group "to be uploaded." In each case, the group includes at least one picture designated by a user: claims 1 and 5 of the '472 Patent recite "at least one image sensor-captured picture stored in the local memory has been designated through the touch sensitive display as part of the group," and claim 1 of the '761 Patent recites "a user has elected an option to designate at least one picture from the group."

Thus, the metes and bounds of the "group" are clear: the group contains at least one picture designated through the specified process in the claim, the group can include additional pictures that are not necessarily designated through the specified process in the claim, and the group can (but is not required to) include every picture in the local memory at the time the upload occurs. Hughes Decl. at ¶¶126-29, 135-37, 141. Covering a range of possibilities does not lead to indefiniteness when the scope of what is covered is reasonably (in this case, absolutely) clear. "Breadth is not indefiniteness." *In re Gardner*, 427 F.2d 786, 788 (C.C.P.A. 1970).

TCL also separately argues lack of antecedent basis for '761 Patent claim 1, which uses the word "group" only once. Def. Brief at 14. TCL's argument is without merit. In context, the "group" of element (f)(ii)(3) simply refers to the pictures stored in the local memory to be uploaded to the remote picture hosting service in element (f)(ii). Claim 1 recites:

> (d) a non-volatile local memory configured to store one or more pictures. …
> (f) a controller configured to: …

17

TMO_CEV_CC_000022

(ii) automatically connect to a remote picture hosting service and cause an *upload of one or more pictures stored in the non-volatile memory* to the remote picture hosting service via the cellular interface, after receiving:…

(3) an indication from the local memory that a user has elected an option to designate at least one picture from *the group of pictures stored in the local memory to be uploaded to the remote picture hosting service*.

In element (f)(ii), the claim refers to the controller's ability to "cause an *upload* of one or more pictures stored in the non-volatile memory *to the remote picture hosting service*." Then, in element (f)(ii)(3), the claim refers to "the group of pictures stored in the local memory *to be uploaded to the remote picture hosting service*." The claim therefore directly ties the recited "group" in the latter part of the claim to the pictures that the controller is configured to cause to be uploaded, in the earlier part of the claim. Hughes Decl. at ¶¶126-27.

It is thus clear from the claim language itself that the non-volatile local memory can (from a variety of ways and sources as described in the specification) store a group of pictures "to be uploaded," and the upload of those pictures takes place after (among other conditions) at least one picture "from the group of pictures stored in the local memory to be uploaded" is designated by user election of an option. The group of pictures to be uploaded must include the "at least one picture" but may include other pictures as well. Hughes Decl. at ¶¶131-34, 138-41.

In both patents, the claim language is absolutely clear on its face. The pictures to be uploaded are properly characterized as a "group."[10]

### H. "periods without potentially increased cellular network access fees" ('472 Patent, Claims 1, 5)

Claims 1 and 5 recite "periods without *potentially* increased cellular network access fees." The claims refer to "potentially increased" upload fees that exist in certain periods, and that the

---

[10] The pictures "to be uploaded" are a group even under TCL's "commonality" requirement. As examples of "commonality," the pictures are all in the local memory and all "to be uploaded."

TMO_CEV_CC_000023

system provides an "upload option" or "user-selectable input" on the touch sensitive display that can be selected to confine automatic picture uploading to periods without such fees.

Similar to the discussion in Section D above, which is not repeated, it is clear from the plain language of the claims that the described "potentially increased cellular network access fees" relate to fees resulting solely from uploads. Hughes Decl. at ¶84. A POSITA would have been well aware that periods with "potentially increased cellular network access fees" exist, and the specification describes that automatic uploads can be confined to periods without them (referenced as "periods of *cheaper* network access" at 13:3-7). Hughes Decl. at ¶¶89-92.

Also, TCL's assertion that "[t]he intrinsic record simply offers no guidance" (Def. Brief at 15) is false. The intrinsic record provides an example consistent with the plain meaning of the claim term and its clear scope. In response to a written description rejection during prosecution CEV stated: "As an example at the time of the invention (known to a PHOSITA), equipment on the network indicates to the cellular phone (through its cellular interface) that the device is roaming on a more-expensive non-provider network. This roaming period would ***not*** be 'one of the periods without potentially increased cellular network access fees,' and upload is prevented during this particular period." '472 F.H. at CEV-0010978; Hughes Decl. at ¶106. The examiner subsequently allowed the '472 Patent without indicating lack of clarity in the claim language or example. *Sonix Tech. Co.*, 844 F.3d at 1379-80 (examiner's demonstration of understanding "provide[d] evidence that a skilled artisan did understand the scope of this invention with reasonable certainty.").

TCL argues: "[I]t is not clear 'increased network access fees' are compared to what?" Def. Brief at 15. That argument ignores the plain meaning of "increased" and that the phrase says "periods without potentially increased cellular network access fees." The specific amount of the "increase" does not matter because the plain meaning of "increased" is clear: it covers *any* increase

TMO_CEV_CC_000024

above what is normal for an upload. Hughes Decl. at ¶116. There is no need for more guidance on "how much potential increase of the fees is needed." Def. Brief at 16.

In addition, as discussed in Section D, the claims are system claims, not method claims requiring fees to *actually* be incurred (or not incurred). Indeed, the phrase "potentially increased cellular network access fees" removes the need for consideration of context, such as user data plans: the system provides an option/input that can be selected by a user to avoid uploading during "periods without potentially increased cellular network access fees," regardless of whether that specific period is in an increased fee for every user. Hughes Decl. at ¶¶107-13. Also, CEV provided the data roaming example for a POSITA and the USPTO. *Id.* at ¶106.

TCL also erroneously calls "potentially increased" a "term of degree." It is not. The term "potentially" does not require evaluation of the "degree" of potential–it simply requires at least the possibility that the described thing will happen. Hughes Decl.at ¶114. The word "increased" covers any increase small or large, not an evaluation of degree, such as whether or not a shape subjectively qualifies as "elongated." In contrast, the cases cited by TCL rely on subjective evaluation adjectives, such as "high," "short," "convenient," "sufficiently," and "elongated."

## V.    CONCLUSION

For the above reasons, CEV respectfully requests that this Court reject TCL's indefiniteness arguments and construe the disputed terms in accordance with CEV's proposal for plain and ordinary meaning and construction of "the device" as "the camera system."

TMO_CEV_CC_000025

Respectfully submitted on December 12, 2022, by:

_/s/ *Justin J. Lesko* _____

Justin J. Lesko
IL Bar No. 6306428
*Admitted Pro Hac Vice*
Law Offices of Lisa & Lesko, LLC
55 East Monroe Street, Suite 3800
Chicago, IL 60603
Tel.: (774) 484-3285
JustinLesko@patentit.com

Steven G. Lisa
IL Bar No. 6187348
*Admitted Pro Hac Vice*
Law Offices of Lisa & Lesko, LLC
55 East Monroe Street, Suite 3800
Chicago, IL 60603
Tel.: (480) 442-0297
SteveLisa@patentit.com

Eamon Kelly
IL Bar No. 6296907
*Admitted Pro Hac Vice*
SPERLING & SLATER, PC
55 West Monroe Street, 32nd Floor
Chicago, IL 60603
Tel.: (312) 641-3200
Fax: (312) 641-6492
ekelly@sperling-law.com

*Lead Counsel for Plaintiff*

*And*

*David N. Deaconson*
*Texas Card Bar #05673400*
*PAKIS, GIOTES, PAGE & BURLESON, P.C.*
*P.O. Box 58*
*Waco, TX 76703-0058*
*(254) 297-7300 Phone*
*(254) 297-7301 Facsimile*
*deaconson@pakislaw.com*
*Local Counsel for Plaintiff*

TMO_CEV_CC_000026

**CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on this the 12th day of December 2022.

_/s/ Justin Lesko_

Justin Lesko

TMO_CEV_CC_000027