# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

+ + + + +

_____
                                :
IN THE MATTER OF:               :
                                :
CUTTING EDGE VISION, LLC,       :
an Arizona Limited              :
Liability Company,              :
                                :
            Plaintiff,          :
                                :
    v.                          : Case No.
                                : 6:24-CV-270-AM-DTG
T-MOBILE US, Inc., and          :
T-MOBILE USA, Inc.,             :
                                :
            Defendants.         :
                                :
_____:

            Friday,
            March 14, 2025


DEPOSITION OF:

        DR. ANDREW WOLFE

called for examination by Counsel for the
Plaintiff, pursuant to Notice of Deposition,
via Video Teleconference, when were present on
behalf of the respective parties:

1    APPEARANCES:

2

3    On Behalf of the Plaintiff:

4    JUSTIN J. LESKO, ESQ.
     MICHELLE B. LISA, ESQ.
     Law Offices of Lisa & Lesko, LLC
5    332 S. Michigan Avenue
     Suite 900
6    Chicago, IL 60604
     774-484-3285
7    JustinLesko@patentit.com

8

9    On Behalf of the Defendants:

10   ELIZABETH J. WEISKOPF, ESQ.
     K&L Gates LLP
11   925 Fourth Avenue
     Suite 2900
12   Seattle, WA 98104
     206-623-7580
13   Elizabeth.Weiskopf@klgates.com

14

15

16

17

18

19

20

21

22

23

24

25

1                              CONTENTS

2        WITNESS                        DIRECT    CROSS

3        Andrew Wolfe                      5       154

4

         EXHIBIT NO.                               PAGE
5
         1    Expert Declaration of Wolfe          15
6        2    U.S. 10,063,761                      31
         3    U.S. 11,153,472                      57
7        4    Hughes Declaration                   38
         5    CEV-TCL 23-02-02 Preliminary Claim
8             Construction Order                   57
         6    U.S. Patent 8,508,498                70
9        7    U.S. Patent 7,555,006                70
         8    Pages from CEV-T-Mobile File History
10            10,063,761                           77
         9    11,153,472 Preliminary Amendment
11            From 19-10-25                        84
         10   U.S. Patent 8,838,370                92
12       11   JavaScript if else if else           103
         12   U.S. Patent 8,726,043                106
13       13   IPR2020-00234 Declaration of Wolfe
              Re 8,847,898 Samsung v Neodron       110
14       14   U.S. Patent 8,243,045                117
         15   If statement in Programming
15            GeeksforGeeks                        123
16

17

18

19

20

21

22

23

24

25

4

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                                        (9:01 a.m.)

 3              COURT REPORTER:  We are now on the

 4      record.  Here begins the deposition of Dr. Andrew

 5      Wolfe, taken in the matter of Cutting Edge Vision

 6      LLC vs. T-Mobile US, Inc. and T-Mobile USA, Inc.,

 7      Case No. 6:24-CV-270-AM-DTG.  We are convened

 8      remotely via Zoom.  My name is Eric Mollen.  I'm

 9      the   court   reporter   from   Neal  R.   Gross   and

10      Company.  Today's date is Friday, March 14th,

11      2025, and the time is 9:02 a.m. Pacific.  Would

12      all present please introduce yourselves and whom

13      you represent for the record?

14              MR. LESKO:  Good morning.  My name is

15      Justin Lesko, and I'm here on behalf of the

16      Plaintiff, Cutting Edge Vision, LLC.

17              MS. LISA:  Hello, I'm Michelle Lisa, and

18      I'm also here on behalf of Plaintiff Cutting Edge

19      Vision, LLC.

20              MS. WEISKOPF:  I'm Elizabeth Weiskopf

21      from K&L Gates, on behalf of the witness and the

22      T-Mobile Defendants.

23              MR. LESKO:  Okay, great.  So, Dr. Wolfe,

24      I'm going to start with a few ground rules for

25      today's deposition.
```

```
1              COURT REPORTER:  Actually, Mr. Lesko --
2              DR. WOLFE:  Do you want to swear me in?
3              COURT REPORTER:  Yes, I should swear him
4    in.
5              MR. LESKO:  Sorry.
6              COURT REPORTER:  Dr. Wolfe, would you
7    raise your right hand, please?
8    WHEREUPON,
9                         ANDREW WOLFE
10   was called as a witness by Counsel for the
11   Plaintiff and, after having been first duly
12   sworn, was examined and testified as follows:
13                    DIRECT EXAMINATION
14             MR. LESKO:  Okay.  Dr. Wolfe, I'm going
15   to start with a few ground rules.  I'm sure
16   you've heard these before but we still want to go
17   through them.  So first, for today's deposition,
18   you  should  only  have  the  Zoom  meeting,  the
19   documents folder -- actually, let me ask you
20   first.  Do you have access to the folder of
21   documents that I sent to Ms. Weiskopf?
22             THE WITNESS:  No.
23             MR. LESKO:  Okay.  Can we go off the
24   record here?
25             COURT REPORTER:  Yes, we're off the
```

6

1    record.

2                    (Whereupon, the above-entitled matter

3    went off the record at 9:04 a.m. and resumed at

4    9:05 a.m.)

5                    COURT REPORTER:  All right.  We're back

6    on the record at 9:05 a.m.

7                    MR. LESKO:  Okay, Dr. Wolfe, I'm going

8    to start with some ground rules here.  First,

9    during the deposition, you should only have  the

10   Zoom meeting, the documents folder and any other

11   document  that  we  are  discussing  during  the

12   deposition on your screen.  Can you confirm that

13   you agree with that?

14                    THE WITNESS:  Yep.  That's fine.

15                    BY MR. LESKO:

16       Q   And currently, do you have anything else

17   open on your computer aside from the documents

18   folder and the Zoom meeting?

19       A   I'm not sure what you mean by open, but

20   I only see the Zoom window and the documents

21   folder.  I mean, I guess I have I still have a

22   web browser open to the Box.

23       Q   Okay.  So you have a web browser to Box

24   and the folder and the Zoom meeting and nothing

25   else is on your computer right now, like, that's

1    usable.

2        A    I mean, I'm sure there's stuff running

3    in the background, but there's nothing else that

4    I can see.

5        Q    Okay.  And throughout the deposition,

6    you cannot have any chats open with colleagues or

7    with Ms. Weiskopf.  Do you agree with that?

8        A    I'm not sure what the rules are.  I mean

9    certainly don't have any communications with

10    anybody while we're on the record.

11        Q    Yeah.  Can we just agree that we're not

12    going to have any communications like that while

13    we're on the record?  It's just hard because

14    we're in a Zoom meeting.  I want to make sure.

15        A    No, that's fine.

16        Q    Okay.  And I'll ask some of my questions

17    slowly.   Can  you  please  let  me  finish  the

18    question before answering?

19        A    I will do my best.

20        Q    Okay.  And if you don't understand a

21    question, will you let me know, and then I'll try

22    to rephrase it for the record?

23        A    I will try to do that.

24        Q    And if you answer a question, I'll

25    assume you understood the question.  Is that

1    okay?

2         A    Okay.

3         Q    And if you need a break at all during

4    the deposition, you can request one, but please

5    try to answer any pending question before we try

6    to take a break.

7         A    Okay.

8         Q    Is there any issue today, such as an

9    illness or a personal issue that would impair

10   your ability to testify fully and accurately

11   today?

12        A    Not at the present time.

13        Q    Okay.  Can you please state your full

14   name and address for the record.

15        A    Andrew Wolfe.  Do you want the address

16   of my office where I am right now or do you want

17   my home address?

18        Q    Your office address is fine.

19        A    2005 De La Cruz Boulevard, Suite 142,

20   Santa Clara, California 95050.

21        Q    Okay.  And you have submitted a claim

22   construction declaration on behalf of T-Mobile

23   US, Inc. and T-Mobile USA, Inc. in this matter,

24   is that correct?

25        A    Yes.

1      Q   And   for   convenience   during   our
2    deposition,   I'll   refer   to   the   Defendants
3    collectively as T-Mobile and to the Plaintiff as
4    CEV.  Is that okay?
5      A   I will understand that.
6      Q   Thank you.  So in preparing for today's
7    deposition, did you review your declaration that
8    we just mentioned in this case?
9      A   Yes.
10     Q   In preparing for today's deposition, did
11   you review the declaration of Dr. Hughes?
12     A   Not since I wrote my declaration, no.
13     Q   Okay.  And in preparing for today's
14   deposition, did you review the patents at issue
15   in this case, U.S. patent numbers 10,063,761 and
16   11,153,472?
17     A   Yes.
18     Q   In preparing for today's deposition, did
19   you read the file histories of either of those
20   patents?
21     A   Portions of it.  I pulled it up online
22   at the Patent Office, and I read the portions
23   that I thought would be relevant.
24     Q   Okay.   In preparation for today's
25   deposition, did you read Plaintiff's Proposed

1    Constructions dated January 3rd, 2025?

2        A    No.

3        Q    And in preparing for today's deposition,

4    did you read Defendant's Amended Preliminary

5    Proposed Claim Constructions dated February 20th,

6    2025?

7        A    No, I believe I was provided with

8    excerpts from each of those that I've included in

9    my declaration.  But other than that, I did not

10   read them.

11       Q    Okay.  Is there anything -- now today,

12   right now, I'm just talking about today's

13   deposition, not the declaration.  Was there

14   anything else that you reviewed to prepare for

15   today's deposition?

16       A    I reviewed portions of the file history

17   of some of the parent applications.

18       Q    Okay.  Would that be, U.S. patent number

19   9,936,116, which is referenced in your

20   declaration in this matter?

21       A    Yes.  I also briefly reviewed the issued

22   patents from some of the predecessors.

23       Q    Okay.  So other CEV patents that are

24   related to the asserted patents here, the '761

25   patent and the '472 patent.  You reviewed those

1    patents as well, you're saying?

2        A    I looked at portions of those where the

3    file history would have indicated to me that they

4    should have had the same specification.

5        Q    Okay.  Is there anything else that you

6    reviewed in preparing for today's deposition that

7    we haven't discussed?

8        A    Not that I can recall.

9        Q    How much time did you spend preparing

10   for today's deposition?

11       A    After having prepared the declaration?

12       Q    Yeah,  just  for  today's  deposition.

13   Unrelated to the declaration preparation.

14       A    I don't know exactly, but, ballpark

15   eight to 12 hours.

16       Q    Okay.  Did you meet with Ms. Weiskopf?

17       A    Over video link.

18       Q    And how many times did you meet with Ms.

19   Weiskopf?

20       A    Twice.

21       Q    And for how long were those meetings?

22       A    The first one was about three hours, I

23   believe.  Second one, maybe ten minutes.

24       Q    Did you meet with anyone else to prepare

25   for today's deposition?

```
1        A    No
2        Q    So, I know you're here on behalf of T-
3    Mobile.  Is that correct?
4        A    They have retained me.  I'm here to give
5    my own opinions, but at their request.
6        Q    Okay.  And so related to that, the
7    opinions that you're giving are supposed to be
8    honest and given on an informed basis to the
9    court.  Do you agree?
10       A    I do.
11       Q    Okay, I don't know if you're familiar
12   with this rule, but there's a Rule 702 for
13   experts that says the testimony is supposed to be
14   based on sufficient facts or data.  Do you agree
15   that the testimony that you are to provide to the
16   court should be based on sufficient facts or
17   data?
18       A    I do.
19       Q    Okay.  And do you understand that as a
20   retained expert, your testimony should assist the
21   court in understanding the evidence?  Is that
22   right?
23       A    That's my understanding.
24       Q    Okay.  And do you agree that your
25   testimony should not omit relevant facts that
```

1    could  impact  the  court's  analysis  of  the

2    technical matters?

3         A    Yes.  As I understand that, I would not

4    want to admit any facts that are relevant to the

5    topic at issue.

6         Q    And just to clarify, you meant to say

7    you would not want to omit any facts, right?

8         A    Yes, O-M-I-T.

9         Q    Understood.  So if there was evidence

10   that was unhelpful to T-Mobile, you would still

11   be obligated to address that evidence.  Is that

12   right?

13              MS. WEISKOPF:  Objection.  This is legal

14   issues.  If you've got something you want to show

15   him, you should just show him.

16              MR. LESKO:  Oh.  So the question is, if

17   there's certain evidence that was unhelpful for

18   T-Mobile, would you still be obligated to address

19   it, Mr. Wolfe?

20              MS. WEISKOPF:  I renew my objection.

21              THE WITNESS:  I don't know.  Again,

22   that's a complicated legal question.  I think

23   that the court would have to determine whether or

24   not there was relevance, whether or not it was

25   within the scope of my testimony.  I think it's

```
 1    more complicated than a yes or no answer, but I
 2    certainly am always trying to do my best to give
 3    full and complete answers to the, questions
 4    relevant  to  my  testimony  without  regard  to
 5    whether or not they're helpful for T-Mobile or
 6    CEV.
 7              MR. LESKO:  In forming your opinions in
 8    this case, you reviewed certain materials.  Is
 9    that correct?
10              THE WITNESS:  Yes
11              BY MR. LESKO
12       Q   And you listed those materials in your
13    declaration, is that correct?
14       A   Yes.  I've done my best to list them all
15    as best as I can recall.
16       Q   And so the materials you reviewed, you
17    selected because you think they're relevant and
18    important to your analysis.  Is that correct?
19       A   Well, not necessarily everything that I
20    reviewed is relevant or important, but if I
21    reviewed it and then determined that it wasn't
22    relevant, I may have still disclosed it.
23       Q   Okay.  So during your review, you might
24    have  reviewed  certain  materials  and  then
25    determined  after  reviewing  them  that  either
```

15

1    they're not relevant or parts of them might not

2    be relevant.

3         A    That's certainly possible.

4         Q    So if you look in the Box folder you

5    provided, there's a Plaintiff's Exhibit 1.  Can

6    you pull that up or download it, whichever is

7    easier for you?

8              (Whereupon, the above-referred to

9    document was marked as Plaintiff's Exhibit No. 1

10   for identification.)

11        A    Okay.

12        Q    Okay.  So Plaintiff's Exhibit 1, take a

13   few minutes, a few seconds to look it over.  And

14   can you confirm that Exhibit 1 is your

15   declaration that you submitted in this matter and

16   that it bears your signature?

17        A    Based on my cursory review, it appears

18   to be.

19        Q    Okay.  And if you scroll down to PDF

20   Page 203, which is, I think, Page 201 in the

21   document, you should see your signature page.

22   Let me know when you get there.

23        A    I see it.

24        Q    Okay.  Is that your signature on the

25   page there?

1          A    Yes.

2          Q    Okay.  So your declaration says there on

3     that page, under penalty of perjury, under the

4     laws of the United States of America, to the best

5     of  my  knowledge,  the  foregoing  is  true  and

6     correct.  Do you see that?

7          A    I see that.

8          Q    Okay.    And  you're  aware  of  the

9     seriousness of that?

10         A    I am.

11         Q    And you believed that statement at the

12    time of your declaration when you signed it?

13         A    I did.

14         Q    And  you  said  you  reviewed  your

15    declaration in preparing for today's deposition.

16     Is that right?

17         A    Yes.

18         Q    And do you still believe that everything

19    in your declaration is true and correct?

20         A    As far as I'm aware.

21         Q    And if you discovered something in your

22    declaration that was untrue or incorrect during

23    today's  deposition,  would  you  change  your

24    testimony?

25              MS. WEISKOPF:  Object to form.  This is

1     vague.

2               THE WITNESS:  We'd have to look at it on

3     a case by case basis.  I would acknowledge if

4     something is incorrect.  I think the nature of

5     the error would determine whether or not my

6     testimony changes.

7               MR. LESKO:  Sure.  So if you saw an

8     error in there that needed to be corrected, you

9     would be able to correct it on the record today?

10              MS.  WEISKOPF:    Object  to  form,

11    speculative.

12              THE WITNESS:  Again, we'd have to see

13    it.  But if I'm able to correct it on the record,

14    I would do so.

15              MR. LESKO:  So just to confirm, the

16    testimony you are providing today will also be

17    true and correct to the best of your knowledge.

18    Is that right?

19              THE WITNESS:  Yes.  I will do my very

20    best to give true and correct testimony today.

21              BY MR. LESKO:

22       Q   And  did  you  write  this  declaration

23    yourself?  Exhibit 1?

24       A   Not  every  word.    I  prepared  the

25    declaration, but I did not write every word.

1      Q    Okay.  Did you review it carefully

2    before you signed it?

3      A    I did.

4      Q    And did any of T-Mobile's lawyers draft

5    portions of this declaration for you?

6            MS. WEISKOPF:  Objection under Rule 26.

7     You  can  answer,  but  you  can't  reveal  any

8    privileged communications, Dr. Wolfe.

9            THE WITNESS:  Yes.

10           MR. LESKO:  Do you recall what portions

11   were written by T-Mobile's lawyers?

12           THE  WITNESS:    Certainly  the  legal

13   standards were provided by T-Mobile's lawyers.

14   And then there were other portions and I don't

15   recall exactly which ones that were the result of

16   discussions I had with T-Mobile's lawyers, where

17   I explained my opinions, and then in some cases,

18   they recorded those opinions into a first draft.

19           BY MR. LESKO:

20     Q    Okay.  So in some instances, the first

21   draft  was  handled  by  the  lawyers  and  then

22   reviewed by you?

23     A    With certain language, that is true.

24   Yes.   But  again,  anything  that  involved  my

25   opinion originated from me.

1      Q    What -- when you say certain language,

2    do you have any -- can you point out which

3    portions might have been drafted by the lawyers

4    first, aside from the legal section, which you've

5    already mentioned.

6             MS. WEISKOPF:  I'm going to continue to

7    object  under  Rule  26  and  privileged

8    communications.  Dr. Wolfe, please don't reveal

9    anything privileged.

10             THE WITNESS:  I actually don't recall.

11             MR. LESKO:  What percentage of the

12   sections do you think were drafted by the lawyers

13   first, roughly?

14             THE  WITNESS:   I  haven't  tried  to

15   estimate that, I don't know, I mean, in this

16   particular  declaration,  80  percent  plus,  I

17   believe is just raw evidence and wasn't drafted

18   by anybody at T-Mobile or anybody on the T-Mobile

19   legal team or me.  About 80 percent of it is just

20   quoted evidence.

21             BY MR. LESKO:

22      Q   So you're referring, for example, to

23   pages -- just looking at your declaration, pages

24   15 through, let's say -- pages 15 through 165

25   show, I mean, I think you'll agree with me,

1    there's excerpts from the file histories.  Is

2    that what you're referring to as the quoted

3    evidence, Page 15 through 165?

4        A    That is the bulk of the quoted evidence.

5        Q    Okay.  So then pages, let's just focus

6    on then pages, and I think we already talked

7    about the introduction and some of the legal

8    discussion.  So let's just focus on pages 166

9    through, I don't know, I guess the end of the

10   declaration, which is Page 201.  So pages 166 to

11   201.  Do you recall which sections there were

12   drafted by the T-Mobile lawyers?

13            MS. WEISKOPF:  And again, I'm going to

14   object to privileged communications.  Please

15   don't reveal anything privileged, Dr. Wolfe.

16            THE WITNESS:  So everything was based on

17   the opinions that I developed and discussed with

18   the attorneys.  But I don't recall which text I

19   drafted originally and which text was drafted by

20   attorneys that I then reviewed and approved.

21            MR. LESKO:  Okay.  So percentage wise,

22   one page – this very specific page range.  I'm

23   talking about pages 166 to 201.  What percentage

24   of that did you draft first?

25            MS. WEISKOPF:  Objection.  Asked and

1    answered.

2              THE WITNESS:  No, I think I've already

3    answered that I don't have that number.

4              MR. LESKO:  So you have no idea which

5    parts were drafted by you or the lawyers between

6    pages 166 and 201?

7              MS. WEISKOPF:  Objection.  Asked and

8    answered.

9              THE WITNESS:  I don't believe -- I

10   explained to you how it was prepared.

11             MR. LESKO:  So in forming -- in drafting

12   the declaration, was there any limits placed on

13   what materials you could review to draft your

14   declaration?

15             MS. WEISKOPF:  Objection, please don't

16   reveal anything privileged, Dr. Wolfe.

17             THE WITNESS:  I'm not aware of any.

18             MR. LESKO:  So, for example, if you --

19   did you ever request additional materials to

20   review and then they weren't provided to you?

21             THE WITNESS:  I'm sorry, did you ask,

22   did  I  ever  request  materials  that  were  not

23   provided to me?

24             BY MR. LESKO:

25       Q    Yeah.  Did you ask, for example, did you

1    ask counsel, T-Mobile's lawyers to provide you

2    with a document to review and they said, no?

3        A    That did not happen.  Every time I asked

4    for a document to review, it was provided.

5        Q    So when it came to what documents you

6    reviewed, did you make that decision or did T-

7    Mobile's lawyers guide you?

8            MS. WEISKOPF:  You know, objection.

9    This  is  really  getting  into  privileged

10   communications.   Please  don't  reveal  any

11   communications between counsel, Dr. Wolfe.

12           THE WITNESS:  I'm not quite sure how to

13   answer  that  without  revealing  privilege.

14   Certainly counsel informed me what the patents

15   were that were in this case, right? I didn't come

16   up with that on my own.  But there were other

17   situations where I asked to review additional

18   documents.

19           MR. LESKO:  So if you could in Exhibit

20   1, turn to the PDF, Page 7.  There's a Paragraph

21   18.  Let me know when we get there, Dr. Wolfe.

22           THE WITNESS:  I see that.

23           BY MR. LESKO:

24       Q    Okay, great.  So in Paragraph 18, we

25   don't have to read it out loud.  Just read it to

1  yourself.  There is a list of -- it's a bullet

2  pointed list of five items.  And it says you have

3  reviewed the following materials in addition to

4  any documents cited herein.  And there's five

5  items listed.  Do you see that?

6      A   Yes.

7      Q   Is that list a complete and accurate

8  record of everything you reviewed in preparing

9  your declaration?

10          MS. WEISKOPF:  Objection.

11          THE WITNESS:  As best as I can recall,

12  yes.

13          MR. LESKO:  So you don't know of any

14  other documents beyond those listed here that you

15  reviewed in preparing your declaration?

16          THE  WITNESS:   I  don't  recall  any.

17  Clearly, if I cited any other documents in the

18  declaration, I must have reviewed them and I

19  could have missed them in making this list.  But

20  this is what I recall having reviewed.

21          MR. LESKO:  Was there any materials that

22  you intentionally avoided reviewing in preparing

23  the declaration?

24          MS. WEISKOPF:  Objection.  This has been

25  asked and answered.

1                    THE WITNESS:  No.

2                    MR. LESKO:  I'm sorry.  Did you answer

3          the question?

4                    THE WITNESS:  Yeah, I said no.

5                    BY MR. LESKO:

6          Q    Oh, okay.  I didn't hear you.  And in

7          preparing your declaration, did you conduct any

8          independent research for other materials that may

9          have been relevant to your declaration?

10         A    No.

11         Q    Did you review any other litigation

12         documents prior to preparing your declaration?

13         Did you review any infringement contentions from

14         CEV, for example?

15                   MS. WEISKOPF:  Objection, vague.

16                   THE WITNESS:  I have not reviewed any

17         infringement contentions.

18                   MR. LESKO:  Okay.  I'll represent to

19         you,   yes,   CEV   served   on   T-Mobile   some

20         infringement contentions in this matter.  Did you

21         review anything like that in preparing your

22         declaration?

23                   MS. WEISKOPF:  Objection, vague.

24                   THE WITNESS:  No.

25                   MR. LESKO:  So I also represent to you

1    that T-Mobile served some invalidity contentions

2    in this matter upon CEV.  Did you review any

3    invalidity contentions prior to preparing your

4    declaration?

5              THE WITNESS:  No, I did not review any

6    invalidity contentions with respect to this

7    matter.

8              BY MR. LESKO:

9        Q    Okay.  So, and now we're talking about

10   not just for preparing your declaration.  Just

11   you have not seen any invalidity contentions

12   relating to this matter ever.  Is that your

13   testimony?

14       A    Correct.

15       Q    Okay.  So attached to the declaration,

16   if you scroll down to PDF Page 205 is where it

17   begins, that's your CV starting there on Page

18   205.  Is that correct?

19       A    Yes, as of mid-February.

20       Q    And as shown in your CV, you've provided

21   expert testimony in a number of cases.  Is that

22   correct?

23       A    Yes.

24       Q    Do you review any prior expert testimony

25   in preparing this declaration, Exhibit 1?

1        A   Oh, make sure I answer the question you

2    asked.    I reviewed some testimony from Dr.

3    Hughes, and I reviewed some declarations that

4    were in the file history, but I did not review

5    any of my own prior expert testimony in preparing

6    this declaration.

7        Q   Okay.  And you're right.  That was my

8    question.   Did you review your own prior

9    testimony regarding this expert declaration?

10       A   I did not.

11       Q   So now we're going to scroll up to

12   Paragraph 24 of this exhibit.  Paragraph 24, if

13   you're there, it says my qualifications and

14   experience made me, at least, a person of

15   ordinary skill in the art.  Can you see that?

16       A   Yes.

17       Q   Okay.   Does that also mean you're

18   qualified as an expert to provide testimony in

19   this matter?

20            MS. WEISKOPF:  Object to form, it's a

21   legal issue.

22            THE WITNESS:   I believe that I'm

23   qualified to provide testimony on the issues that

24   I am providing testimony on.  There are going to

25   be many other issues in this case where the

1    expertise required is different than mine.

2            MR. LESKO:  Okay.  So for purposes of

3    claim construction, as of 2005, you were at least

4    a person of ordinary skill in the art?

5            THE WITNESS:  I believe so.  Again, the

6    court may, define the qualifications of a person

7    of ordinary skill in the art at some point and at

8    that point I would reevaluate.  But under my

9    understanding of what is required of a person of

10   ordinary skill in the art, I am at least a person

11   of ordinary skill in the art, and was, as of

12   2005.

13           BY MR. LESKO:

14   Q    Okay.  If you could scroll up again to

15   Paragraph 18.  Like I said, I asked you a few

16   questions about the amount of time you spent

17   revealing each of the materials listed here.  If

18   you could help me with that.  So looking at U.S.

19   patent  number  10,063,761,  in  preparing  your

20   declaration, about how much time did you spend

21   reviewing that?

22   A    I don't recall.

23   Q    I'm sorry, I couldn't hear your answer.

24   A    I don't recall.

25   Q    Okay.  Did you take notes as you were

28

1    reviewing it?

2        A    No.

3        Q    Did anyone assist you in reviewing these

4    documents, like do you have another expert or

5    somebody at your group that helps you with

6    reviewing documents like these?

7        A    No.

8        Q    But you received some guidance from

9    counsel on what to review in these patents -- in

10    this patent, I should say?

11        A    I was told what claims are at issue in

12    the case, but that's the only guidance I

13    received.

14        Q    Okay.  So let's do this again, for

15    patent number 11,153,472, do you know how much

16    time you spent reviewing that patent in preparing

17    your declaration?

18        A    I don't.

19        Q    And did anyone assist you with reviewing

20    it?

21        A    No.

22        Q    Were you limited in the amount of time

23    you could spend reviewing either the '761 patent

24    or the '472 patent?

25        A    No.

1      Q   Okay.  So let's go to the next item, the

2   file history.  So here in your declaration,

3   Paragraph 18, you list three file histories that

4   you reviewed in preparing your declaration.  Do

5   you agree with me?

6      A   Yes.

7      Q   Do you recall how much time you spent

8   reviewing the file histories?

9      A   I do not.

10     Q   And did you take notes as you were

11   reviewing those file histories?

12     A   No.

13     Q   And did anyone assist you in reviewing

14   the file histories, someone else at your firm or

15   another expert?

16     A   No, I discussed them at certain points

17   in time with counsel.  But no one else.

18     Q   Okay.  And for the file histories, was

19   there any portions of them that you skimmed, let

20   me ask you this first.  I'm sorry.  Withdraw the

21   question.  For each of the file histories listed

22   in Paragraph 18, did you read it from start to

23   finish?

24          MS. WEISKOPF:  Objection, vague.

25          THE WITNESS:  I had the entire file

1    history available to me, but there were sections

2    that I did not read carefully that involve things

3    like whether or not fees were paid on time, and

4    other things that simply weren't relevant to my

5    opinions.

6            MR. LESKO:  Okay.  So at times did you

7    skim the file histories?  Is that accurate?  You

8    skimmed through them or skipped over parts that

9    seemed irrelevant to you?

10           MS. WEISKOPF:  Object to form.  Asked

11   and answered.

12           THE WITNESS:  I only skimmed parts that

13   I didn't think would constitute the intrinsic

14   record, so I carefully read all the parts in

15   which there were representations made by the

16   applicant, and where there was feedback provided

17   by the examiner.  Those are the portions that

18   were relevant to me, including amendments and

19   summaries of interviews and things like that.

20           MR. LESKO:  Did you run searches for

21   terms  as  well  when  you  looked  at  the  file

22   histories?  Like a Ctrl-F to try to find certain

23   words?

24           THE WITNESS:  Not in preparing the

25   declaration.  I don't think I did.

1          BY MR. LESKO:

2      Q   And let's circle back to the patents for

3   a moment.  So for those, U.S. patent numbers

4   10,063,761 and 11,153,472, did you read the

5   entire patent from start to finish?

6      A   Yes.

7      Q   So some of the patents have references

8   cited at the beginning of the patents.  Did you

9   pull up any of those references or just skip past

10  that part?

11         MS. WEISKOPF:  Objection, compound.

12         THE WITNESS:  Are you referring to the

13  elements listed in as a result of the prior art

14  search?

15         MR. LESKO:  Let's just pull up, if you

16  could, Plaintiff's Exhibit 2.  That'll make this

17  simpler.  In the Box folder.  Let me know when

18  you get there, Dr. Wolfe, please.

19         (Whereupon,   the   above-referred   to

20  document was marked as Plaintiff's Exhibit No. 2

21  for identification.)

22         THE WITNESS:  Okay, I have that.

23         BY MR. LESKO:

24     Q   Thank you.  So if you look at the patent

25  starting mostly on Page 2 through Page 4, there's

1    various references cited, I think those are

2    references that were cited during prosecution.

3    Did you skip over that part, or did you read all

4    that?

5        A    I read --

6            MS. WEISKOPF:  Object to form, vague.

7            THE WITNESS:  I read the text that is in

8    the '761 patent.  I did not pull up each and

9    every one of those documents and review them.  in

10   some  cases  where  the  examiner  referred  to

11   specific quotations in the file history, I did

12   verify those.

13           MR. LESKO:  So if there is a rejection,

14   for example, in the file history that involved

15   one of these prior art references, you would have

16   actually pulled up the reference or just read

17   what the examiner said about it?

18           THE WITNESS:  In some cases I verified

19   the  quote,  but  I  did  not  read  the  entire

20   reference  and  determine  whether  or  not  the

21   examiner had cited to the best portion, for

22   example.

23           BY MR. LESKO:

24       Q    Okay.  So for the -- and maybe to save

25   time, I won't pull up the '472 patent.  But so

1    the '472 patent, would it be the same that the

2    references cited section that we just referred to

3    that starts on Page 2, would you have read the

4    names of the documents but not the actual

5    documents?

6        A    Correct.

7              MS.    WEISKOPF:              Objection,

8    mischaracterizes testimony.

9              THE WITNESS:  I mean, there may have

10    been cases where I've read the documents

11    previously.  I recall certain ones.  I think,

12    some of the touchscreen patents in particular,

13    but, I did not go through each one of the what I

14    believe is probably more than a hundred documents

15    that were listed as references cited and review

16    each one.

17              MR. LESKO:  So, if you could, let's turn

18    back to Plaintiff's Exhibit 1 and Paragraph 18

19    that we were reviewing.

20              So, the next item listed is the expert

21    declaration of Dr. Hughes dated December 12th,

22    2022.  Do you see that?

23              THE  WITNESS:  Yes.

24              BY MR. LESKO:

25        Q    How much time did you spend reviewing

1    that document --

2         A    I don't recall.

3          Q    -- in preparing your declaration?

4         A    I do not recall.

5         Q    Did anyone assist you in reviewing that

6    document?

7         A    No.

8         Q    And did you read that one from start to

9    finish, the Dr. Hughes declaration?

10        A    I believe I did at one point.

11        Q    Was there any parts of it that you

12    decided to skim instead of reading carefully?

13        A    I only skimmed his CV.

14        Q    The CV?

15         A    Yeah.

16         Q    So did you feel like you spent

17    sufficient time reviewing the Dr. Hughes

18    declaration to understand it?

19             MS. WEISKOPF:  Object to form.

20             THE WITNESS:  I spent sufficient time to

21    understand it for purposes of the opinion that I

22    put in my declaration.

23             MR. LESKO:  And was there any parts of

24    it that you were told to ignore or not review?

25             THE WITNESS:  No.

1    BY MR. LESKO:

2       Q    The  last  two  documents  here  are

3    Plaintiff's Proposed Constructions, dated January

4    3rd, 2025, and Defendant's Amended Preliminary

5    Proposed  Claim  Constructions,  dated  February

6    20th, 2025.  Do you see that in Paragraph 18 of

7    Plaintiff's Exhibit 1?

8       A    Yes.

9       Q    And did you read those from start to

10   finish?  Did you read those entire documents and

11   review them?

12      A    No.

13      Q    What parts did you not read?

14      A    I only looked at the parts that were

15   relevant to the term that I opined on.

16      Q    Okay.   So  where  there  was  --  the

17   disputed claim terms listed, aside from the

18   controller and the means-plus-function debate,

19   you ignored those claim terms like the device and

20   the periods in the preamble discussion?

21          MS.  WEISKOPF:   Object  to  form,

22   mischaracterizes testimony.

23          THE WITNESS:  I did not carefully review

24   portions that were not related to the claim terms

25   that I've opined on.

```
 1              MR. LESKO:  And how many claim terms did
 2      you opine on?
 3              THE  WITNESS:   Well,  there's  some
 4      semantics involved.  Maybe I'd characterize it as
 5      three.   They're  very  similar,  but  they're
 6      separately written out in different claims.
 7              BY MR. LESKO:
 8        Q   Let's make it a little easier.  So if we
 9      look at Plaintiff's Exhibit 1, starting on Page
10      168 --
11              (Simultaneous speaking.)
12        Q   -- PDF Page 171, there's a list of three
13      disputed claim terms.  Do you see that?
14        A   Yes.
15        Q   Table, I should say.  It's in a table
16      format, right?
17        A   Yes.
18        Q   Okay.  So in the claim construction
19      documents from CEV and from T-Mobile that you
20      reviewed, did you focus solely on those three
21      terms?
22              THE WITNESS:  Yes.
23              MS.  WEISKOPF:   Object  to  form,
24      mischaracterizes testimony.
25              THE WITNESS:  I did.
```

1          MR. LESKO:  We'll scroll back up to

2    Paragraph 18 of your declaration and move on.

3    Are you confident your review of the materials in

4    Paragraph 18 was careful and thorough?

5          THE WITNESS:  Yes, for the purposes that

6    I reviewed them, which was for preparation of

7    this declaration.

8          MR. LESKO:  So you believe you met your

9    obligation as an expert to consider all relevant

10   information that was in these documents?

11         MS. WEISKOPF:  Object to form.

12         THE WITNESS:  Yes.

13         MR. LESKO:  So you didn't feel like your

14   review of this case was rushed or you were told

15   to ignore certain evidence or anything like that?

16    You felt like you had a full consideration of

17   the evidence listed in Paragraph 18?  Is that

18   correct?

19         MS. WEISKOPF:  Object to form, asked and

20   answered.

21         THE WITNESS:  I felt that I -- I felt

22   that I was given the freedom, and also that I

23   actually performed a complete review of the

24   relevant materials.

25         MR. LESKO:  Dr. Wolfe, if you could

38

```
1    please download or open the Plaintiff's Exhibit
2    4.  It's been marked in the deposition folder.
3    And let me know when you have that in front of
4    you.
5              (Whereupon,   the   above-referred   to
6    document was marked as Plaintiff's Exhibit No. 4
7    for identification.)
8              THE WITNESS:  I do have it.
9              BY MR. LESKO:
10   Q   If you could skim through this document.
11    And do you know what this document is?
12   A   My  understanding  is  that  this  was
13   testimony that was provided by Dr. Hughes in
14   another case relating to the same two patents.
15   Q   Okay.  So if you look at -- you don't
16   have to go back to your declaration.  Is this the
17   -- does this look like the expert declaration of
18   Dr. Hughes dated December 12th, 2022, that's
19   listed in Paragraph 18 of Plaintiff's Exhibit 1?
20   A   It appears to be.  It has the same
21   docket number.
22   Q   Okay.  And so according to Paragraph 18
23   of Plaintiff's Exhibit 1, your declaration, you
24   reviewed this document of Dr. Hughes.  Is that
25   correct?
```

1      A    I did.

2      Q    If you turn to Paragraph 12 of

3    Plaintiff's Exhibit 4.  Are you there?

4      A    Yes.

5      Q    Did you see the list of materials in

6    Paragraph 12?  There's Materials A through T in

7    Paragraph 12.  It's a list.  Do you see that?

8      A    Yes.

9      Q    So you read Paragraph 12 of Dr. Hughes's

10    declaration before finalizing the declaration.

11    Is that correct?

12      A    Yes.

13      Q    Now, looking at Paragraph 12, if you can

14    tell me by letter indication which of these

15    documents A through T did you review while you

16    were drafting your declaration that you submitted

17    in this matter?

18      A    I don't want to go through some matching

19    exercise here.  I've already told you and

20    disclosed the documents that I reviewed.

21      Q    Okay, so I'll help you.  So, A and B are

22    the patents, and you reviewed those.  So, here in

23    Exhibit 4, there's 12a and 12b.  You viewed both

24    of those.  Is that right?

25      A    As I said, I've already told you in

1    writing and in answering your questions exactly
2    what documents I reviewed.
3         Q   Okay.   12c  is  a  portion  of  the
4    prosecution history and you said you review that
5    prosecution history.  Is that correct?
6         A   I did review portions of the prosecution
7    history of the 9,936,116 patent.
8         Q   Okay.  12d and 12e, those are also --
9    yeah,  you  already  said  12d.   You  said  you
10   reviewed the '761 patent file history, right?
11        A   I did.  Again, I haven't seen those
12   particular Bates numbers, but I have reviewed the
13   prosecution history of the '761 patent.
14        Q   And 12e, your reviewed the prosecution
15   history of the '472 patent.  Correct?
16        A   Correct.
17        Q   So, 12f is Defendant's Updated List of
18   Proposed Terms for Construction, and there we're
19   talking about the Defendant's TCL.  Did you
20   review  that  document  in  preparing  your
21   declaration?
22        A   No.
23        Q   Let's say 12g and h are other claim
24   construction documents from the CEV versus TCL
25   litigation.  Did you review either of those in

1    preparing your declaration, Plaintiff's Exhibit

2    1, in this case?

3        A    No.  As I said, I told you exactly

4    multiple times what I reviewed in preparing my

5    declaration.

6        Q    Can you answer the question?

7        A    I did answer the question.

8            MR. LESKO:  Reporter, can you read back

9    the question to Dr. Wolfe?

10           COURT REPORTER:  Give me a moment.

11           (Whereupon, the record was read back.)

12           MS. WEISKOPF:  I'm going to object to

13    relevance.

14           MR. LESKO:  Can you answer the question,

15    Dr. Wolfe?

16           THE WITNESS:  I will repeat my answer.

17    No.  I have already provided you, both in writing

18    and in response to your prior questions, a list

19    of exactly what I reviewed in this case.

20           MR. LESKO:  Okay.  Let's say, Paragraph

21    12i, declaration of Dr. Ryan Garlick, did you

22    review that in preparing your testimony in this

23    case?

24           MS. WEISKOPF:  Objection, relevance.

25           THE WITNESS:  I believe I've answered

1    that already.  I did not.

2              MR.  LESKO:     12j,  the  deposition

3    transcript of Dr. Ryan Garlick taken on December

4    2nd, 2022, did you review that in preparing your

5    declaration?

6              MS. WEISKOPF:  Objection, relevance.

7              THE WITNESS:  As I've told you now many

8    times, that is not one of the things that I

9    relied   on   or   reviewed   in   preparing   my

10   declaration.

11             MR. LESKO:  Okay.  So 12k through 12t in

12   this Plaintiff's Exhibit 4, did you review or

13   rely on any of those documents for preparing a

14   declaration?

15             MS. WEISKOPF:  Objection, relevance.

16             THE WITNESS:  As I testified several

17   times now, those are not documents on the list of

18   what I reviewed or relied on for preparing my

19   declaration.

20             MR. LESKO:  Do you see here that Dr.

21   Hughes states, the data or other information that

22   I considered in forming the opinions that I may

23   express in this phase of the action include those

24   detailed in the listing that follows.  You see

25   that in Paragraph 12 of this Plaintiff's Exhibit

43

1    4, correct?

2              THE WITNESS:  Yes.

3              BY MR. LESKO:

4        Q    So    you    reviewed    Dr.    Hughes's

5    declaration.  So everything in Paragraph 12, you

6    are   aware   that   it   existed   at   the   time   you

7    prepared your declaration?  Is that right?

8        A    I'm aware that it existed, yes.

9        Q    Did anyone tell you to not review these

10   materials?

11       A    No.

12       Q    So   you   chose   not   to   review   the

13   materials, aside from those that you said you

14   reviewed in Paragraph 12?

15             MS.   WEISKOPF:     Object   to   form.

16   Relevance.

17             THE WITNESS:  I reviewed the materials

18   that I believed at the time were relevant and

19   necessary to form the opinions that I provided in

20   my declaration.  And I have provided you with a

21   list of those materials, and I have testified as

22   to what materials I reviewed.  Those are the

23   materials that I chose to review.

24             MR. LESKO:  Okay.  So, 12f through 12t,

25   you were aware of them and you chose not to

1   review?

2             (Simultaneous speaking.)

3             MS. WEISKOPF:  Objection.  Asked and

4   answered.

5             THE WITNESS:  Yes, I was aware of

6   thousands of documents that I did not review for

7   purposes of this declaration.

8             MR. LESKO:  So you didn't mention these

9   materials in your declaration, either, did you?

10  12f through 12g in Plaintiff's Exhibit 4?

11            MS. WEISKOPF:  Object to form.  It's

12  vague and irrelevant.

13            THE WITNESS:  My declaration stands on

14  its own.  But I don't recall mentioning the

15  documents that are listed in Paragraph 12

16  Subsections f through p in my declaration.

17            MR. LESKO:  So you didn't explain in

18  your declaration how these might have been

19  relevant to your opinion or not relevant to your

20  opinion?

21            MS. WEISKOPF:  Object to form.

22            THE WITNESS:  I've already told you I

23  don't recall mentioning them in my declaration at

24  all.   I certainly did not explain in my

25  declaration every document that was not relevant

45

1    to my opinion.

2            MR. LESKO:  So, we've been going an hour

3    here.  Do you want to take a break or do you want

4    to keep going, Dr. Wolfe?  I'm fine either way.

5            THE WITNESS:  I'm fine either way, as

6    well.

7            MR. LESKO:  All right.  We can just keep

8    going.  No problem.  Figured I would offer.

9            BY MR. LESKO:

10       Q   So let's say in Plaintiff's Exhibit 4,

11   if you could.  We will turn to Paragraph 67,

12   which is on Page 25.  Let me know when you get

13   there.

14       A   Okay.

15       Q   Are you there, Dr. Wolfe?

16       A   I am.

17       Q   Okay, thanks.  So there's a heading

18   there, The Device.  Do you see that?

19       A   Yes.

20       Q   Okay.  So in Plaintiff's Exhibit 4,

21   Paragraph 67 through 83, are under the heading

22   The Device.  Do you agree?

23       A   Yes.

24       Q   So, in preparing your declaration, did

25   you review these Paragraphs 67 through 83 from

1    Plaintiff's Exhibit 4?

2        A    I read them.  I didn't rely on them

3    because I haven't provided an opinion on the

4    phrase the device in my declaration.

5        Q    So you're aware of these paragraphs in

6    Plaintiff's Exhibit 4 and you did read them?

7        A    Yes.

8        Q    I think you just said you didn't comment

9    on them in your declaration at all.  Is that

10   correct?  The declaration you submitted in this

11   matter?

12       A    Correct.  That is not one of the topics

13   I was asked to provide opinions on.

14       Q    So were you told to ignore them or you

15   chose to ignore these Paragraphs 67 through 83?

16               MS.       WEISKOPF:              Objection,

17   mischaracterizes evidence -- testimony, I mean.

18               THE WITNESS:  Neither.  They simply were

19   not on a topic that I was asked to provide

20   testimony or opinions on.

21               MR. LESKO:  That claim language, the

22   device, is that part of the claim term that you

23   opined on?  Does it appear in the claim term that

24   you opined on, those words, the device?

25               MS. WEISKOPF:  Objection, vague.

```
 1              THE WITNESS:  They do.
 2              MR.  LESKO:   So  is  it  possible  a
 3    discussion of the device could be relevant to
 4    your  discussion  of  the  claim  terms  in  the
 5    declaration?
 6              MS. WEISKOPF:  Object to form.  Vague.
 7              THE WITNESS:  I don't know what you mean
 8    by it's possible.  It's certainly possible that
 9    it could be relevant to some discussions of those
10    claim  terms,  but  it's  not  important  to  the
11    opinions that I provided.  The opinions that I
12    provided are accurate whether or not the phrase
13    the device is indefinite.
14              BY MR. LESKO:
15      Q    Okay,  let's  go  back  to  Plaintiff's
16    Exhibit  4,  and  starting  on  PDF  Page  30,
17    Paragraphs 84 through to 116, let's say.  If you
18    could just skim through that and tell me, did you
19    read those paragraphs while you were reviewing
20    Dr.  Hughes's  declaration  in  preparing  your
21    declaration in this manner?
22      A    I did.
23      Q    So  you  were  clearly  aware  of  them
24    because you read them, right?
25      A    Yes.
```

1    Q    Were you instructed to ignore them?

2    A    No.  As we've -- I've testified several

3    times, I was not instructed to ignore anything.

4    Q    Okay.  So you decided to ignore -- I'm

5    sorry.  I've got to look at the paragraphs here.

6    Let me start again.  Withdraw the question.

7         You decided not to comment in your

8    declaration on Paragraphs 84 through 116 of

9    Plaintiff's Exhibit 4.  Is that correct?

10        MS.    WEISKOPF:        Objection,

11   mischaracterizes testimony.

12        THE WITNESS:  I don't recall whether or

13   not I commented on any of those paragraphs.  I

14   would have to go back through my declaration

15   again.  My declaration is what it is.  But I

16   don't recall relying, in any substantial way, on

17   that particular set of paragraphs, because those

18   paragraphs don't specifically address the topic

19   of my opinions.

20        MR. LESKO:  Well, if there was an item

21   in Paragraphs 84 through -- let me start again.

22   I withdraw the question.

23        If there was an item or an opinion by

24   Dr. Hughes in Paragraphs 84 through 116 that you

25   disagreed with, would you have commented on that

1    in your declaration that you submitted in this

2    matter?

3              MS. WEISKOPF:  Object to form,

4    mischaracterizes testimony.

5              THE WITNESS:  Not necessarily.  I was

6    asked to provide opinions in this declaration on

7    a specific set of topics.  Whether or not I

8    disagree with other statements made by Dr.

9    Hughes, I was not doing a comprehensive critique

10    of all of Dr. Hughes's opinions in my

11    declaration.  I was providing my opinions on

12    specific claim construction issues, and where it

13    would be helpful for the court for me to contrast

14    those with statements made by Dr. Hughes with

15    respect to that specific set of issues, I

16    included those.

17              MR. LESKO:  Okay, but you certainly had

18    Paragraphs 84 through 116 in front of you, so you

19    had the opportunity to comment on them if you

20    felt it was necessary.  Is that right?

21              MS. WEISKOPF:  Objection to form,

22    mischaracterizes testimony.

23              THE WITNESS:  I was asked to address a

24    specific set of issues in my report.  I focused

25    my report on addressing that set of issues.  I

1    did not address issues outside of what I was

2    asked to do, whether or not that was possible or

3    not.

4            MR. LESKO:  If you look on PDF Page 30

5    of Plaintiff's Exhibit 4.  It says cellular

6    network access fees.  Does that term, cellular

7    network access fees, appear in the claim language

8    of elements (f)(i) and (f)(ii) of Claim 1 of the

9    '761 patent or Claims 1 and 5 of the '472 patent?

10          THE WITNESS:  Those words appear as part

11    of longer phrases.  So, the actual phrase in the

12    '761 patent is potential cellular network access

13    fees.  Let me pull up '472 to make sure I get

14    that phrase right.

15          The phrase in the '472 is potentially

16    increased cellular network access fees.  And then

17    that's further qualified in the claim.

18          MR. LESKO:  Okay.  So you agree that

19    these terms that are discussed in Paragraphs 84

20    through 116 of Plaintiff's Exhibit 4, they are a

21    part of the terms that you address in your

22    declaration in this matter?

23          MS.  WEISKOPF:   Object  to  form,

24    mischaracterizes testimony, asked and answered.

25          THE WITNESS:  Those words do appear in

1      the functions of the two -- the three claimed
2      controller terms that I opined on, as parts of
3      longer phrases.
4              MR. LESKO:   But you felt it was
5      unnecessary to carefully review or opine on
6      Paragraphs 84 through 116 that address those
7      phrases in Dr. Hughes's declaration, Plaintiff's
8      Exhibit 4?
9              MS. WEISKOPF:   Object to form,
10     mischaracterizes his testimony.
11             THE WITNESS:   I did review them.  I
12     didn't think I needed to provide any additional
13     testimony, other than what's in my declaration,
14     in order to express the opinions that are in the
15     declaration.
16             MR. LESKO:  So if there was something in
17     Paragraphs 84 through 116 that you felt you
18     needed to comment on or clarify, you would have
19     provided that opinion in your declaration in this
20     matter?
21             MS. WEISKOPF:  Object to form, vague,
22     mischaracterizes testimony.
23             THE WITNESS:  Again, I don't understand
24     when and how and for what purpose -- I was able
25     to express and explain the opinions that are

1    included in my declaration by using the

2    references to Dr. Hughes's declaration that are

3    present there. And I do not feel, and did not

4    feel, that I need to comment on any other

5    portions of Dr. Hughes's declaration in order to

6    express those opinions.

7           BY MR. LESKO:

8      Q  Is there any explanation in your

9    declaration of how Paragraphs 84 through 116 of

10    Plaintiff's Exhibit 4 influenced your opinions in

11    your declaration?

12      A  I don't recall. Would you like me to go

13    through the declaration and look?

14      Q  Another way to say it is this: if it's

15    not in there, if you don't refer to 84 through

16    116 at all, did it have any impact on the opinion

17    that you offered in your declaration?

18          MS. WEISKOPF: Object to form. Vague.

19          THE WITNESS: And as I testified before,

20    I cited to every portion of Dr. Hughes's

21    declaration that was necessary for me to express

22    the opinions that are in my declaration. I read

23    additional portions, but I did not find

24    commenting on them to be necessary in order to

25    express the opinions that are in my declaration.

1              BY MR. LESKO:

2         Q    I think earlier when we were discussing

3    your declaration you referred to the fact that

4    you were aware of prior proceedings involving

5    these same patents.  Does that -- let me ask you

6    a different way.  Are you aware that these

7    patents were involved in prior litigation, ones

8    that  you  comment  on  in  your  declaration,

9    Plaintiff's Exhibit 1?

10        A    It is my understanding that Plaintiff's

11   Exhibit 4 is a document from a prior litigation.

12    And so that means that it is my understanding

13   that the two patents at issue here were at issue

14   in a prior litigation.

15        Q    And when did you become aware of that

16   fact?

17        A    When I saw Plaintiff's Exhibit 4.

18        Q    So you were provided this declaration

19   and that made you aware of the prior litigation

20   proceedings?  Is that a fair characterization?

21   Plaintiff's Exhibit 4 was given to you, and then

22   you became aware that the patents were involved

23   in litigation?

24        A    Yes.

25        Q    Do you know that there was a Markman

1    proceeding in that prior CEV v. TCL case that's

2    captioned here in Plaintiff's Exhibit 4?

3         A    I don't know one way or another whether

4    or not there was a hearing.

5         Q    Did you ask if there was a hearing?  Did

6    you ask counsel, for example, if there was a

7    hearing involving these patents?

8         A    No.

9         Q    Plaintiff's Exhibit 4, if you look at

10   Paragraph 12h, it refers to Defendant's Opening

11   Claim Construction Brief.  Did you read -- I

12   think earlier you said you did not review

13   Defendant's Opening Claim Construction Brief,

14   item 12h on this list.  Is that correct?

15        A    That's correct.

16        Q    Did you ask for item 12h?

17        A    No.  TCL's positions in a related case

18   were not relevant to the opinions that I

19   presented.

20        Q    And what about opinions of TCL's expert

21   in a related case?  Would those be relevant?

22        A    No.  I formed my opinions independently.

23    I did not base them on Dr. Garlick.  I assume

24   that's who you're referring to.  I did not base

25   any of my opinions on Dr. Garlick's opinions.

1    Q   So you never even have seen Dr.

2    Garlick's opinion, is that correct?

3    A   I believe Dr. Hughes may have cited one

4    or two of them, or repeated one or two of them,

5    but that would be the only way I would have seen

6    it.

7    Q   So any testimony of Dr. Garlick that

8    you've seen would have been only what's cited in

9    Plaintiff's Exhibit 4, Dr. Hughes's declaration,

10   is that correct?

11   A   That's my recollection.

12   Q   And so, just to keep this simple, it

13   sounds like you did not review any claim

14   construction briefing, oral arguments, or other

15   litigation documents that were part of the CEV v.

16   TCL proceeding, as captioned here on Plaintiff's

17   Exhibit 4.  Is that right?

18   A   I'm not sure I understand the question.

19   As we've discussed, I have reviewed Dr. Hughes's

20   declaration.

21   Q   Yeah, maybe that's an easier way to

22   phrase the question.  And I apologize, it was a

23   vague question.  Let's try again.

24         Plaintiff's Exhibit 4 is the Dr. Hughes

25   declaration from Cutting Edge Vision v.  TCL.

1    And aside from that document, did you review any

2    other documents from Cutting Edge Vision v.  TCL

3    in preparing your declaration in this matter?

4        A   Not that I can recall.  But, as I said,

5    I've disclosed, either through citations or

6    through listing, all the documents that I relied

7    on in preparing my declaration.

8            MR. LESKO:  Would we be able to take a

9    short break here?  Is that okay with everybody?

10           MS. WEISKOPF:  Yeah.  How long would you

11   like, Justin?

12           MR. LESKO:  Just five minutes.  Just to

13   use the bathroom.

14           MS. WEISKOPF:  Okay.  Thank you.

15           MR. LESKO:  Thanks, everyone.

16           COURT REPORTER:  Sounds good.  We're off

17   the record.

18           (Whereupon, the above-entitled matter

19   went off the record at 10:24 a.m. and resumed at

20   10:31 a.m.)

21           COURT REPORTER:  We are back on the

22   record at 10:31 a.m.  Pacific.

23           BY MR. LESKO:

24       Q   So, just a bit of housekeeping here, Dr.

25   Wolfe.  Can you look at Plaintiff's Exhibit 3 in

1     the Box folder, please?

2          A    Okay.

3          Q    Do you recognize that document?

4          A    Yes.

5          Q    So is that U.S. Patent number 11,153,472

6     that we've been discussing and that you discussed

7     in your declaration?

8                (Whereupon, the above-referred to

9     document was marked as Plaintiff's Exhibit No. 3

10    for identification.)

11         A    It appears to be.

12         Q    Okay.  So, Dr. Wolfe, if you could

13    please pull up Plaintiff's Exhibit 5.  Have you

14    ever seen this document before, Plaintiff's

15    Exhibit 5?

16               (Whereupon, the above-referred to

17    document was marked as Plaintiff's Exhibit No. 5

18    for identification.)

19         A    I don't recall having seen this before.

20         Q    Okay.  So this Plaintiff's Exhibit 5,

21    you've never seen.  It wasn't considered as part

22    of the materials reviewed to prepare your

23    declaration?

24         A    It was not.  As we've discussed a number

25    of times, I've already told you what materials I

1     considered.

2          Q    Okay.  So, Dr. Wolfe, are you familiar

3     with the term microprocessor?

4          A    Yes.

5          Q    What is a microprocessor?

6          A    I think it depends on the context and

7     the timeframe.

8          Q    So, let's say as of 2005, October of

9     2005, how would you describe a microprocessor?

10         A    Again, I think it would depend on the

11    context, but it would be common at that time to

12    use that phrase to describe the primary computing

13    component of a general purpose computer that

14    would perform different computing tasks based on

15    how it was programmed.

16         Q    So the phrase, the word microprocessor,

17    does that typically refer to a physical item?

18         A    Again, it depends on the context, but

19    typically it would be a physical item.

20         Q    So were you ever aware of someone using

21    the term microprocessor to refer to something

22    that wasn't physical?

23         A    Yes.

24         Q    And how would that happen?

25         A    During the design and development phases

1      microprocessors are modeled.  They're simulated.
2       They are virtualized.  They are emulated.  So
3      there are exceptions, depending on context, to
4      using  that  term  necessarily  for  a  physical
5      object.  But certainly it was most common to use
6      that term to refer to a physical object.
7          Q    Would  you  say  that's  usually  a
8      structural  object,  too,  the  microprocessor?
9      Like, an object that has structure?
10              MS. WEISKOPF:  Objection, vague.
11              THE WITNESS:  I think that's a legal
12     term.  A person of ordinary skill in the art
13     typically would not talk about whether or not a
14     microprocessor had structure.
15              MR. LESKO:  But you discuss structure in
16     your declaration, right?
17              THE WITNESS:  Yes.  I'm applying the
18     legal standard as it was explained to me by
19     counsel.
20              BY MR. LESKO:
21          Q    Okay.  When you refer to structure in
22     your declaration, you're referring to structure
23     in a legal sense.  Is that your testimony?
24          A    Yes.  Yes.  I mean, as I said, that's
25     not a term that an engineer would normally use in

1    dealing with a microprocessor or any other
2    electronic system. But it does have a specific
3    legal meaning, as it's been explained to me, and
4    that's what I've applied in my opinions.
5         Q    Is a microprocessor part of an
6    electronic system?
7         A    It could be, along with other parts. I
8    mean, a microprocessor alone doesn't, typically,
9    do anything.
10        Q    Is there a difference between a
11   microprocessor and a microcontroller?
12        A    Again, it depends on context and
13   timeframe.
14        Q    Let's say we're talking 2005 October.
15   What's the difference between a microprocessor
16   and a microcontroller?
17        A    Again, it would depend on context. But
18   oftentimes, in that timeframe, a microprocessor
19   referred to what we would typically call a CPU, a
20   single compute engine; where most commonly, in
21   that timeframe, a microcontroller also included
22   some input/output functionality and some memory
23   integrated onto the same chip.
24        Q    So, at that timeframe, a microcontroller
25   has more elements integrated into it than a

1    microprocessor?

2        A    Again, depends on context, but in what I

3    think is probably the most common usage at the

4    time, that would be true.

5        Q    What are, like, the basic elements of a

6    microprocessor in that timeframe, October of

7    2005?

8        A    Again, it would depend on context and

9    there would be a lot of variability.  There are

10   many different kinds of microprocessors in that

11   timeframe, but, might include a program counter

12   and arithmetic logic unit, a status register.

13   But, again, a lot of variation.  There are a lot

14   of different approaches that could be used.

15   There's no single answer to that question.

16       Q    So  the  word  micro  in  the  term

17   microprocessor or microcontroller, what is that

18   referring to?  Why does it say micro?

19       A    Again, that depends on timeframe and

20   context.  But, initially, it was introduced in

21   the 1980s as a way to differentiate computers

22   that might be the size of a refrigerator from

23   computers where the primary computing elements

24   were on a single piece of silicon.

25       Q    So the word micro, just to clarify, is

1    that usually the physical size of the item, the
2    microcontroller or the microprocessor?  Are you
3    talking about physically how large it is?
4         A    Again,  it  depends  on  context  and
5    timeframe, but, in many cases, it would refer to
6    the physical size.  By 2005, it had become almost
7    irrelevant because other kinds of processors
8    were, predominantly, obsolete.
9         Q    So microprocessors and microcontrollers,
10   as of 2005, sort of dominated the market for a
11   CPU or a computing device?
12                MS. WEISKOPF:  Object to form, vague.
13                THE WITNESS:  In general, although there
14   were   hundreds   of   different   kinds   of
15   microprocessors and microcontrollers at the time,
16   and   they   often   had   quite   different
17   characteristics.
18                BY MR. LESKO:
19        Q    Would you say that a microprocessor
20   refers to a class of electronics devices?
21        A    It depends what you mean by a class of
22   electronic devices.  I mean, you can build a
23   class   out   of   anything,   abstractly.
24   Microprocessors  were  used  for  many,  many
25   different things in the 2005 timeframe, and they

1    weren't necessarily interchangeable or suitable

2    for other things.

3         Some microprocessors would be suitable

4    for supercomputing, others would be suitable for

5    a smoke detector.  They would differ in key

6    characteristics by factors of tens of thousands.

7     They would not be suitable replacements for each

8    other.  They wouldn't necessarily contain the

9    same components.  They wouldn't contain the same

10   components.  They wouldn't -- the components that

11   they did have in common wouldn't be connected

12   together  in  the  same  way,  and  wouldn't  be

13   quantitatively similar.

14         So, if you make a class big enough --

15   objects as a class, physical objects, right, is a

16   class.  But it really just depends on how big you

17   make the grouping as to whether or not it would

18   be reasonable to make microprocessors into a

19   class.

20    Q   Well, is there a commonality -- if you

21   use  the  term  microprocessor,  let's  say,  in

22   October 2005, would a skilled artisan -- would

23   that signal a specific type of item to a skilled

24   artisan?

25    A   I would say, no, not a specific type.

1    Because if you told me to go get a microprocessor

2    and didn't give me a great deal more detail, I

3    would not be able to go get one that was suitable

4    for your needs.

5       Q  So if I had some detail about the

6    operations that the microprocessor was to

7    perform, could you find a suitable

8    microprocessor?  Could a skilled artisan find one

9    in October of 2005?

10          MS. WEISKOPF:  Object to form.

11          THE WITNESS:  If you had sufficient

12    detail, then they probably could, but that could

13    be quite a bit of detail depending on the

14    context.

15          MR. LESKO:  Okay.  But usually, if I

16    said these are the operations I need and I need a

17    microprocessor for it, somebody skilled in the

18    art in October of 2005 would understand what

19    they're looking for, at least.  Is that a fair

20    statement?

21          MS. WEISKOPF:  Object to form, vague.

22          THE WITNESS:  No, it would depend on

23    whether or not you had provided sufficient

24    detail.  If you told me that you needed a

25    microprocessor that could calculate and

1    communicate, that would be not enough for me to

2    figure out what you were looking for.  If you

3    told me a great deal more detail, then it might

4    be.

5         MR. LESKO:  Another way to phrase it is

6    what -- would I know -- would a skilled artisan

7    in 2005, October 2005 at least know the group of

8    items to pull from if I said give me a

9    microprocessor to perform these operations?  So

10   would they be looking at, for example, memories?

11        THE WITNESS:  They might be looking at

12   things that included memories.  I mean, yes,

13   there would be some boundary, but that boundary

14   would be huge, and it would include a wide

15   variety of things that are not substitutable for

16   each other and that are not equivalent to each

17   other.  If you draw a big enough box, it can

18   incorporate everything.  If you draw a slightly

19   smaller box, it can incorporate almost

20   everything.

21        But you need to really be relatively

22   specific in describing what the expectations are

23   of a microprocessor, and how it's to be used in

24   some reasonable detail in order for a person of

25   ordinary skill to understand what you're talking

```
 1    about.  I mean, clearly if you just told me you
 2    need electronics, that would include some things
 3    and not other things, but it wouldn't give me
 4    enough  guidance  to  be  able  to  bring  you
 5    electronics in a box that were suitable for your
 6    needs.
 7              BY MR. LESKO:
 8        Q   But in reviewing your CV, just going to
 9    change topics here.  You're a named inventor on a
10    number of U.S. patents and patents abroad, is
11    that correct?
12        A   Yes.
13        Q   Approximately how many patents have you
14    been a named inventor on?
15        A   I believe 90-some.
16        Q   Okay.   And  in  the  course  of  your
17    involvement in -- let me withdraw that question,
18    sorry.  So are you aware of something called the
19    duty of disclosure, candor, and good faith at the
20    U.S. Patent Office?
21        A   I am aware of it.  I am not a patent
22    attorney or a patent examiner or a -- but it has
23    been explained to me in my role as an inventor.
24        Q   Okay.  And what's your understanding of
25    what that means?
```

1      A    It's been some time.  I haven't filed a

2    patent  in  many  years,  but,  in  general,  my

3    understanding  is  that  you  are  expected  to

4    disclose your invention in sufficient detail that

5    a person -- that enables a person of ordinary

6    skill in the art to practice the invention, that

7    you must provide sufficient detail to show that

8    you were in possession of the invention at the

9    time of filing.  And you need to disclose any

10   relevant prior art that you're aware of.

11      Q    Okay, and that applies to inventors.  Is

12   that right?

13      A    That's the way I form my understanding.

14    Yes.

15      Q    Okay.  So I'm reading from the USPTO

16   rules.  It says each individual associated with

17   the  filing  and  prosecution  of  a  patent

18   application has a duty of candor and good faith

19   in dealing with the office, which includes the

20   duty to disclose to the office all information

21   known  to  that  individual  to  be  material  to

22   patentability as defined in this section.  So

23   does that generally reflects your understanding

24   of your duty as an inventor to the USPTO?

25      A    Generally, it does.  Again, I'm not

1    going to give you a legal opinion on it, but

2    that's my general understanding.

3        Q    All right.  So and I understand you're

4    not a lawyer giving legal opinions but part of

5    that you would agree is if you're an inventor

6    involved in a filing with the Patent Office, you

7    should be honest with the Patent Office, right?

8        A    Yes.  In fact, more than that, honest

9    and complete.

10        Q    And I know you said this was a long time

11   ago, but for writing your patent applications,

12   was it your practice to write any portions of the

13   specifications in the patent applications that

14   you submitted?

15            MS. WEISKOPF:  Object to form.  This is

16   getting pretty far afield.

17            THE WITNESS:  I also want to be careful

18   that I don't -- I don't own any of these patents.

19    I wasn't paying the attorneys.  I want to be

20   careful that I don't go past privilege here.  I

21   produced inventions in a number of contexts.  I

22   don't believe I was ever the assignee.  I would

23   write an invention disclosure.  I would provide

24   that to a patent attorney or a patent agent.

25   Depending  on  the  circumstances,  that  patent

1    attorney or patent agent may copy portions from

2    my invention disclosure verbatim into the patent

3    application, or they may paraphrase it in other

4    ways.

5         I would also often have verbal

6    discussions with patent prosecutors to expound on

7    or explain portions of my invention disclosure.

8    Those would sometimes be turned into text by the

9    patent prosecutor.  And then I would always read

10   and approve a patent application prior to its

11   filing to ensure that it accurately reflected

12   what I had invented, and that it did not have any

13   misrepresentations, and that, as far as I could

14   tell at the time, the explanations were

15   sufficient.

16         MR. LESKO:  So if you noticed any errors

17   in the patents that you were an inventor on, you

18   would correct them or ask the prosecuting

19   attorney to correct those errors?

20         THE WITNESS:  Prior to filing.  I, in

21   general have not had any interaction post-filing

22   with any of my patent applications.

23         BY MR. LESKO:

24    Q   All right, thanks for the clarification.

25    And that's what I meant.  So in preparing the

1    applications before you file them, it sounded

2    like you would review them.  And if you noticed

3    errors or omissions, you would raise that with

4    the prosecuting attorney.

5    A    Yes.

6    Q    I'm looking at -- I'm gonna put in the

7    folder Plaintiff's Exhibit 6.

8          (Whereupon,    the    above-referred    to

9    document was marked as Plaintiff's Exhibit No. 6

10    for identification.)

11    A    Okay.

12    Q    Hang on one second here.  I'm sorry, I

13    think I marked the wrong exhibit here.  I'm going

14    to mark a Plaintiff's Exhibit 7 here and put in

15    the Box.  You can close Plaintiff's Exhibit 6.

16    My apologies.  Okay, so Plaintiff's Exhibit 7

17    should now be there.  If you could open it,

18    please.

19          (Whereupon,    the    above-referred    to

20    document was marked as Plaintiff's Exhibit No. 7

21    for identification.)

22    A    Yes.

23    Q    Okay.  You see on the front there, your

24    name is on Page 1 as an inventor.  It says

25    inventors Andrew L.  Wolfe, do you see that?

1       A    Yes.

2       Q    Okay.  So is this one of your patents,

3  Plaintiff's Exhibit 7?

4       A    It's one where I'm listed as a named

5  inventor.

6       Q    Okay.  Could you scroll to Page 4 of

7  Plaintiff's Exhibit 7?

8       A    Okay.

9       Q    So there's a Figure 2 there on Page 4 of

10  this document.  Do you see it?

11      A    Yes.

12      Q    Okay.  So if you look at Item 206 in

13  Figure 2, it says memory.  Do you see that?

14      A    Yes.

15      Q    Based on your understanding of that

16  term, is that memory a physical item?

17      A    I don't think I've read this patent in

18  almost 20 years.  I'm not going to start giving

19  you definitions based on one box in a picture.

20      Q    Are you aware of a situation where a

21  memory is something that isn't, you know, a

22  physical location somewhere or physical storage?

23      A    Depends on context.  At some level,

24  memory is always physical storage, but when we

25  refer to it, it could be a virtual memory, it

1    could be an emulated memory.  It needs to be

2    considered in context before you can determine

3    what the particular words are referring to.

4        Q   Well, what about input switches?  See

5    item number 203.  Would that be physical input

6    switches or is that -- can that mean something

7    else?

8        A   Again, I haven't read this patent in

9    almost 20 years.  I -- it would depend on what

10    the  description  is  in  the  text.   I  would

11    certainly think that it could be a physical input

12    switch.

13        Q   What other type of input switch is

14    there?

15        A   You can have software switches.  But

16    again, I don't recall what was described in this

17    particular patent.

18        Q   If you look at Item 224 there's a

19    speaker.  Item 222 there's a monitor.  Item 220

20    there's a TV.  Do those appear to be physical

21    items just based on what they say, TV, monitor,

22    speaker?

23        A   Just based on Figure 2 alone, they do

24    appear to be physical objects.

25        Q   You've got Item 208 in the center.

1      That's the controller.  You see that?

2          A    It is a controller.  Yes.

3          Q    Now I notice all of the items in this

4      figure are in boxes.  Do you know why?

5          A    I do not.

6          Q    Does this look like a block diagram to

7      you?

8          A    It generally looks like one.

9          Q    In  a  block  diagram,  are  the  items

10     typically placed in boxes?

11         A    That would be typical.

12         Q    Would  that  be  a  common  format  in

13     patents, sometimes you put the items in boxes in

14     a block diagram?

15             MS. WEISKOPF:  Object to form, vague.

16             THE WITNESS:  That's not unusual.  In a

17     well-written patent, there would be additional

18     text to describe what each box represents.

19             MR. LESKO:  But sometimes, even if

20     there's text describing what each box represents,

21     sometimes there's high level block diagrams in a

22     patent in your experience, is that right?

23             THE WITNESS:  Sometimes patents include

24     high level block diagrams.

25             MR. LESKO:  And so even if there's a

1    structure or even if there's a physical item in

2    the block diagram, it's not always described in

3    the diagram itself.  Is that right?

4              MS. WEISKOPF:  Object to form.

5              THE WITNESS:  I'm certainly aware of

6    patents where there's a physical item in a block

7    diagram, and the physical item is not described

8    in the diagram itself.

9              MR. LESKO:  If you look at -- if you

10   could scroll down please, Dr. Wolfe, to Column 15

11   of this patent, Lines -- Line 36.

12             THE WITNESS:  Okay.

13             BY MR. LESKO:

14        Q   Can you read the sentence that begins at

15   Line 36?

16        A   In addition, use of the term means in

17   any  claim  is  intended  to  invoke  35  U.S.C.

18   Section 112, Paragraph 6, and any claim without

19   the word means is not so intended.

20        Q   What's  your  understanding  of  that

21   statement?  What does it mean?

22             MS. WEISKOPF:  Object to form; it's a

23   legal issue.

24             THE WITNESS:  I didn't write that;

25   attorney did many years after I had provided my

1    invention   disclosure,   and   it's   also   my

2    understanding that the law has changed over time

3    with respect to 35 U.S.C.  112, Paragraph 6.  So,

4    as an inventor on this patent, I don't have any

5    understanding of whether or not that phrase is

6    operable or -- and to me, it means exactly what

7    it says.

8              MR.    LESKO:      You    received    some

9    instruction on the law about intrinsic evidence

10   in preparing your declaration.  Is that right?

11             THE WITNESS:  Yes.

12             MR. LESKO:  Okay, so would you agree

13   that this sentence at 15, 36 through 38 that you

14   just read to me, is that part of the intrinsic

15   record for this patent, Exhibit -- Plaintiff's

16   Exhibit 7?

17             MS. WEISKOPF:  Object to form.

18             THE WITNESS:  I don't know; that's

19   really a legal issue.  I don't know whether or

20   not legal statements made in patents are part of

21   the intrinsic record or not.

22             MR. LESKO:  Is the specification part of

23   the intrinsic record of a patent?

24             THE WITNESS:  It generally is, yes.

25             BY MR. LESKO:

1      Q    Is  this  statement  included  in  the

2      specification of this patent, Plaintiff's Exhibit

3      7?

4      A    Again, I can't give you a legal opinion,

5      but it appears to be on its face.  Yes.

6      Q    So on its face, is this statement part

7      of the intrinsic record?

8      A    Again, it appears to be, but I can't

9      give you a legal opinion.  I mean, in general, I

10     don't think you're allowed to redefine the law in

11     the specification.  So to the extent that it

12     expresses the patentee's intent at the time, I

13     suppose it is.

14     Q    Well if I were asking you to review this

15     patent  and  construe  these  claims  or  decide

16     whether they're, you know, means plus function,

17     would you -- would that sentence seem relevant to

18     you or not?

19     A    Again, I'm only implying the law as I've

20     been instructed, but my understanding is that

21     under the current standards for 112 6, intent is

22     not a factor that I would consider.

23     Q    So because it, in your view, expresses

24     intent, you would just ignore it?

25          MS.  WEISKOPF:    Object  to  form,

1    mischaracterizes testimony.

2           THE WITNESS:  It's not one of the

3    factors that under the explanation that I've been

4    given as to the current law with respect to means

5    plus function elements, intent is not one of the

6    factors that would be considered.

7           MR. LESKO:  All right.  I'm marking some

8    other exhibits here.  Just give me one second.

9    Okay.  If you could, I just uploaded Plaintiff's

10   Exhibit 8.  Could you please open that, Dr.

11   Wolfe?  And once you have it open, can you sort

12   of skim through it and tell me, do you recognize

13   this document?

14           (Whereupon,   the   above-referred   to

15   document was marked as Plaintiff's Exhibit No. 8

16   for identification.)

17           THE WITNESS:  I looked at it.  There

18   were a lot of very similar documents in the file

19   history, so I don't recognize whether or not this

20   is a particular one or not.

21           BY MR. LESKO:

22   Q   Okay.  Let's separately open Plaintiff's

23   Exhibit 1, and we'll go to Page -- PDF Page 16.

24   A   Okay.

25   Q   So Paragraph 46 says the application

1     leading to the '761 patent was filed on November

2     24th, 2015.  On the same day, the claims were

3     amended as follows.  And then there are some

4     claims provided.  It looks like it was pulled

5     from the history.  And then there's a Paragraph

6     47 that has another excerpt from the remarks

7     underneath it.  And then that sort of ends on PDF

8     Page 36.  Do you see all that?

9         A    Yes.

10        Q    Okay, so now let's go back to

11    Plaintiff's Exhibit 8.  There's some amendments

12    to the claims on Page 4 through 9.  There's some

13    -- and then on Pages 12 through 25, there's some

14    remarks.  And maybe another way -- easier way to

15    do this, there's a -- also a date on Page 11 that

16    says November 24th, 2015.  So looking at all

17    that, does that correspond to materials that are

18    cited on Page -- Pages 14 through 34 of your

19    declaration, Plaintiff's Exhibit 1?

20             MS. WEISKOPF:  Object to form.

21             THE WITNESS:  It appears to at the

22    moment.  I would have to compare them very, very

23    carefully to know for sure.

24             MR. LESKO:  Okay.  Well, how about this?

25     I'll represent to you as well that this is the

1   same office action that's -- you pulled excerpts

2   from it.   Not office action, I'm sorry,

3   submission that you pulled excerpts from in your

4   declaration on those pages.  So that's true,

5   you've seen this before, right? You've probably

6   seen the submission because you reviewed it and

7   then included it in your declaration?

8        THE WITNESS:  Yes.  If that's the same

9   material that I included in my declaration then I

10  have reviewed it.

11       BY MR. LESKO:

12   Q   Okay.  And so if you look at PDF Page

13  10, it says -- there's a paragraph third to last

14  that says in addition.   Can you read that

15  paragraph out loud for the record?

16   A   Sure.  In addition, applicant has taken

17  care to prepare the claims in a manner that does

18  not fall within 35 U.S.C.  Section 112, Paragraph

19  6.  Specifically, applicant has undertaken to

20  draft the claims in a manner that recites

21  structure, material, or acts in support of the

22  various operations.  Applicant requests that the

23  examiner inform applicant if he believes that any

24  claim falls within 35 U.S.C.  Section 112,

25  Paragraph 6, so that appropriate amendments can

80

1    be made.

2        Q    Do you recall during your review seeing

3    this statement in the prosecution history that

4    you reviewed?

5        A    Yes.

6        Q    Okay.  So you've seen it before.  Do you

7    recall in your expert declaration, Plaintiff's

8    Exhibit 1, did you comment on this statement?

9        A    I don't believe so.  As I mentioned

10   before, the standard that I applied did not

11   include intent.  And also the claims that are

12   being referred to here are different claims than

13   the ones I opined on.

14       Q    So you're aware of this statement and

15   you -- but you didn't -- you had a reason why you

16   believed there was no need to comment on it.  Is

17   that fair?

18       A    Yes.

19       Q    Now,  what  about  the  examiner's

20   understanding of the claims?  Would that be

21   relevant to your analysis of claim construction?

22       A    Might be something that I consider, but

23   again, my understanding of the standard is not

24   that the examiner gets to decide at this point in

25   time whether or not the claims are covered by

1    Section 112, Paragraph 6, that -- that we need to

2    apply the standard to the claim language and to

3    the specification as it's written.

4        Q   Well, generally speaking, would you say

5    that comments by the applicant or comments by the

6    examiner form part of the intrinsic record in

7    reviewing claim language?

8        A   They do, but they need to be considered

9    appropriately with respect to the context and

10   content of the comments.

11       Q   So   there   are   instances   in   your

12   declaration   where   you   quote,   for   example,

13   comments made by the applicant in this case, CEV,

14   during prosecution.  Is that right?

15       A   Yes.

16       Q   And that's because you believed they

17   were relevant to the intrinsic evidence for how

18   they look at the claims.  Is that an accurate

19   statement?

20       A   In those cases, yes.

21       Q   But in this case, the statement that

22   these are not prepared in 112, 6 and the request

23   for   the   examiner   to   notify   applicant   if   he

24   disagrees, that wasn't relevant in your view?

25       A   It wasn't necessary to comment on it in

1    order to provide the opinions in my declaration.

2    It doesn't change my opinion as to whether or

3    not these particular claims are covered by 112,

4    6.  It doesn't, in fact, create structure or

5    disclosure of structure in the specification.  It

6    doesn't link any disclosures of structure to the

7    claimed functions.  So there was an overwhelming

8    number of factors to help me reach the conclusion

9    that these were -- the elements that I opined on

10    were 112, 6 elements, and that they were not

11    supported in the specification in terms of

12    structure, whether or not the applicant had

13    suggested that it was their intent in these other

14    claims to do it that way, or whether or not there

15    had been a request to the examiner.

16    Q   In your review of the file history, did

17    you see the examiner flag anything as means plus

18    function in any of the office actions for -- this

19    is -- I'm sorry, this is the application

20    corresponding to the '761 patent.  So let me

21    start my question again.

22    In your review of the '761 patent file

23    history, did you ever see any instances where the

24    examiner told CEV, the applicant, that he's

25    construing the claims as means plus function?

83

1        A   I don't recall seeing him comment on

2    that issue one way or the other.  And of course,

3    even if he had, he would be using a broadest

4    reasonable construction standard and not the

5    standard that we're using today.

6        Q   What's   the   difference   in   those

7    standards?

8        A   Again, I can't give you a legal opinion,

9    but a broadest reasonable construction standard

10   is generally broader than the plain meaning

11   standard that we that we are using in court or

12   the ordinary and customary meaning, I think, is

13   the -- in view of the specification, I think is

14   the language.  Again, I don't remember the exact

15   legal language, but I think it's in my report.

16       Q   Well, it's interesting you raise it.  So

17   how does that affect the means test function

18   determination here if we were looking at this

19   from a broadest reasonable construction?

20       A   I don't know if it does or not because I

21   haven't looked at it from a broadest reasonable

22   construction.  But if there had been any comments

23   from the examiner, which there weren't, I would

24   have had to take into account that he may have

25   been applying a different claim construction

1    standard.

2        Q   If you could, Dr. Wolfe, please pull up

3    Plaintiff's Exhibit 9.

4            (Whereupon, the above-referred to

5    document was marked as Plaintiff's Exhibit No. 9

6    for identification.)

7        A   I don't have a Plaintiff's Exhibit 9.

8    Was that recently put in the folder?

9        Q   Can you try refreshing the folder,

10   please?  It should be in there, but, you know,

11   sometimes there's technical issues.

12       A   Okay, I have it now.

13       Q   Thanks.  Okay, so here in the

14   Plaintiff's Exhibit 9 -- well, first of all, do

15   you recognize this document?

16       A   It appears to be a portion of the file

17   history.  But again they are very similar.  I

18   can't tell you exactly which portion it is

19   without comparing them page by page.

20       Q   So if you go to Page 9 of Plaintiff's

21   Exhibit 9, there's a date October 25th, 2019.  Do

22   you see that?

23       A   I do.

24       Q   Okay.  So now if you go back to

25   Plaintiff's Exhibit 1 and PDF Page 50 -- I'm

1    sorry, 60 of that document, there is a reference

2    to the same date, October 25th, 2019.  And then

3    there's an excerpt from the file history that

4    goes from Page 60 to Page 63 of Plaintiff's

5    Exhibit 1.  Do you see that?

6         A    Yes.

7         Q    Okay.  And then actually on -- if you

8    could scroll up to Page 58 of the PDF.  It says

9    in your Paragraph 54 -- I'm talking about Page 58

10   of Plaintiff's Exhibit 1.  It says in Paragraph

11   54 on Page 58 of Plaintiff's Exhibit 1, the

12   application leading to the '472 patent was filed

13   on October 25th, 2019.  The claims were amended

14   the same day to the following, and then there's a

15   footnote, Footnote 2.  Do you see that?

16        A    I don't see a footnote.  This is on Page

17   58 of the document?

18        Q    PDF, Page 58.

19        A    Oh, I'm sorry.

20        Q    That's okay.  I know it's confusing when

21   the page numbering differs.  So just a -- yeah,

22   58 of the PDF, not your declaration page number.

23        A    Okay.  I do see that.

24             (Simultaneous speaking.)

25        Q    There's a Footnote 2 there, and it says

1    original claims 21 through 22 issued as claims 1

2    to 2 of the '472 patent.  Original claims 25 to

3    26 issued as Claims 5 to 6 of the '472 patent.

4    Do you see the footnote?

5         A    Yes.

6         Q    Okay.  So here there's a filing on

7    October -- I'm referring to Plaintiff's Exhibit 1

8    now.  It refers to a filing on October 25th,

9    2019, where the claims that issued of the '472

10   patent were actually filed, and then if you

11   continue through Page 61 -- I'm sorry, Page --

12   PDF Page 63, there's the remarks that were filed

13   with those claims.  Do you agree with me?

14            MS. WEISKOPF:  Objection to form.

15            THE WITNESS:  I have included copies of

16   the claims that were filed and some of the

17   remarks that were filed with the claims.

18            MR. LESKO:  Okay.  And if you look at

19   Plaintiff's Exhibit 9, Pages 4 through 6, those

20   are the -- I'll represent to you those are the

21   same claims that are copied into your declaration

22   that we just discussed.  And those remarks on

23   Pages 7 through 9 are the same that are copied

24   into your declaration that we just discussed.

25            THE WITNESS:  Yes.

1        BY MR. LESKO:

2        Q   Okay.  So if that's true, then these are

3   -- this is the filing of the claims that led to

4   the same claims that issued in the '472 patent.

5   Do you agree?

6        A   It appears that way to me.

7        Q   Okay.  With this filing -- and frankly,

8   maybe it's easier just go to your -- go back to

9   Plaintiff's Exhibit 1, I'm sorry.  On Page 63 --

10  I'm sorry, on Page -- let me withdraw my question

11  and start again.  Plaintiff's Exhibit 1, which is

12  your declaration, on Page 62, there's a final

13  paragraph there and then there's a sentence that

14  starts in addition.  Can you read that paragraph

15  at the bottom of PDF Page 62 of Plaintiff's

16  Exhibit 1?

17       A   Applicant believes that no new matter

18  has been added.  In addition, applicant has taken

19  care to prepare the claims in a manner that does

20  not fall within 35 U.S.C.  Section 112, Paragraph

21  6.  Specifically, applicant has undertaken to

22  draft  the  claims  in  a  manner  that  recites

23  structure, material, or acts in support of the

24  various operations.  Applicant requests that the

25  examiner inform applicant if he believes that any

1    claim falls within 35 U.S.C.   Section 112,
2    Paragraph 6, so that appropriate amendments can
3    be made.
4        Q   All right, so based on your declaration,
5    Plaintiff's Exhibit 1, that statement you just
6    read to me was provided with the filing of the
7    claims that issued in the '472 patent.  Would you
8    agree?
9        A   The statement was made by the applicant.
10       Q   And when it was made, the claims that
11   were pending are those that issued in the '472
12   patent.  Do you agree with that as well?
13       A   They were.   I disagree with the
14   statements made by the applicant, but I agree
15   that the applicant made those statements at the
16   time that those claims were presented.
17       Q   Okay.  And, again, in the '472 patent
18   file history, did you see any instance where the
19   examiner flagged any claim element as 35 U.S.C.
20   112 Paragraph 6, means plus function?
21       A   I didn't see him comment either way.  I
22   think the examiner did a poor job in -- in
23   general here.  I think that if the examiner had
24   looked, they would have seen that new matter was
25   clearly added to this application, and if they

89

1    had examined the claims carefully, they would

2    have seen that they were within 35 U.S.C. 112,

3    Paragraph 6. I didn't see any indication in the

4    file history that the examiner had considered the

5    issues in this paragraph at all.

6        Q    Did you see any indication in the file

7    history that the examiner believed any claim was

8    112, Paragraph 6. Yes or no?

9        A    As I said, I didn't see any indication

10   that the examiner had considered the issue one

11   way or the other at all.

12       Q    I'll ask you again. Did you see any

13   instance in the file history where the examiner

14   flagged any claim as being subject to 112

15   Paragraph 6 for the '472 patent?

16           MS. WEISKOPF: Objection, asked and

17   answered.

18           THE WITNESS: I did not see any

19   indication in the file history that the examiner

20   had considered the question of 35 U.S.C. 112,

21   Paragraph 6, at all.

22           MR. LESKO: Did you see any 112

23   rejections in the file history of the '472

24   patent?

25           MS. WEISKOPF: Objection, asked and

1      answered.

2              MR. LESKO:  No, different question.  Did

3      you see any 112 rejections in the file history of

4      the '472 patent, sir?

5              MS. WEISKOPF:  Same objection.

6              THE WITNESS:  Again, I don't want to

7      give you a legal opinion here.  I did see the

8      examiner object that certain things were not

9      supported by the specification.  That was always

10     part of a list of reasons for rejecting claims.

11     So I haven't really considered whether or not

12     that was the only reason for a rejection or one

13     among many reasons for rejection.

14             MR. LESKO:  Did you see any rejections

15     that cited -- let's just put it this way.  I'm

16     not asking for a legal opinion.  Did you see any

17     rejections in the file history of the '472 patent

18     that referred to Section 112, 35 U.S.C.  Section

19     112?

20             THE WITNESS:  I don't recall seeing that

21     by name, but as I said, I recall comments through

22     the complete history of this family of patents in

23     which claims were requested, and the examiner

24     responded by saying that certain elements of the

25     claims were not supported in the specification.

1    That in my mind that is within paragraph -- or

2    within Section 112, but I don't think that they

3    were phrased that way by the examiner.

4           BY MR. LESKO:

5        Q    Okay.  So let's just go to Page 175 of

6    Exhibit -- Plaintiff's Exhibit 1 which is your

7    declaration.  PDF Page 175.  And there's a

8    paragraph there, Paragraph 19 says -- 92 that

9    says specifically, the examiner rejected the

10   claims under Section 112.  Do you see that?

11       A    Yes.

12       Q    So do your -- based on that statement,

13   now, maybe this helps you remember, did you see

14   in the file history of the '472 patent that the

15   examiner rejected the claims that eventually

16   issued in the '472 patent under Section 112 at

17   one point in time?

18       A    This was one of the rejections I was

19   referring   to   before,   where   it   was   my

20   understanding in reading the examiner's remarks

21   that he did not believe that there was sufficient

22   support and specification for what at the time

23   was a claim element.

24       Q    Okay.  And so you would agree the

25   examiner considered 112 issues in examining the

 1    U.S. Patent -- the '472 patent?

 2              MS. WEISKOPF:  Object to form, vague.

 3              THE WITNESS:  In at least this one case

 4    he did consider a 112 issue.

 5              MR. LESKO:  But there was no means plus

 6    function assertion by the examiner that you're

 7    aware of?

 8              THE WITNESS:  I'm not aware of any

 9    discussion one way or the other about means plus

10    function terms in the claims for the '472 in the

11    examiner's file history.

12              BY MR. LESKO:

13        Q    Okay.   Sorry,  I'm  marking  another

14    exhibit here.  Okay.  You should see in the

15    folder now Plaintiff's Exhibit 10.

16              (Whereupon,   the   above-referred   to

17    document was marked as Plaintiff's Exhibit No. 10

18    for identification.)

19        A    Okay.

20        Q    Were you able to open that, Dr. Wolfe?

21        A    Yes.

22        Q    Okay, great.  Do you recognize this

23    document?

24        A    This  is  a  patent  where  I'm  named

25    inventor.

1    Q    Okay.  And in this case, you're the only

2    named inventor.  Is that right?

3    A    Correct.

4    Q    Okay.  Can you scroll down to Page 7 of

5    this document, and then this is actually on Pages

6    7 and 8.  Can you take a look at Figures 7B and

7    7C.  Take your time there.  Read those over to

8    yourself, please.

9    A    Okay.

10    Q    Okay.  Can you describe what's there in

11    Figure 7B and 7C?

12    A    I think, again, I haven't looked at this

13    patent in 15 years or so, but just quickly

14    looking at just those pages, it appears to be an

15    exemplary algorithm for performing some of the

16    functions disclosed in the patent specification.

17    Q    Would you agree also that it's an

18    example of program code as well?

19    A    It's not program code.  It's perhaps

20    pseudocode.  It's intended to express an

21    algorithm or a set of steps.  I guess it is

22    described as exemplary program code, but it's not

23    actual program code.  It's not in an actual

24    programming language.  It's exemplary.

25    Q    Okay.  But a programmer reading this

1    would understand how to write this type of
2    program, do you think?
3        A    This would disclose an algorithm to a
4    programmer that they could then implement in a
5    system.
6        Q    So the date on this patent is 2014.  I
7    understand there's some differences here, but if
8    we're talking October of 2005 instead, let's just
9    hypothetically say this same code was in this
10   patent and the patent was dated October of 2005.
11    Would you still agree that this discloses an
12   algorithm for a programmer?
13               MS. WEISKOPF:  Objection, vague.
14               THE WITNESS:  Well, in the first place,
15   I think that the date of relevance would be March
16   9th, 2009 when this was filed, not when it was
17   issued.  But this is -- in 2005, this would have
18   been a disclosure of an algorithm.  If one were
19   to evaluate this patent, they would still have to
20   determine whether it's a sufficient disclosure,
21   whether it discloses enough of an algorithm to
22   support the claims, whether or not it's
23   sufficient to enable a person of ordinary skill
24   to implement.  I haven't done that level of a
25   detailed analysis.

1          MR. LESKO:  Right.  I just would -- I

2    guess I would say this type of code would have

3    been available in 2005 as well? Is there any

4    difference between this code and -- you know,

5    this algorithm in 2005 versus 2009?

6          THE WITNESS:  Yeah, I hadn't invented

7    this algorithm in 2005.  That's why I got an

8    issued patent later for inventing it.

9          BY MR. LESKO:

10     Q   How about the format of the algorithm,

11   though, this if, you know, parentheses, traffic

12   lane equals equals non HOV, and then --

13          (Simultaneous speaking.)

14     Q   -- under that.  Is that format, you

15   know, a new format in 2009?

16     A   No,  no,  I  mean,  the  words,  the

17   punctuation were known, but the content of the

18   algorithm, the sequence of steps, the specificity

19   of the steps.  That's the algorithm; that's the

20   inventive step.  And, again, I'm not making a

21   judgment  here  today  whether  or  not  this  is

22   sufficient for the claims in this patent.  But

23   just the form of an algorithm is never sufficient

24   to express an algorithm.  You need its actual

25   content as well.

1      Q   Right.  Okay.  So this -- let me just

2   ask you, not the specifics of this particular

3   algorithm.  Is there a name for this format of an

4   algorithm?    These  if  statements,  else,  if

5   statements, is there a common name that maybe a

6   skilled artisan would use to describe those types

7   of statements?

8             MS. WEISKOPF:  Object to form.

9             THE WITNESS:  If someone described this

10  as pseudocode, P-S-E-U-D-O code, I think a

11  person  of  ordinary  skill  would  generally

12  understand what they're talking about.  But,

13  again, that's like saying a paragraph is made of

14  words.  It doesn't tell you what that paragraph

15  expresses.

16            MR. LESKO:  Well, like an if statement -

17  - let me ask you first, maybe I'll establish a

18  little bit of foundation here.  Do you have some

19  understanding of coding?

20            THE WITNESS:  I have a very detailed

21  understanding of coding.

22            BY MR. LESKO:

23      Q   You have a very detailed understanding

24  of  coding.   Okay,  great.   If  --  this  if

25  statement, right, and then there's some lines

1    underneath it.  Based on your detailed of

2    understanding of coding, like what type of

3    statement is that to a coder?

4        A   It is a conditional statement.  But,

5    again, that's pretty meaningless in terms of

6    understanding the content.  It's like saying that

7    a paragraph includes verbs and nouns.  It doesn't

8    tell you what the paragraph's expressing.  It's

9    the actual words, the order that they're used,

10   and the specific way that they're formatted that

11   would express the algorithm.

12       Q   So if else or maybe if then, you agree

13   those are called conditional statements in

14   programming?

15       A   It depends how they're used.  But that

16   that would be common, yes.

17       Q   Why are they called conditional

18   statements?

19       A   Because under some conditions you would

20   do one thing and under other -- sorry.  Under

21   some conditions you would do one thing, and under

22   other conditions you would do something else, as

23   a general concept.

24       Q   And that general concept, just focus on

25   that.  I'm on the same page as you.  That general

1      concept did exist as of 2005 in coding.  Do you
2      agree?
3              MS. WEISKOPF:  Objection, vague.
4              THE WITNESS:  The general concept of
5      using conditionals existed.  But, again, that's
6      like saying the general concept of using verbs in
7      sentences.  It doesn't tell you anything about
8      what's actually being expressed.
9              MR. LESKO:  Yeah, I understand you need
10     to know what the conditions are, but conditional
11     programming was available and known to coders in
12     2005.  Is that right?
13             THE WITNESS:  It was available as a
14     building block.  But, again, the mere existence
15     doesn't tell you anything.  It depends on what
16     the conditions are, what happens under each
17     condition, and the overall structure of them.
18     Simply the existence of a condition or one simple
19     condition may not be enough to be an algorithm,
20     and  may  not  be  sufficient  to  describe  any
21     particular function at all.  You have to look at
22     the totality.
23             MR. LESKO:  So if I wanted to program
24     something to happen based on a condition, could I
25     use this type of code --

1          MS. WEISKOPF:  Objection, vague.

2          MR. LESKO:  -- as of 2005?

3          THE WITNESS:  If you had a complete and

4     sufficient description of the entirety of the

5     algorithm  in  order  to  perform  a  specific

6     function, then you could turn that into code.

7          MR. LESKO:  Right.  Well, like in this

8     instance, for example, if I want to check time of

9     query, I'm just looking at, you know, Exhibit --

10    what are we on, Exhibit 10.  So in Exhibit 10 in

11    your patent there's an item that says check time

12    of query.  So then it says if traffic lane equals

13    equals non-HOV, check time of query.  So is non-

14    HOV the condition in that statement?

15         THE WITNESS:  It is a partial condition

16    in a portion of the statement that describes a

17    portion of the algorithm.  In and of itself, it's

18    not the algorithm.  The algorithm is the entirety

19    of the description of functionality.

20         BY MR. LESKO:

21    Q    I understand that.  So traffic lane

22    equals equals non-HOV, is that a condition in

23    this code?  Just one of the conditions in this

24    code, maybe that's a better way.

25    A    That is one condition in this code.  It

1    is a tiny part of this algorithm.

2        Q   And what would be returned from, let's

3    say in the item -- and it doesn't really matter

4    what the specifics of this patent are, but let's

5    just use this as an example.  Let's say traffic

6    lane equals equals non-HOV.  That's the case.

7    What would be sort of returned in the code then?

8        A   Well, again it depends on a lot of other

9    things, the entirety of the algorithm.  But if

10   you look at it only at that locality then that

11   condition, traffic lane is equal to non-HOV,

12   would be either true or false.

13       Q   Okay.  And then if true what happens

14   according to this particular example?

15       A   If true in this particular example, if

16   traffic lane was equal to non-HOV, you would

17   proceed through a sequence, in order, of eight

18   additional steps.  Then you would test another

19   condition.  Depending on the result of that

20   condition, you might perform a ninth step.  If

21   that condition is not true, then you would check

22   another  condition,  in  which  case  you  might

23   perform an alternative ninth step.  And in that

24   one particular case, which, again, is only a

25   portion of the algorithm, that's what you would

1    do.  That portion is likely not sufficient enough

2    to support the claims in this patent.  You

3    probably need the remainder of the algorithm as

4    well.

5       Q   Okay.  But it -- and that's helpful.

6    But generally speaking then an if statement, like

7    the first one here, that returns true or false,

8    and  then  what  happens  next  depends  on  the

9    remainder of the code.  Would you agree with

10   that?

11          MS. WEISKOPF:  Objection, vague.

12          THE WITNESS:  In a very general sense,

13   that's true.  Again, you know, the remainder of

14   the code could express thousands or millions of

15   different algorithms.  So you don't know much at

16   all from that kind of a high level description.

17          MR. LESKO:  So if traffic lane equals

18   equals non-HOV here in Plaintiff's Exhibit 10

19   corresponds to a condition?

20          THE WITNESS:  It is a test of a very

21   specific condition that is a small portion of an

22   algorithm.

23          BY MR. LESKO:

24      Q   And the result of that test is true or

25   false here?

102

```
 1        A    I don't know that I'd --
 2             MS. WEISKOPF:  Objection --
 3             (Simultaneous speaking.)
 4             THE WITNESS:  One result is that you
 5     would evaluate that to be true or false, but in
 6     context of the entire algorithm, the result is
 7     that you proceed with another sequence of eight
 8     to ten steps.
 9             MR. LESKO:  Right.  So just looking at
10     that  first  step  here  on  this  page,  the  if
11     parentheses traffic lane equals equals non-HOV
12     end parenthesis.  The result of that -- that
13     initial step is a true or false?
14             THE WITNESS:  No, I think that would be
15     a mischaracterization.  The result is that the
16     evaluation of true or false guides you to which
17     additional steps to take in the algorithm.  So
18     you may go through one set of eight to ten steps,
19     or you may go through another set of eight to ten
20     steps, or you may go through a third one.  So
21     there's lots of -- the algorithm is much more
22     complicated than that, and the results are much
23     more complicated than that.  I don't think it's
24     fair to look at just a single value and call that
25     the result.
```

```
1              MR. LESKO:  So the code here is a series

2       of true or falses and then other steps that are

3       taken as a result of the true or false, right?

4              MS.     WEISKOPF:        Objection,

5       mischaracterizes testimony.

6              THE WITNESS:  The overall algorithm here

7       consists of evaluating a number of conditions.

8       Those evaluations will result in a value of true

9       or false, and then the algorithm describes a

10      sequence of eight to ten steps that would be

11      taken under each of at least four different --

12      well, maybe more, 4, 5, 6, 7, 8, 9, 10, 11, 12,

13      13, 14 different combinations of conditional

14      evaluations.

15             MR. LESKO:  I'm marking Plaintiff's

16      Exhibit 11.  Just bear with me.  Okay.  Dr.

17      Wolfe, can you pull up Plaintiff's Exhibit 11

18      please from --

19             (Whereupon,   the   above-referred   to

20      document was marked as Plaintiff's Exhibit No. 11

21      for identification.)

22             THE WITNESS:  Yes.

23             BY MR. LESKO:

24       Q   So I'd ask, have you ever seen this

25      before?
```

1        A    No, I am not familiar with JavaScript.

2        Q    Okay.  There's a statement here about

3    conditional statements, pages one and two.  Can

4    you read pages one and two of Plaintiff's Exhibit

5    11 to yourself?

6        A    Okay.

7        Q    Do you agree generally with what stated

8    here on pages one and two that you just read to

9    yourself about conditional statements?

10            MS. WEISKOPF:  Objection, vague.

11            THE WITNESS:  I don't know.  I don't

12    know JavaScript.

13            MS. WEISKOPF:  Can I also just put on

14    the record that doesn't seem to be a date on this

15    document.  Is that right?

16            THE WITNESS:  The last page has a

17    copyright 1999 to 2025.

18            MR. LESKO:  Yeah, I see that.  Let's

19    just make this simpler.  It says here, very often

20    when  you  write  code,  you  want  to  perform

21    different actions for different decisions.  You

22    can use conditional statements in your code to do

23    this.  Do you agree with that statement, Dr.

24    Wolfe?

25            THE WITNESS:  It depends what you're

1    coding language is.  But in some coding languages

2    that is true sometimes.

3         BY MR. LESKO:

4    Q    But setting aside the date, as of 2005,

5    can you use conditional statements in your code

6    to  perform  different  actions  for  different

7    decisions?

8    A    It   depends   on   your   development

9    environment, but in some you could.  Again, that

10   doesn't tell you what conditions to test or what

11   steps to take.  It doesn't provide you with an

12   algorithm,  but  as  a  very  low  underlying

13   technique, it was available.

14   Q    Would it have been known to your sort of

15   definition of a skilled artisan in 2005 to use

16   conditional statements in programming for that

17   purpose?

18   A    Yes.  But again, it needs to be put into

19   context.  It would be in the same way that it

20   would be known that a pen can be used for writing

21   poetry.  It doesn't help you understand the

22   content of the poetry or what the poem should be.

23   Q    So I'm marking here Plaintiff's Exhibit

24   12.  And Dr. Wolfe, let me know if you're getting

25   hungry for lunch, too.  I'm fine either way.

1           (Whereupon,  the  above-referred  to

2      document was marked as Plaintiff's Exhibit No. 12

3      for identification.)

4      A    Yeah, we should stop reasonably soon,

5      but I don't have 12 yet.

6      Q    Okay.  It should be there now, I think.

7      A    Yep.  It's downloading now.

8      Q    Great.  Thanks.

9      A    Okay.

10     Q    Okay.  Do you recognize Plaintiff's

11     Exhibit 12?

12     A    Yes.  I haven't read it in more than a

13     decade, but that is a patent on which I am a

14     named inventor.

15     Q    Okay.  Column four of this patent --

16     actually, let's look at Columns two and three.

17     Columns two and three say, at the very bottom of

18     Column 2.  The very last sentence, Column 2, Line

19     66, then it continues to Column 3, Line 4.  Can

20     you read that to me?

21     A    Sure.  In some examples the data may be

22     sent from the backing storage to the cache in

23     encrypted form only if certain conditions are

24     met.  For example, the data can be encrypted if

25     the data are stored in encrypted form in the

1     backing  storage,  or  if  there  is  some  other

2     indication that the data should be encrypted

3     before being sent.

4        Q   Thank you, Dr. Wolfe.  If you look at

5     that, let's focus on Column 3, Lines 2 and 3 says

6     the data can be encrypted if the data are stored

7     in encrypted form in the backing storage.  Does

8     that statement provide an algorithm for the data

9     can be encrypted?

10        A   On its own, no, I don't think so.

11    There's much more detail in this patent.  There's

12    flowcharts, and even then, I don't know for

13    certain  whether  or  not  there's  sufficient

14    disclosure of an algorithm.  I just haven't

15    considered --

16       Q   I'm not asking about supportable claims.

17     Not at all.  Let's just focus on the specific

18    issue.  It said the data can be encrypted if data

19    is  stored  in  encrypted  form  in  the  backing

20    storage.  And I said, what's the algorithm using

21    just that excerpt for the data can be encrypted.

22     Is there an algorithm there for how the data can

23    be encrypted.

24          MS. WEISKOPF:  Objection to form.

25          THE WITNESS:  I don't know if there's a

108

```
1    legal rule here, but in my ordinary business as
2    an engineer, I can't imagine describing that as
3    an algorithm.  It's simply a fragment of a
4    sentence describing one characteristic of a
5    system.
6          MR. LESKO:  Well, for example, if you
7    read this, would you understand it to mean if
8    data equals encrypted form and backing storage,
9    data is encrypted.  Can you read that or
10   understand that from reading that?
11         THE WITNESS:  You could.  Of course here
12   we have the advantage that there's a flowchart in
13   Figure 3 that actually puts forward the steps.
14   There's more description later.  I wouldn't
15   normally take that sentence alone and consider it
16   to be an algorithm.
17         BY MR. LESKO:
18   Q   If it's an algorithm just for data can
19   be encrypted, though it's a simple -- would you
20   say it's a simple algorithm for that specific
21   purpose?
22   A   No, it doesn't tell you how to encrypt
23   anything.
24   Q   Does it tell you the answer to encrypt,
25   yes or no?
```

1        A    Under some circumstances it could, and

2    then you would have to consider whether or not

3    that's sufficient for any particular function.

4    But again, I would not normally call that an

5    algorithm in the way that I would normally define

6    an algorithm, but it would depend on the context.

7        Q    Right.  And the context is I want to

8    know the answer whether data should be encrypted.

9     And so I write a program that says, if

10    parentheses data equals encrypted form in the

11    backing storage closed parentheses.  And go to

12    the next line.  Data is encrypted.  Just for

13    that, is that enough disclosure to understand

14    that's the corresponding program?

15        A    I suppose that if you define your

16    function narrowly and trivially enough, it could

17    be.    But  certainly  in  the  context  of  this

18    specification, it's not an algorithm.

19        Q    Well, it's not an algorithm for an

20    entire claim element.  I'm not asking you to

21    review the claims in this, but it is an algorithm

22    for that specific function, right?

23            MS. WEISKOPF:  Object to form.

24            THE WITNESS:  I mean, in in the real

25    world, it would almost always be a step in an

1       algorithm, not an algorithm in and of itself.
2       But if you defined your entire world as being
3       that one step, then then maybe it could.
4                   MR. LESKO:  Maybe or yes it could?
5                   MS. WEISKOPF:  Object to form.
6                   THE WITNESS:  You would have to consider
7       it in terms of what you're trying to accomplish.
8        Again, if all you're trying to accomplish is
9       exactly what those words say and nothing more
10      than I suppose it could be an algorithm.
11                  MR. LESKO:  Would your answer be the
12      same if we were talking about 2005 instead of
13      2009?
14                  MS. WEISKOPF:  Object to form, vague.
15                  THE  WITNESS:    Yes.    With  all  the
16      limitations that I provided before.
17                  MR. LESKO:  Okay.  So I'm marking
18      another document as Plaintiff's Exhibit 13.  You
19      have  Plaintiff's  Exhibit  13.    Do  you  have
20      Plaintiff's Exhibit 13 now in your folder, Dr.
21      Wolfe?
22                  (Whereupon,   the   above-referred   to
23      document was marked as Plaintiff's Exhibit No. 13
24      for identification.)
25                  THE WITNESS:  I see it, let me download

111

1    it.  Okay.

2              BY MR. LESKO:

3        Q    Do you recognize this document?

4        A    Well not really, but it appears to be a

5    declaration that I prepared about five years ago.

6     I definitely recognize some of the content.

7        Q    Okay, I think that's right.  If you'd

8    like to maybe scroll down to Page 117, the last

9    page.  Do you see your signature on that page.

10       A    Yes.

11       Q    Does it look like a declaration you

12   submitted and signed on December 5th, 2019.

13       A    Yes.

14       Q    Okay.  There is a section, starting on

15   PDF Page 18.  Well, before I even ask you this,

16   I'm sorry.  Withdraw the question.  But you can

17   turn to Page 18.  I'm looking at your CV, and it

18   seems like you clearly have a deep understanding

19   of touch sensitive display technology.  Do you

20   agree with that?

21       A    Yes.

22       Q    Okay.  So touchscreens, touch sensitive

23   displays, touch sensing on a display.  So it

24   seems to me reading your CV, that's an area where

25   you have significant experience and expertise

1    based on what was presented.

2        A    I think that's accurate.

3        Q    And so, if you look at this Page 18, you

4    go through starting in Paragraph 36, there are --

5    actually probably all the way through - it goes

6    on for a while.  All the way through Paragraph

7    53, you have a background of touch sensing

8    technology, right?

9        A    Yes.  That may have been more than the

10    Patent Office needed to know.

11        Q    I suspect, though, you believe what's in

12    here, I'm sure you believe all this is true and

13    accurate, right?

14        A    I do.

15        Q    Okay.  And it's based on your

16    significant experience in that field, is that

17    right?

18        A    Yes.

19        Q    Okay.  So you reference here, PDF Page

20    18.  At the beginning of this section, you refer

21    to measurement and decision algorithms.  Take a

22    minute to look at that.  There's a sentence

23    there.  It starts, in addition, innovations have

24    been introduced in sensing circuitry measurement

25    and decision algorithms and detection of motions

113

1    and gestures.  If you read that sentence and kind

2    of read the surrounding context, can you tell me

3    what you're talking about in that section -- in

4    that sentence, I should say, is more accurate?

5        A    So  in  general,  an  algorithm  is  a

6    detailed description of a process where you

7    describe the steps to be taken, the sequence of

8    steps, the conditions under which certain steps

9    should be performed, and the data that should be

10   evaluated in performing those steps and the

11   results that should be provided.  And over the

12   years,  people  have  developed  a  number  of

13   algorithms for measurement of touch data, for

14   processing of that data to improve its quality

15   and for making decisions based on that data.  So,

16   for example, whether you've tapped on the screen

17   or  whether  or  not  you're  trying  to  draw  a

18   straight line, and both in the patent art and in

19   the non-patent literature, people have described

20   many of those algorithms in substantial detail.

21       Q    So as of October of 2005, those type of

22   touch algorithms, they were around, is that

23   right?

24       A    Some were, there have been some very

25   substantial improvements since then.  I think

1    Apple in particular would contend that they made

2    great improvements in some of those algorithms

3    with the introduction of the iPad and the iPhone.

4        Q    But certainly in 2005, algorithms

5    existed to figure out where a user is touching a

6    touch screen.  Would you agree with that?

7        A    Those algorithms did exist.  There were

8    many different kinds.  Some were suitable for

9    some things, others were suitable for other

10   things.

11       Q    Like an algorithm for saying, for

12   example, there's an option displayed on a touch

13   screen, and I want to know if a user touched that

14   option or didn't touch it.  Did an algorithm

15   exist in prior art for that specific task?

16       A    I don't know that there was one for that

17   specific task.  I mean, there was there was

18   enough description of algorithms that a person of

19   ordinary skill could have created an algorithm to

20   select a specific item, but it would depend on

21   what the item is, what its shape is, what its

22   size is, how long you wanted the person to touch

23   it before you recognize their touch.  So you'd

24   need to consider a number of factors in order to

25   choose the appropriate algorithm or construct the

115

1      appropriate algorithm.

2          Q   So I can select a menu option on a

3      screen.   I  realize  you  could  construct  an

4      algorithm, but let's say if I wanted to select

5      from  an  existing  algorithm,  per  se,  I've

6      displayed a button on my screen, did the user

7      select it or not select it? Was that existing

8      algorithm there and available as of 2005?

9          A   There  were  a  number  of  existing

10     algorithms.  Depending on the specifics, you

11     would have to choose one.  Is that button square?

12      Is that button oval?  Is that button round?  Is

13     it large?  Is it small?  Will somebody die if you

14     pick the wrong button?  So, if somebody just

15     pokes at something, do you want to recognize

16     that?  So there were a number of algorithms and

17     depending on the requirements of the specific

18     situation, a person of ordinary skill could

19     choose one.

20         Q   Yeah, what if the requirement was very

21     basic, like was there a touch or not a touch.

22     Was that algorithm out there and available.  So I

23     don't -- it doesn't really matter to me how long

24     just impressed the shape of it really doesn't

25     seem that relevant.  Let's say doesn't matter.

116

1      But I wanted to say did you touch the option or

2      not touch it?  Was that an algorithm that existed

3      in the prior art?

4              MS. WEISKOPF:  Object to form.

5              THE WITNESS:  I don't think so.  Not

6      without regard to the shape, because otherwise I

7      don't know how you would determine whether you

8      touch something or you touched outside of it.  I

9      guess there was an existing algorithm of did you

10     touch the screen at all? But if you wanted to

11     select a particular object, then I think you need

12     some information about the nature of that object

13     to select an algorithm.

14             MR.  LESKO:   But  there's  multiple

15     algorithms available for different objects on a

16     screen at that time in 2005.  So there was an

17     algorithm probably for did you touch a circular

18     object? There's probably an algorithm for did you

19     touch a word? There's probably an algorithm for

20     did you touch a square.  Would you agree with

21     that?

22             MS. WEISKOPF:  Object to form.

23             THE WITNESS:  I think those all probably

24     existed.  But again, the challenge would be

25     choosing the right one.

```
 1            MR. LESKO:  So I'm putting in the folder
 2    Plaintiff's Exhibit 14.  Are you able to access
 3    this item?
 4            (Whereupon,   the   above-referred   to
 5    document was marked as Plaintiff's Exhibit No. 14
 6    for identification.)
 7            THE WITNESS:  Hasn't refreshed yet?
 8    Give me a second.
 9            BY MR. LESKO:
10      Q    Sure.
11      A    I think we got it.  Okay.  I have it.
12      Q    Okay, do you recognize that document?
13      A    Yes.
14      Q    What is it?
15      A    This is a patent application that I
16    filed in 2009 that has been issued as a patent.
17      Q    Okay, and so what we're looking at,
18    though, just to clarify, in Plaintiff's Exhibit
19    14 is the issued patent, do you agree?
20      A    It is.
21      Q    So let's just scroll down to Column 1,
22    really underneath the heading background, the
23    very first sentence.  Can you read that sentence
24    out loud?
25      A    Touch  screens  are  widely  used  for
```

1      inputting data in a variety of electronic
2      devices, including handheld devices such as
3      mobile phones and cameras.
4          Q   Do you agree with that statement as of
5      the filing date for this patent application that
6      led to this patent?
7          A   Yes.
8          Q   Okay.  So let's go back to October in
9      2005.  Would that statement also be true?
10         A   Probably not.
11         Q   What would be different in 2005?
12         A   I don't think it was widely used in
13     either mobile phones or cameras in 2005.
14         Q   So have you kind of amended this to say
15     touch screens are used for inputting data in a
16     variety of electronic devices, including handheld
17     devices such as mobile phones and cameras.  You
18     amended it to say that in 2005.  Would that be
19     accurate?
20         A   I think it would.
21         Q   You said it would?
22         A   Yes.
23         Q   Okay.  I'm sorry, you cut out for a
24     minute there.  Sorry, I lost my place here.  Oh,
25     okay.  There's another statement here in this

119

1      Column 1 of Plaintiff's Exhibit 14.  It's the

2      last sentence in this background section.  It

3      starts with the word rather.  Can you read that

4      sentence out loud?

5          A    Rather by touching the touch screen, a

6      change is sensed in the touch screen panel and a

7      touch screen controller couples the sensor to a

8      driver and/or computer processing unit, CPU, and

9      translates information from the touch sensor into

10     data usable by the driver CPU.

11         Q    What does that mean?

12         A    That means that in prior art touch

13     screens, there would be a touch screen controller

14     which would measure signals from a touch screen

15     sensor and generally inform a CPU about those

16     signals by translating the measurements into a

17     more usable form that the CPU could interpret.

18     Typically where and when the touch had occurred.

19         Q    What format was it translated to for the

20     CPU?

21         A    It would vary.  Typically some

22     descriptive message.  That would say something

23     like there's been a new touch at this X

24     coordinate and this Y coordinate.

25         Q    Now, that statement we were just

120

1    discussing those starts with the word rather and

2    ends with the word CPU in Plaintiff's Exhibit 14,

3    was that statement true in October 2005?

4        A   I believe so.

5        Q   I think you refer here to the prior art,

6    right?  I realize we're talking 2009.  So prior

7    art in 2005.  This statement that starts with

8    rather, ends with CPU in Plaintiff's Exhibit 14

9    still applies to that prior art.  Is that right?

10       A   In general, yes.

11           MS. WEISKOPF:  Objection.

12           MR. LESKO:  Would the prior art touch

13   screens  have  algorithms  for  handling  that

14   translation  that's  discussed  here  and  also

15   referred here in Plaintiff's Exhibit 14?

16           THE  WITNESS:   They  would.   Those

17   algorithms would differ from system to system and

18   sensor to sensor.  But they would use algorithms.

19    And in fact, in this patent Figure 6B describes

20   an algorithm for this particular touch screen.

21           BY MR. LESKO:

22       Q   Okay.  Where did you say there's an

23   algorithm for this particular touch screen?

24       A   Figure 6B.

25       Q   Figure 6B.

121

1          A    Yeah.

2          Q    So that's an algorithm for translating

3    touches to the CPU in this particular system in

4    6b?

5          A    No, this is an algorithm for sensing.

6          Q    Okay.

7          A    And it's only a portion of the

8    description of the algorithm.

9          Q    So 6b is part of an algorithm for touch

10   sensing used in the system described in this

11   Plaintiff's Exhibit 14?

12         A    It's a portion of the description of an

13   algorithm for sensing.

14         Q    Okay.  So this patent gets into some

15   maybe new algorithms for sensing.  But based on

16   the background here, what we just discussed,

17   existing algorithms for sensing did exist.  Do

18   you agree?

19         A    For different kinds of touch screens

20   than this one, they did.

21         Q    And then algorithms existed for quote

22   translating information from a touch sensor into

23   data usable by the driver/CPU.  Do you agree?

24         A    A variety of algorithms did exist,

25   depending on the particular structure and

1    configuration of the touch screen.

2        Q    And that was the case in 2005, those

3    algorithms are available?

4        A    For touch screens that existed in 2005,

5    they included algorithms that would format the

6    data and present it to a host computer or a main

7    CPU.

8            MR. LESKO:  Would you like to take a

9    lunch break now or would you like to keep going,

10    Dr. Wolfe?  I'm just trying to be polite.

11            THE WITNESS:  No, we can take a lunch

12    break now.

13            MR. LESKO:  Okay.  That works for me.

14            MS. WEISKOPF:  How long?

15            MR. LESKO:  Let's go off the record if

16    you could, Eric.

17            COURT REPORTER:  Yes, we're off the

18    record at 12:29 p.m.

19            (Whereupon, the above-entitled matter

20    went off the record at 12:29 p.m. and resumed at

21    1:19 p.m.)

22            COURT REPORTER:  We're back on the

23    record at 1:19 p.m.

24            MR.  LESKO:    Okay,  Dr.  Wolfe,  I've

25    uploaded the exhibits folder Plaintiff's Exhibit

123

1    15.  Could you open that, please?  Oh, I'm sorry.

2     Before we get to that, during the break, did you

3    talk to Counsel at all?  Ms. Weiskopf?

4              THE WITNESS:  No.

5              MR. LESKO:  You did not talk?

6              THE WITNESS:  I did not talk to Ms.

7    Weiskopf during the break.

8              MR. LESKO:  Okay, not on the chat or

9    anything either.  Just not at all?

10             THE WITNESS:  I did not communicate with

11    her in any way outside of what you see on the

12    record.

13             BY MR. LESKO:

14        Q   Okay.  Thanks.  So back to Plaintiff's

15    Exhibit 15, please.  Is that open on your screen?

16             (Whereupon,  the  above-referred  to

17    document was marked as Plaintiff's Exhibit No. 15

18    for identification.)

19        A   Not yet.  But it's coming.

20        Q   Have you ever seen this document before?

21    A   No.

22    Q   Did you say yes or no?

23    A   No.

24        Q   Oh, okay.  Okay so, if you could just

25    read the first two sentences there.  It says, an

1    if statement is a fundamental control structure.
2     Can you start there, please?
3        A    Sure.  An if statement is a fundamental
4    control structure in programming languages that
5    allows you to execute specific code blocks based
6    on whether a condition is true or false.  It is
7    used to make decisions and control the flow of
8    execution in your program.
9        Q    Thank you.  Do you agree with that
10   statement?
11             MS. WEISKOPF:  Object to form, vague.
12             THE WITNESS:  The statement is vague.
13   It would be true for some programming languages.
14    But not for others.
15             MR. LESKO:  So what's an example of a
16   programming language where an if statement means
17   something different?  From what's --
18             THE WITNESS:  Programming languages that
19   don't have if statements.
20             BY MR. LESKO:
21       Q    Okay.  So there's a programming language
22   that doesn't have an if statement specifically.
23   What's an example of that?
24       A    Certainly true in assembly language.  I
25   believe it's true in Lisp, but it's been a couple

125

1       decades since I programmed in Lisp.  Again, I

2       don't know every programming language, but it's

3       not a requirement for programming languages.

4       There are different programming languages that

5       work in different ways.

6           Q    Would they usually have an equivalent to

7       determining whether a condition is true or false?

8        Do most programming languages have that type of

9       ability?

10          A    Some do and some don't.

11          Q    All right.  So just scroll down if you

12      could to Page 2.  There's a statement that says,

13      an if statement consists of two main parts and

14      then there's two bullet points.  Can you just

15      read that sentence and those two bullet points

16      for me, please?

17          A    An if statement consists of two main

18      parts.  The condition, this is an expression that

19      evaluates to either true or false, and a code

20      block.  This is the code that will be executed if

21      the condition is true.

22          Q    Was that statement consistent with your

23      understanding of an if statement in programming?

24              MS. WEISKOPF:  Objection, vague.

25              THE WITNESS:  Consistent with the way

1    some programming languages are implemented, but

2    not all.

3            MR. LESKO:  So did an if statement

4    consisting of these two main parts exist in 2005?

5            THE WITNESS:  It existed, again, as

6    described as a building block.  It's not an

7    algorithm.

8            BY MR. LESKO:

9    Q    So  an  if  statement  consisting  of

10    condition and code block existed as a building

11    block for code in 2005?

12    A    It did.

13    Q    A skilled artisan in 2005, like the

14    skilled artisan defined in your declaration,

15    Plaintiff's Exhibit 1, will be familiar with that

16    if statement in that format?

17    A    They would and they would also know what

18    additional information they needed in order to

19    use it effectively.

20    Q    Okay.  So you can close the document if

21    you'd like.  Have you ever heard of data roaming?

22    A    Depending what context.

23    Q    Yeah.   In  the  context  of  cellular

24    networks and cellular phones.  Have you heard of

25    the concept of roaming?

1         A    Yes.

2         Q    Are you familiar with -- can you

3    describe what that concept is.  What is roaming?

4         A    It's used in a number of different ways.

5     The term does not appear in the patents.  It was

6    used commercially by a number of vendors, in a

7    variety of ways, to represent obtaining service

8    that was not from their own supported cell

9    towers.  And it might include simply using towers

10   of other vendors that have a cooperation

11   agreement without any financial impact.  It could

12   include using vendor towers -- from other vendors

13   where there is some differential in pricing.  Or

14   it could sometimes involve using a secondary

15   communication system that might be incompatible,

16   as if you were in another country and there was a

17   secondary form of communication supported.  It's

18   somewhat time dependent, because in practice the

19   most common usages have changed over time.

20        Q    All right.  So let's talk about usage in

21   2005.   The usage of the term roaming when

22   discussing cell phones and cellular networks.

23   What did that mean in 2005?

24        A    I think in general --

25             MS. WEISKOPF:  I'm going to object.

1    This is very far outside the scope of Dr. Wolfe's
2    declaration.
3            THE WITNESS:  Right, so as I mentioned,
4    it's not a term that's found in the patents or
5    the claims, but in general it meant using --
6    connecting to a tower that was not operated by
7    your primary service provider.  Whether or not
8    that was transparent to you or whether it had
9    some impact on your usage patterns either way.
10           MR. LESKO:  I'm reading -- I know you
11    haven't seen this.  I'm reading something from T-
12    Mobile's invalidity conventions, it says, quote
13    long before the priority date of the asserted
14    patents, it was well-known that users were
15    allowed to select their home network or could
16    switch roaming off to prevent data upload or
17    download if there are roaming charges, end quote.
18     Do you agree with that statement?
19           MS. WEISKOPF:  I'm going to object.  He
20    hasn't reviewed the contentions, he hasn't seen
21    the document.  And this is very far outside of
22    his testimony that he's offering.
23           THE WITNESS:  So again, I haven't seen
24    that statement in context, that could change my
25    opinion.  But in the 90s, I think, you know,

129

1    prior to unlimited plans and such, I do recall

2    there being options to turn off roaming, in some

3    systems.

4            MR. LESKO:  So before the priority date,

5    it was well known that users were allowed to

6    select their home network or can switch roaming

7    off to prevent data upload or download if there

8    are roaming charges.  Would you agree with that?

9            MS. WEISKOPF:  Same objection as before.

10    It's very far outside the scope, and he hasn't

11    seen what you're reading from or what is cited or

12    anything.

13            MR. LESKO:  Okay.  You don't need to

14    have speaking objections, Ms. Weiskopf.  Your

15    objection is noted.

16            MS. WEISKOPF:  Well, I think maybe what

17    we can do is for this entire line of questioning

18    about roaming and you reading from the invalidity

19    contentions, I'll just keep the same objection

20    and I'll just say same objection.  Is that okay

21    with you?

22            MR. LESKO:  Sure.  Objection, scope?  Is

23    that your objection?

24            MS. WEISKOPF:  And also that it's out of

25    context.  So, it's sort of mischaracterizing the

130

1    statement.

2         MR. LESKO:  I don't think that's a

3    proper objection.  What's your objection that you

4    want to maintain?

5         MS. WEISKOPF:  Vague.  That it's vague

6    and that it's outside of the scope of any opinion

7    that he's offering.

8         MR.  LESKO:   So  objection,  vague,

9    objection,  scope?   That's  what  you  want  to

10   maintain?

11        MS. WEISKOPF:  For sure.  And then I'll

12   add more if I --

13        MR. LESKO:  Okay.

14        THE  WITNESS:   So  if  I  take  that

15   statement out of context, then I do believe it

16   was true.

17        MR. LESKO:  Okay.  And there's a lot of

18   discussion in between, I just want to -- I know

19   you've kind of answered this, so I just want to

20   say -- so it was well known.  Regardless of the

21   context here, I'm just asking you, was it well

22   known that users were allowed to select their

23   home  network,  or  can  switch  roaming  off  to

24   prevent data upload or download if there are

25   roaming charges before the 2005 priority date?

```
 1              THE  WITNESS:   Again,  taking  that
 2      statement out of context, it sounds like it's
 3      true to me in 2005.
 4              BY MR. LESKO:
 5         Q   So if roaming -- if the phones -- if
 6      that was a -- let me withdraw my question.  In
 7      order for a user to be able to turn roaming on or
 8      off, does the cell phone need to determine if
 9      it's roaming?
10         A   No.
11         Q   And here's another way to phrase it.
12      Cell phones in 2005, could they determine and
13      report to a user that they were roaming or not
14      roaming?
15              MS.  WEISKOPF:    Object  to  form,
16      foundation.
17              THE WITNESS:  Some could, some couldn't.
18       It would depend on the phone.  It would depend
19      on the provisioning by the provider.  It would
20      depend on the way the network had been set up.
21      There are lots of conditions that you would have
22      to evaluate.
23              MR. LESKO:  So you were familiar with
24      cellular phone technology in 2005?
25              THE WITNESS:  Yes.
```

132

```
1              MR. LESKO:  Okay.  And would you agree
2      that  cellular  phones  existed  that  had  the
3      capability to determine if they were roaming or
4      not roaming?
5              MS. WEISKOPF:  Object to form.
6              THE WITNESS:  There were cell phones
7      that existed as the capability of indicating
8      whether  they  were  roaming  or  not  roaming.
9      Without doing a much deeper investigation, I
10     couldn't tell you whether or not they were making
11     that determination, or whether or not they were
12     communicating back with a carrier who was making
13     that determination elsewhere.
14             MR. LESKO:  So did programming exist in
15     2005 to make that type of determination, i.e.
16     roaming or not roaming?
17             THE WITNESS:  It existed somewhere.  But
18     as I said, I can't tell you for sure without
19     doing some more analysis whether it existed on
20     the phone platform.
21             MR. LESKO:  So if it didn't exist -- so
22     if it existed on the phone platform, then you're
23     saying there might be software on the phone that
24     determines if it's roaming or not.  Is that what
25     you mean by that?
```

133

1           MS. WEISKOPF:  Objection, vague.

2           THE WITNESS:  Again, I can't confirm

3    that  that  was  ever  implemented.    But

4    hypothetically, it's possible that somebody could

5    do that.  They would need an algorithm to be

6    defined and a set of criteria.

7           MR. LESKO:  And so in, what's the other

8    way?  Would there be an algorithm on a, would

9    there be a signal from the cell tower that tells

10   you it's a roaming or not? Is that a possibility?

11          MS. WEISKOPF:  Objection, speculation.

12          THE WITNESS:  I don't know if there

13   would be a way to do that directly.  Again, it

14   might be possible.  You would need to define the

15   criteria.  It's also quite possible that you

16   simply get a cell phone tower ID and that you

17   send that back to your carrier, and your carrier

18   determines whether it's their tower or not their

19   tower.

20          MR. LESKO:  So the tower ID, where does

21   that come from that you're referring to in your

22   last answer?

23          THE WITNESS:  Again, if it exists, it

24   may exist in some systems.  It may not exist in

25   other systems.  But it wouldn't be communicated

134

1    from the tower to the phone.

2              BY MR. LESKO:

3        Q    Well, just set aside roaming.  And you

4    said you know about cellular phone technology and

5    cellular network technology in 2005.  Is that

6    right?

7        A    Yes.

8        Q    Okay.  Are you aware -- was there

9    technology for cellular phone to receive a tower

10   ID from a network to which it was connected in

11   2005?

12       A    I can't tell you for certain.  I think

13   it probably existed in at least some systems, but

14   maybe not in all systems.

15       Q    When you say probably existed, what do

16   you mean by that? Are you aware of it existing at

17   all, or can you confirm there's any situation

18   where it existed that a phone could receive a

19   tower ID from a cellular network?

20              MS. WEISKOPF:  Object to form.

21              THE WITNESS:  Not as a factual matter.

22   Without going back and reviewing the protocols

23   again, I would expect it to be the case in some

24   protocols and not in others.  But I don't know

25   factually,  one  way  or  the  other  for  any

135

1    particular protocol.

2              MR. LESKO:  So you reviewed Dr. Hughes's

3    declaration   Exhibit   4   in   preparing   your

4    declaration in this matter, is that right?

5              THE WITNESS:  I did.

6              BY MR. LESKO:

7        Q   Okay.  And do you recall he mentioned

8    data roaming in his declaration?

9        A   I do remember that he mentioned it, but

10   I'd have to go look to see where and in what

11   context.

12       Q   Okay.  But you didn't have any reason to

13   consider his opinion on data roaming in putting

14   together your declaration?

15       A   I considered all of his opinions with

16   respect to the controller elements.  But once

17   again, data roaming is not in the specification.

18    It's not in the claims.  I was asked to look at

19   specific issues and that is whether or not the

20   word controller itself had sufficient structure

21   to implement the claims without looking to the

22   specification.  I concluded it did not.  And then

23   whether  or  not  the  specification  provided

24   sufficient support for the claimed functions.

25   None of that information had anything to do with

1    roaming, because roaming is not mentioned in the

2    specification and it's not mentioned in the

3    claims.

4        Q    You talk about the structure of the

5    controller, whether it's insufficient structure.

6    What do you mean by that?

7        A    So the question is would a person of

8    ordinary skill understand -- one of the questions

9    is would a person of ordinary skill understand in

10   the  context  of  the  claim,  from  the  word

11   controller  alone,  what  structure  is  being

12   claimed?  And the answer is no, the way that

13   that's used in that particular claim, there is no

14   specific structure known to a person of ordinary

15   skill for a controller that, on its own, absent a

16   specific algorithm, is capable of performing the

17   claimed functions.

18       Q    So when you say structure, are you

19   referring to hardware?  Hardware plus programming

20   or  programming?    What  are  you  referring  to

21   specifically?  What would provide structure?

22   First let me ask you, could it be just the

23   hardware  item  itself?    Could  that  provide

24   structure?

25            MS. WEISKOPF:  Objection, form.

1              THE WITNESS:  In the abstract, yes.  But

2     you've really pointed out one of the problems

3     here is that in the context of this claim, the

4     word controller alone doesn't tell you whether or

5     not  it's  claiming  hardware  or  software  or

6     hardware and software together.  So you need to

7     look to the specification to understand that, and

8     you need to look at the claimed functions in

9     order to understand what's actually being claimed

10    in terms of structure.

11             MR. LESKO:  Could structure for the

12    claim also be provided in the form of a program

13    for the controller?  Was that another structure

14    based on your understanding of what we've been

15    instructed on the law?

16             THE WITNESS:  Yes.  If a program had

17    been disclosed and if that program had been

18    linked to the claimed functions and the term

19    controller in a way that a person of ordinary

20    skill would understand those relationships, then

21    that would be sufficient structure.  If you had a

22    program that was disclosed that performed the

23    claim  function  and  was  linked  to  the  claim

24    function, I think that that could be the right

25    structure.  I did not see that here.

1          BY MR. LESKO:

2          Q   One of the claim itself, you sort of

3     described  in  words,  the  program  for  the

4     controller.  Is that something you considered

5     whether the claim itself described in words a

6     program or the controller?

7          A   I did consider that.  I don't believe

8     that the claim language itself describes the

9     structure of the controller or an algorithm for a

10    processor  that  would  be  the  controller  in

11    sufficient  detail  to  perform  the  claimed

12    functions.  It simply recites the functions.  And

13    also, I don't think that the functions that are

14    claimed are completely supported in the body of

15    the specification.

16         Q   So the program in the claim, though,

17    that you're looking for, it wouldn't have to be,

18    per se, actual software code.  Would you agree

19    with that?

20         A   No, it would need to be the structure of

21    a program that was more than simply the function

22    of the program.

23         Q   Okay.  So like I -- like you said, if

24    there was an algorithm in the claim, you know,

25    even if it wasn't an if else statement, let's

139

1    say, or formal programming language, there could

2    be a structural program in the claim.  And you

3    were looking for that when you were reviewing

4    these claims.  Is that correct?

5        A   I did look for that.  I did not see a

6    structural  program.   I  only  saw  functions

7    described in the claim.  And as I mentioned, I

8    did not see support for all of those functions in

9    the body of the specification.

10       Q   Well, let's turn to Plaintiff's Exhibit

11    3, Dr. Wolfe.

12       A   Okay.

13       Q   Thanks.  Let's go ahead and scroll down

14    if you could, to PDF Page 32 of Plaintiff's

15    Exhibit 3, which is -- I don't think you would

16    agree those are the claims of the '472 patent.

17    Do you agree with me?

18       A   Yes.

19       Q   Okay.  So on Line 24 through 26 in

20    Column 17 there's language that says, during any

21    period direct -- detected by the controller in

22    which all three of the following conditions are

23    met.  Can you see that?

24       A   I do.

25       Q   What does that mean?  During any period

1   detected by the controller in which all three of

2   the following conditions are met?

3       A    Needs to be taken into context.  It

4   talks   about   a   function   of   automatically

5   connecting to a picture hosting service that is

6   internet based, and enabling an upload to the

7   picture hosting service over the internet and via

8   the cellular interface of a group of image sensor

9   captured pictures stored in the local memory.

10  And then it says when that function should be

11  performed during any period detected by the

12  controller, in which all three of the following

13  conditions are met, and then in functional terms,

14  it describes three conditions.

15      Q   So, reading that language, if conditions

16  one, two, and three in the claim are met, Element

17  f(ii) of claim one of the '472 patent is carried

18  out.  Do you agree?

19          MS. WEISKOPF:  Object to form, vague.

20          THE WITNESS:  I don't see the word if,

21  right? If I saw the word if, to me if it were

22  being written in the form of an algorithm, it

23  would mean if and only if.  Where in a claim,

24  it's my understanding that that's not something

25  that I can assume.  So I have not put that

1    limitation on that.

2    MR. LESKO:  So how would you interpret

3    the language during any period?

4    THE WITNESS:  It's a comprising claim.

5    So I would interpret it that -- again I have to

6    interpret it probably in light of the -- of the

7    file history where the applicant kept explaining

8    that it doesn't just mean during any period, but

9    what it says is, I think that the particular

10   automatic connection and uploading that's

11   described in this limitation has to happen during

12   any period of time determined or detected by the

13   controller, which again, we don't really have

14   structure for, in which each of those three

15   conditions are met.

16   And as I mentioned before, at least one

17   of those conditions, maybe two or three, really

18   are not supported in the specification.  So it

19   means that you have to determine using data from

20   the cellular interface that you are -- that the

21   system is within a period without potentially

22   increased cellular network access fees.  And you

23   also have to determine from -- that you are

24   connected to the internet via the cellular

25   interface.  And you also have to have determined

142

1     that at least one picture captured by the phone

2     sensor, and not from somewhere else, has been

3     designated through the touch sensitive display

4     and not some other way, as being part of the

5     group of pictures to be uploaded to the picture

6     hosting service.  So at a minimum, all those

7     conditions  have  to  be  true.   But  it's  a

8     comprising claim, so I don't see anything that

9     says that you can't also upload when one of those

10    conditions is false.

11              BY MR. LESKO:

12         Q   So you're talking about outside the

13    scope of the claim, there's a possibility the

14    same system performs other uploads?  Is that what

15    you're suggesting?

16         A   No, I'm saying within the scope of the

17    claim, there's a possibility that it performs

18    other uploads based on my understanding of a

19    comprising claim.  As long as you meet all the

20    limitations of the claim, you can do other things

21    as well.  And I don't see any place where it says

22    only, or if it says only if or anything like

23    that.  It simply says that under those three

24    conditions,  you  can  automatically  upload

25    pictures.

143

1      Q   Are you saying you can or you must under

2   those three conditions according to Element

3   f(ii)?

4      A   That you are configured to.

5      Q   All right.  So -- just looking at Claim

6   5, do you see Claim 5?

7      A   Yes.

8      Q   So it says, during any period detected

9   by the controller in which all the following

10  conditions are met.

11     A   Yes.

12     Q   So, if all four of these conditions are

13  met, what happens according to the claim?

14     A   If all four of the conditions are met,

15  according to the claim, you will automatically

16  connect to a picture hosting service that is

17  internet based and enable and upload to the

18  picture hosting service over the internet and via

19  the cellular interface of a group of image sensor

20  captured pictures stored in the local memory.

21  But again, I don't see that as being -- well,

22  that is a limitation of the claim.  I don't see

23  anything that says that that's the only time that

24  you can upload pictures.

25     Q   Right, I understand what you're saying

144

1       there.  I understand your argument.  But what I'm

2       saying, though, is if those four things happen,

3       then element (ii) is carried out.  Would you

4       agree with that?

5          A    That's    true.    I    think    that's    a

6       functional   description   of   a   system,   not   an

7       algorithm.

8          Q    If condition 1, condition 2, condition

9       3, and condition 4 are all true, then it will

10      automatically   connect   to   a   picture   hosting

11      service that is internet based and enable and

12      upload to a picture hosting service over the

13      internet.  And via the cellular interface, give a

14      group of image-sensor captured pictures stored in

15      a local memory.  Do you agree with that?

16              MS. WEISKOPF:  Object to form.

17              THE WITNESS:  I don't think so.  It

18      doesn't say if, and if you're using if as a code

19      construct, then I would disagree.  What it says

20      is that during a period where those conditions

21      are met, it will perform the upload that was

22      previously described.

23              MR.   LESKO:    What's   the   difference

24      between during any period and if, in your view?

25              THE WITNESS:  Well, again, if you're

145

1    using if not in plain English language, which

2    would depend on context, but if you're using if

3    in the way we would use it in an algorithmic

4    construct, then it means if and only if, which is

5    not what I see described here.

6                    BY MR. LESKO:

7        Q    And you're basing that conclusion on the

8    use of the word comprising?

9        A    The use of the word comprising and the

10   structure of the claim as a whole.  It would have

11   been very easy to say only during, if that's what

12   the patentee intended.

13       Q    So in the structure of an if else

14   statement, is it always only if?

15       A    In the programming languages that I'm

16   familiar with at the moment, yes.  Again, you can

17   build your own programming language, do anything

18   else.    I'm  sure  there  are  thousands  of

19   programming languages out there.  But in the way

20   that I would describe an algorithm to a person of

21   ordinary skill, I use if to describe things that

22   only happen under a certain condition, else to

23   describe things that happen when that condition's

24   false.  And if you have things that can happen

25   that happen whether or not the condition is true,

146

1    then you do them outside of the if else

2    statement.  But that's why we write pseudocode

3    and build flowcharts is because they're precise

4    as opposed to language, which can be more

5    ambiguous than in written English paragraphs.

6         Q   How would that look, those conditions

7    you say that fall outside the if or outside the

8    else, how would they look in the code?

9              MS. WEISKOPF:  Object to form, vague.

10             MR. LESKO:  So that would be a different

11   structure?  What would that look like?

12             THE WITNESS:  It would simply perhaps be

13   -- again, it depends.  You have to actually have

14   the algorithm to know what it would look like.

15   But, hypothetically, it could happen before an if

16   statement or instead of an if statement, or after

17   an if then else statement had completed.

18             BY MR. LESKO:

19        Q   I'm going to go to the '472 patent,

20   Column 1, Lines 55 to 60.  Can you scroll to

21   those pages, Dr. Wolfe?  Let me know when you're

22   there.

23        A   I'm at Column 1, Line 55.

24        Q   All right.  So this says U.S. Patent

25   numbers 4,951,079, 6,021,278 and 6,101,338 are

1    herein incorporated by reference.  You see that?

2         A   Yes.

3         Q   Do    you    know    what    that    means,

4    incorporated by reference?

5         A   I do.  My understanding is depends a

6    little bit on the language that, that is used.

7         Q   So   during   your   review   of   the   file

8    history, though, did you see the statement in the

9    '472 patent?

10        A   I did.

11        Q   Did you say yes?

12        A   Yes.

13        Q   Okay.  And during your review of the

14   '761 patent, did you see an equivalent statement

15   in that patent?

16        A   My recollection is I did, but let me

17   check.  Yes, I did.

18        Q   Okay.  So do you understand that if a

19   patent incorporates another document by reference

20   and incorporated materials treated as if it were

21   explicitly included in the patent itself?

22             MS. WEISKOPF:  Object to form.

23             THE WITNESS:  I do, but it's also my

24   understanding that when it's incorporated in a

25   form like this, where it's incorporated with

148

1    respect to a particular issue, that it's being

2    incorporated with respect to its teachings about

3    that issue.

4            MR.   LESKO:   Can  you  pull  up  the

5    declaration of Dr. Hughes, I think it's Exhibit

6    4, please?

7            THE WITNESS:  Okay.

8            BY MR. LESKO:

9    Q    Okay.  This is Paragraph 30 of our Dr.

10   Hughes declaration.  Do you share that same

11   understanding of incorporation by reference?

12   A    That's  my  general  understanding.

13   Although, as I said, it is my understanding that

14   under  current  law  that  if  a  patent  is

15   incorporated by reference with respect to a

16   specific feature of the claims, then it only

17   needs to be reviewed -- or it only needs to be

18   incorporated with respect to that feature.  And

19   that's my interpretation of the language in these

20   two patents.

21   Q    If you look at paragraph -- could you

22   scroll down to paragraph 41 of Dr. Hughes's

23   declaration?

24   A    Okay.

25   Q    This one refers to the '278 and '338

1    patents to Bernardi.

2        A   Okay.

3        Q   Did you -- in forming your opinions, did

4    you read either of those patents or look at them?

5        A   I didn't because there's been no

6    suggestion that the sensory RSC-164 chip has been

7    linked to the claimed functions, or that there

8    has been an algorithm presented in those patents

9    for the claimed functions.

10       Q   So just looking at -- just read

11   paragraphs 41 and 42 of the declaration here to

12   yourself, that's exhibit -- Plaintiff's Exhibit

13   4.

14       A   Yes.

15       Q   Do you agree or disagree with the

16   statements in paragraphs 41 and 42 here?

17       A   I agree with those statements as

18   presented for the purpose of doing voice

19   recognition in the '278 and '338 patents.  The

20   RCS 164 microcontroller is disclosed.

21       Q   In paragraph 44, it says, it's my

22   opinion, it starts there, it says, it's my

23   opinion, though, that a POSITA would have been

24   the aware of the materials such as those that the

25   inventor specifically incorporated by reference

1    or as patent specification, including the RSC-164

2    family of controllers.  Reading this Paragraph 44

3    of  the  Hughes  declaration,  do  you  agree  or

4    disagree with this paragraph?

5        A    As I understand it, I agree with it

6    because what it does not say, well, no, no.  It's

7    ambiguous.  If they're talking about a claimed

8    controller in Exhibits 2 and 3, then I disagree.

9     A person of ordinary skill would have known of

10   the RSC-164 family of controllers.  They would

11   not know of its suitability for the functions

12   claimed in Exhibits 2 and 3, and they would not

13   have known the structure of the algorithms that

14   are attempting to be claimed in Exhibits 2 and 3.

15       Q    Looking at Paragraph 45 of Dr. Hughes's

16   declaration.  It refers to three dictionary

17   definitions for controller.

18       A    Yes.

19       Q    Do you believe that those dictionary

20   definitions  reflect  the  understanding  of  a

21   skilled artisan as of 2005 for what a controller

22   means?

23       A    Well, one of those is from 1996.  It's a

24   little early.  But the question is a controller

25   in what context?  I think that those reflect what

1    a controller would be in a certain context.  I

2    don't think they reflect what the controller is

3    being claimed.  And also, if you read these

4    definitions,  none  of  them  recite  specific

5    structure.  They  all  talk  about  general

6    categories of structure, and they talk about

7    either things that have particular functions,

8    which means they're functional descriptions, or

9    they talk about things where the functionality

10   depends on their programming.

11          And my understanding is that when you

12   claim a function of a controller or a processor

13   in a claim, if that function is specialized, then

14   you need to disclose the algorithm for that

15   specialized  function.   And  none  of  these

16   definitions change that or disclose -- none of

17   these disclose an algorithm.  None of these

18   disclose a specific structure rather than just

19   using other general words to describe it.  I

20   mean, look at -- one of these is a circuit

21   mechanism device or system which monitors one or

22   more variables.  That's not specific structure.

23       Q   So you don't think a circuit is a

24   structural term?

25       A   It's not a description of a specific

152

1    structure.  If you sent me off to go get you a

2    circuit, it's very unlikely that I would bring

3    you back what you wanted because you haven't told

4    me with enough specificity, what you expect.

5        Q   So what if it is -- so it's usually

6    contained on a single chip, circuit board or

7    device.  Do you know what I mean when I say it's

8    contained on a chip? Is the chip a structure?

9            MS. WEISKOPF:  Object to form.

10           THE WITNESS:  Chip is a structure.  But

11   again, that's not saying what it is.  It's saying

12   what form it takes.  It's like saying it comes in

13   a box.  It doesn't tell you the structure of the

14   underlying thing.  And again, if you look at the

15   total description there, it uses the word device.

16    Device is a nonce term.

17           BY MR. LESKO:

18       Q   Let's turn to Paragraph 46.  It refers

19   to Judge Albright's prior opinions.  So does 47,

20   frankly.   Did  you  read  any  of  these  prior

21   opinions that are listed in Paragraphs 46 and 47?

22       A   I did not.

23       Q   So do you have any opinion on whether

24   Dr.  Hughes's  statements  in  46  and  47  are

25   accurate?

153

1        A    I don't know if they are or not.   I

2   haven't seen Judge Albright's reasoning.   I

3   haven't seen whether or not he was provided with

4   all the facts when he made his judgment.

5        Q    Would you think there'd be any reason to

6   investigate those opinions in Paragraphs 46 and

7   47?

8        A    No, the fact pattern for each one of

9   them is different.   They all are in different

10  claims,    different    patents,    different

11  specifications.   And I wasn't asked to make a

12  legal judgment.   I was asked to determine whether

13  or   not   a   person   of   ordinary   skill   would

14  understand sufficient structure for the term

15  controller as it's used in a specific claims in

16  this   matter,   and   whether   or   not   there   was

17  sufficient structural or functional support in

18  the specification.

19        MR. LESKO:   So I think that's all my

20  questions for today, Dr. Wolfe.   I appreciate

21  your time.   So thanks for taking the time to

22  speak with me today.   Thank you.

23        MS. WEISKOPF:   I'm going to have a

24  little bit of redirect.   Can I have a one or two

25  minute break, five minute break before we do it?

154

1          MR. LESKO:  Thirty seconds I'll give

2     you.  I'm just kidding.  Five minutes is fine.

3     Is that how long you want?

4          MS. WEISKOPF:  Yeah, maybe just --

5          MR. LESKO:  Five or ten.  Either fine

6     for me.

7          MS. WEISKOPF:  Yeah.  Let me just have

8     five, please.

9          MR. LESKO:  Okay.

10          MS. WEISKOPF:  Thank you.

11          MR. LESKO:  So we'll see at 4:20 p.m.

12     my time.

13          MS. WEISKOPF:  Sounds good.  Thank you,

14     Justin.

15          MR. LESKO:  Sure.

16          COURT REPORTER:  All right.  So we're

17     off the record at 2:13 p.m.

18          (Whereupon, the above-entitled matter

19     went off the record at 2:13 p.m. and resumed at

20     2:20 p.m.)

21          COURT REPORTER:  We're back on the

22     record at 2:20 p.m.

23               CROSS EXAMINATION

24          MS. WEISKOPF:  Okay.  Dr. Wolfe, do you

25     recall discussing the functions in the asserted

1    claims with Mr. Lesko?

2             THE WITNESS:  Yes.

3             BY MS. WEISKOPF:

4        Q    Okay.  Can we please turn to Plaintiff's

5    Exhibit 2, which is the '761 patent?

6        A    Yes.

7        Q    Okay can you please look at the portion

8    of the claim labeled one, two and three?

9        A    I have that.

10       Q    Do you have an opinion about whether

11   there are any functions of the controller in this

12   portion of the claim?

13       A    The   controller   is   configured   to

14   automatically connect under certain conditions.

15   So automatically connecting under the recited

16   conditions is a function.

17       Q    Do you have an opinion whether the

18   controller functions to determine that the upload

19   is allowed based on the selected upload option

20   and uses data from the cellular interface?

21       A    That is a controller function, yes.

22       Q    Do   you   have   an   opinion   on   whether

23   there's structure in the claim sufficient to

24   perform that function?

25       A    I'm not even sure I saw a description of

156

1    the function in the claims -- whether there's

2    structure in the claims? There's certainly not

3    structure in the claims.  The only structure in

4    the  claims  is  controller,  and  not  every

5    controller can do that.  An ordinary controller

6    can't  do  that.    It  would  require  either

7    specialized hardware or specialized software,

8    neither of which are disclosed in the claim.

9        Q    And do you have an opinion whether

10   there's an algorithm in the specification to

11   support that function?

12       A    There is not one.

13       Q    Okay.  Let's turn to Plaintiff's Exhibit

14   3, which is the '472 patent.

15       A    Okay.

16       Q    Do you recall discussing what's labeled

17   one, two and three and claim 1 with Mr. Lesko?

18       A    Yes.

19       Q    Alright, do you see any functions of the

20   controller in this portion of the claim 1 of the

21   '472 patent?

22            MR. LESKO:  Objection, scope.

23            THE WITNESS:  I'm sorry.  Yes.

24            MS. WEISKOPF:  Do you have an opinion

25   whether the controller is configured to detect

157

1    that the upload is allowed because the system is

2    within one of the periods without potentially

3    increased  cellular  network  access  fees,  as

4    determined  using  data  from  the  cellular

5    interface?

6              THE WITNESS:  Yes, the controller must

7    detect that condition.

8              BY MS. WEISKOPF:

9    Q    Is that a function of the controller?

10    A    It is a function of the controller.

11    Q    Do you have an opinion whether there's

12    structure in the claim sufficient to perform that

13    function?

14    A    There is not sufficient structure in the

15    claims to perform that function.

16    Q    And do you have an opinion whether there

17    is structure in the specification sufficient to

18    perform that function?

19              MR. LESKO:  Objection, outside scope.

20              THE WITNESS:  I don't believe there is.

21    There is a description of a cellular interface

22    that's  been  added  that  I  don't  think  was

23    supported in the original specification, but

24    that's not sufficient to describe this function.

25    This function is more complicated than just

158

1    requiring the existence of a cellular interface.

2     It would require an algorithm or specialized

3    hardware structure.

4            MS. WEISKOPF:  Okay, let's turn to claim

5    5 and look at the portion of the claim in F2.  Do

6    you have any opinions whether there's functions

7    in this portion of the claim?

8            THE WITNESS:  Yes.  The functions to

9    automatically connect under the four specified

10   conditions, and also that the controller must

11   detect those conditions are present.  Those are

12   functions.

13           BY MS. WEISKOPF:

14    Q   Okay.  Looking at the at the portion of

15   the claim with a label two, the numeral two, do

16   you have an opinion whether the controller is

17   configured to confirm that the camera system is

18   within a period without potentially increased

19   cellular network access fees, as determined using

20   data from the cellular interface?

21    A   The claim requires that the controller

22   be configured to perform that function.

23    Q   Do you have an opinion whether that's a

24   function?

25    A   As  described  in  claim  5  it  is  a

1      function.

2          Q    Okay.  Do you have an opinion whether

3      there is structure in the claim sufficient to

4      perform that function?

5          A    There is not sufficient structure in the

6      claim.

7          Q    And do you have an opinion whether

8      there's     sufficient     structure     and     the

9      specification to perform that function?

10              MR. LESKO:  Objection, outside scope.

11              THE WITNESS:  There is not sufficient

12      structure in the specification to perform that

13      function.

14              MS. WEISKOPF:  Those are my questions.

15      I can pass the witness, but I would like to

16      review and sign.

17              MR. LESKO:  I don't have any further

18      questions.  But one thing I wanted to say, I

19      guess on the record though is given the timing of

20      this, we have a briefing on Thursday.  I'm going

21      to have to write our brief using the rough

22      transcript, I think.  So I guess I would ask if

23      there's -- normally you would review a final

24      transcript and sign, as you're suggesting.  I

25      guess I would ask if there's certain corrections

160

1      that stand out or that are important or that we

2      need to debate before our brief is submitted, if

3      you could try to raise those with us so that

4      we're just making this as efficient as possible.

5           Does that make sense?  So in other

6      words,  if  you  see  something  in  the  rough

7      transcript when you get it that we need to

8      discuss and consider correcting as you would,

9      let's try to talk about before the brief is

10     submitted or nearly about to be submitted.  Can

11     we do that?

12          MS. WEISKOPF:  Yeah.  We'll make every

13     effort to accommodate that request.  I think I

14     need to talk to the court reporter about when we

15     can get the rough and everything because you're

16     right, the timing is tight.  So I think  we're

17     also having a similar issue, but I will try to

18     accommodate that.

19          MR. LESKO:  Okay.  And the rough, just

20     so you know, we can go off the record if you

21     want.  I don't know if there's anything else to

22     address on the record.  I was just going to say,

23     I think they told me an estimate on the rough, I

24     could look it up if you'd like.

25          COURT REPORTER:  Yeah.  Let's go ahead

1    and finish up and go off the record.

2            MR. LESKO:  Oh, it's supposed to be next

3    day rough.  So, yeah.  Go ahead.  Sorry.

4            COURT REPORTER:  Okay.  And so, Ms.

5    Weiskopf, you are planning to purchase a rough

6    and a final?

7            MS. WEISKOPF:  I believe we're going to

8    need to do that given the timing.

9            COURT REPORTER:  All right.  And then I

10   just  have  a  short  little  read  off.   This

11   concludes the deposition of Dr. Andrew Wolfe,

12   taken in the matter of Cutting Edge Vision vs.

13   T-Mobile.  Today's date is Friday, March 14th,

14   2025.  And the time is now about 2:30 p.m.

15   Pacific.  We are off the record.

16            (Whereupon, the above-entitled matter

17   went off the record at 2:30 p.m., signature

18   having NOT been waived.)

19

20

21

22

23

24

25

**A**

**a.m** 4:2,11 6:3,4,6 56:19
    56:20,22
**ability** 8:10 125:9
**able** 17:9,13 51:24 56:8
    64:3 66:4 92:20 117:2
    131:7
**above-entitled** 6:2
    56:18 122:19 154:18
    161:16
**above-referred** 15:8
    31:19 38:5 57:8,16
    70:8,19 77:14 84:4
    92:16 103:19 106:1
    110:22 117:4 123:16
**abroad** 66:10
**absent** 136:15
**abstract** 137:1
**abstractly** 62:23
**access** 5:20 50:6,7,12
    50:16 117:2 141:22
    157:3 158:19
**accommodate** 160:13
    160:18
**accomplish** 110:7,8
**account** 83:24
**accurate** 23:7 30:7
    47:12 81:18 112:2,13
    113:4 118:19 152:25
**accurately** 8:10 69:11
**acknowledge** 17:3
**action** 42:23 79:1,2
**actions** 82:18 104:21
    105:6
**acts** 79:21 87:23
**actual** 33:4 50:11 93:23
    93:23 95:24 97:9
    138:18
**add** 130:12
**added** 87:18 88:25
    157:22
**addition** 23:3 74:16
    79:14,16 87:14,18
    112:23
**additional** 21:19 22:17
    51:12 52:23 73:17
    100:18 102:17 126:18
**address** 8:14,15,17,18
    13:11,18 48:18 49:23
    50:1,21 51:6 160:22
**addressing** 49:25
**admit** 13:4
**advantage** 108:12
**affect** 83:17
**afield** 68:16
**agent** 68:24 69:1
**ago** 68:11 111:5
**agree** 6:13 7:7,11 12:9

12:14,24 19:25 29:5
    45:22 50:18 68:5
    75:12 86:13 87:5 88:8
    88:12,14 91:24 93:17
    94:11 97:12 98:2
    101:9 104:7,23
    111:20 114:6 116:20
    117:19 118:4 121:18
    121:23 124:9 128:18
    129:8 132:1 138:18
    139:16,17 140:18
    144:4,15 149:15,17
    150:3,5
**agreement** 127:11
**ahead** 139:13 160:25
    161:3
**Albright's** 152:19 153:2
**algorithm** 93:15,21
    94:3,12,18,21 95:5,7
    95:10,18,19,23,24
    96:3,4 97:11 98:19
    99:5,17,18,18 100:1,9
    100:25 101:3,22
    102:6,17,21 103:6,9
    105:12 107:8,14,20
    107:22 108:3,16,18
    108:20 109:5,6,18,19
    109:21 110:1,1,10
    113:5 114:11,14,19
    114:25 115:1,4,5,8,22
    116:2,9,13,17,18,19
    120:20,23 121:2,5,8,9
    121:13 126:7 133:5,8
    136:16 138:9,24
    140:22 144:7 145:20
    146:14 149:8 151:14
    151:17 156:10 158:2
**algorithmic** 145:3
**algorithms** 101:15
    112:21,25 113:13,20
    113:22 114:2,4,7,18
    115:10,16 116:15
    120:13,17,18 121:15
    121:17,21,24 122:3,5
    150:13
**allowed** 76:10 128:15
    129:5 130:22 155:19
    157:1
**allows** 124:5
**Alright** 156:19
**alternative** 100:23
**ambiguous** 146:5 150:7
**amended** 10:4 35:4
    78:3 85:13 118:14,18
    **Amendment** 3:10
**amendments** 30:18
    78:11 79:25 88:2
**America** 16:4

**amount** 27:16 28:22
**analysis** 13:1 14:18
    80:21 94:25 132:19
**and/or** 119:8
**Andrew** 1:16 3:3 4:4 5:9
    8:15 70:25 161:11
**answer** 7:24 8:5 14:1
    18:7 22:13 24:2 26:1
    27:23 41:6,7,14,16
    61:15 108:24 109:8
    110:11 133:22 136:12
**answered** 21:1,3,8
    23:25 30:11 37:20
    41:25 44:4 50:24
    89:17 90:1 130:19
**answering** 7:18 40:1
**answers** 14:3
**anybody** 7:10 19:18,18
**apologies** 70:16
**apologize** 55:22
**appear** 46:23 50:7,10
    50:25 72:20,24 127:5
**APPEARANCES** 2:1
**appears** 15:17 38:20
    57:11 76:5,8 78:21
    84:16 87:6 93:14
    111:4
**Apple** 114:1
**applicant** 30:16 79:16
    79:19,22,23 81:5,13
    81:23 82:12,24 87:17
    87:18,21,24,25 88:9
    88:14,15 141:7
**application** 67:18 69:3
    69:10 77:25 82:19
    85:12 88:25 117:15
    118:5
**applications** 10:17
    68:11,13 69:22 70:1
**applied** 60:4 80:10
**applies** 67:11 120:9
**apply** 81:2
**applying** 59:17 83:25
**appreciate** 153:20
**approaches** 61:14
**appropriate** 79:25 88:2
    114:25 115:1
**appropriately** 81:9
**approve** 69:10
**approved** 20:20
**Approximately** 66:13
**area** 111:24
**argument** 144:1
**arguments** 55:14
**arithmetic** 61:12
**Arizona** 1:6
**art** 26:15 27:4,7,10,11
    31:13 32:15 59:12

64:18 67:6,10 113:18
    114:15 116:3 119:12
    120:5,7,9,12
**artisan** 63:22,24 64:8
    65:6 96:6 105:15
    126:13,14 150:21
**aside** 6:17 19:4 35:17
    43:13 56:1 105:4
    134:3
**asked** 20:25 21:7 22:3
    22:17 23:25 26:2
    27:15 30:10 37:19
    44:3 46:13,19 49:6,23
    50:2,24 89:16,25
    135:18 153:11,12
**asking** 76:14 90:16
    107:16 109:20 130:21
**assembly** 124:24
**asserted** 10:24 128:13
    154:25
**assertion** 92:6
**assignee** 68:22
**assist** 12:20 28:3,19
    29:13 34:5
**associated** 67:16
**assume** 7:25 54:23
    140:25
**attached** 25:15
**attempting** 150:14
**attorney** 66:22 68:24
    69:1,19 70:4 74:25
**attorneys** 20:18,20
    68:19
**automatic** 141:10
**automatically** 140:4
    142:24 143:15 144:10
    155:14,15 158:9
**available** 30:1 95:3
    98:11,13 105:13
    115:8,22 116:15
    122:3
**Avenue** 2:5,11
**avoided** 23:22
**aware** 16:8,20 21:17
    43:6,8,25 44:5 46:5
    47:23 53:4,6,15,19,22
    58:20 66:18,21 67:10
    71:20 74:5 80:14 92:7
    92:8 134:8,16 149:24

**B**

**B** 2:4 39:21
**back** 6:5 31:2 33:18
    37:1 38:16 41:8,11
    47:15 48:14 56:21
    78:10 84:24 87:8
    118:8 122:22 123:14
    132:12 133:17 134:22

152:3 154:21
**background** 7:3 112:7
  117:22 119:2 121:16
**backing** 106:22 107:1,7
  107:19 108:8 109:11
**ballpark** 11:14
**base** 54:23,24
**based** 12:14,16 15:17
  20:16 58:14 71:15,19
  72:21,23 88:4 91:12
  97:1 98:24 112:1,15
  113:15 121:15 124:5
  137:14 140:6 142:18
  143:17 144:11 155:19
**basic** 61:5 115:21
**basing** 145:7
**basis** 12:8 17:3
**Bates** 40:12
**bathroom** 56:13
**bear** 103:16
**bears** 15:16
**beginning** 31:8 112:20
**begins** 4:4 25:17 74:14
**behalf** 1:19 2:2,9 4:15
  4:18,21 8:22 12:2
**believe** 10:7 11:23
  16:18 19:17 21:9
  26:22 27:5 33:14
  34:10 37:8 41:25 55:3
  66:15 68:22 80:9
  91:21 112:11,12
  120:4 124:25 130:15
  138:7 150:19 157:20
  161:7
**believed** 16:11 43:18
  80:16 81:16 89:7
**believes** 79:23 87:17,25
**Bernardi** 149:1
**best** 7:19 14:2,14,15
  16:4 17:17,20 23:11
  32:21
**better** 99:24
**beyond** 23:14
**big** 63:14,16 65:17
**bit** 56:24 64:13 96:18
  147:6 153:24
**block** 73:6,9,14,21,24
  74:2,6 98:14 125:20
  126:6,10,11
**blocks** 124:5
**board** 152:6
**body** 138:14 139:9
**bottom** 87:15 106:17
**Boulevard** 8:19
**boundary** 65:13,13
**box** 6:22,23 15:4 31:17
  57:1 65:17,19 66:5
  70:15 71:19 73:18,20

152:13
**boxes** 73:4,10,13
**break** 8:3,6 45:3 56:9
  122:9,12 123:2,7
  153:25,25
**brief** 54:11,13 159:21
  160:2,9
**briefing** 55:14 159:20
**briefly** 10:21
**bring** 66:4 152:2
**broader** 83:10
**broadest** 83:3,9,19,21
**browser** 6:22,23
**build** 62:22 145:17
  146:3
**building** 98:14 126:6,10
**bulk** 20:4
**bullet** 23:1 125:14,15
**business** 108:1
**button** 115:6,11,12,12
  115:14

---
**C**
---

**cache** 106:22
**calculate** 64:25
**California** 8:20
**call** 60:19 102:24 109:4
**called** 1:17 5:10 66:18
  97:13,17
**camera** 158:17
**cameras** 118:3,13,17
**candor** 66:19 67:18
**capability** 132:3,7
**capable** 136:16
**captioned** 54:2 55:16
**captured** 140:9 142:1
  143:20 144:14
**care** 79:17 87:19
**careful** 37:4 68:17,20
**carefully** 18:1 30:2,14
  34:12 35:23 51:5
  78:23 89:1
**carried** 140:17 144:3
**carrier** 132:12 133:17
  133:17
**case** 1:9 4:7 9:8,15 14:8
  17:3,3 22:15 26:25
  28:12 37:14 38:14
  41:2,19,23 54:1,17,21
  81:13,21 92:3 93:1
  100:6,22,24 122:2
  134:23
**cases** 18:17 25:21
  32:10,18 33:10 62:5
  81:20
**categories** 151:6
**cell** 127:8,22 131:8,12
  132:6 133:9,16

**cellular** 50:5,6,12,16
  126:23,24 127:22
  131:24 132:2 134:4,5
  134:9,19 140:8
  141:20,22,24 143:19
  144:13 155:20 157:3
  157:4,21 158:1,19,20
**center** 72:25
**certain** 13:17 14:8,24
  18:23 19:1 29:16
  30:22 33:11 37:15
  90:8,24 106:23
  107:13 113:8 134:12
  145:22 151:1 155:14
  159:25
**certainly** 7:9 14:2 15:3
  18:12 22:14 44:24
  47:8 49:17 59:5 72:11
  74:5 109:17 114:4
  124:24 156:2
**CEV** 9:4 10:23 14:6
  24:14,19 25:2 36:19
  40:24 54:1 55:15
  81:13 82:24
**CEV-T-Mobile** 3:9
**CEV-TCL** 3:7
**challenge** 116:24
**change** 16:23 66:9 82:2
  119:6 128:24 151:16
**changed** 75:2 127:19
**changes** 17:6
**characteristic** 108:4
**characteristics** 62:17
  63:6
**characterization** 53:20
**characterize** 36:4
**charges** 128:17 129:8
  130:25
**chat** 123:8
**chats** 7:6
**check** 99:8,11,13
  100:21 147:17
**Chicago** 2:6
**chip** 60:23 149:6 152:6
  152:8,8,10
**choose** 114:25 115:11
  115:19
**choosing** 116:25
**chose** 43:12,23,25
  46:15
**circle** 31:2
**circuit** 151:20,23 152:2
  152:6
**circuitry** 112:24
**circular** 116:17
**circumstances** 68:25
  109:1
**citations** 56:5

**cited** 23:4,17 31:8 32:1
  32:2,21 33:2,15 52:20
  55:3,8 78:18 90:15
  129:11
**claim** 3:7 8:21 10:5 27:3
  35:5,17,19,24 36:1,13
  36:18 40:23 46:21,22
  46:23 47:4,10 49:12
  50:7,8,17 54:11,13
  55:13 74:17,18 79:24
  80:21 81:2,7 83:25
  88:1,19 89:7,14 91:23
  109:20 136:10,13
  137:3,12,23,23 138:2
  138:5,8,16,24 139:2,7
  140:16,17,23 141:4
  142:8,13,17,19,20
  143:5,6,13,15,22
  145:10 151:12,13
  155:8,12,23 156:8,17
  156:20 157:12 158:4
  158:5,7,15,21,25
  159:3,6
**claimed** 51:1 82:7
  135:24 136:12,17
  137:8,9,18 138:11,14
  149:7,9 150:7,12,14
  151:3
**claiming** 137:5
**claims** 28:11 36:6 50:9
  76:15 78:2,4,12 79:17
  79:20 80:11,12,20,25
  81:18 82:3,14,25
  85:13 86:1,1,2,3,9,13
  86:16,17,21 87:3,4,19
  87:22 88:7,10,16 89:1
  90:10,23,25 91:10,15
  92:10 94:22 95:22
  101:2 107:16 109:21
  128:5 135:18,21
  136:3 139:4,16
  148:16 153:10,15
  155:1 156:1,2,3,4
  157:15
**Clara** 8:20
**clarification** 69:24
**clarify** 13:6 51:18 61:25
  117:18
**class** 62:20,21,23 63:14
  63:15,16,19
**clearly** 23:17 47:23
  66:1 88:25 111:18
**close** 70:15 126:20
**closed** 109:11
**code** 93:18,19,22,23
  94:9 95:2,4 96:10
  98:25 99:6,23,24,25
  100:7 101:9,14 103:1

104:20,22 105:5
124:5 125:19,20
126:10,11 138:18
144:18 146:8
**coder** 97:3
**coders** 98:11
**coding** 96:19,21,24
97:2 98:1 105:1,1
**colleagues** 7:6
**collectively** 9:3
**Column** 74:10 106:15
106:18,18,19 107:5
117:21 119:1 139:20
146:20,23
**Columns** 106:16,17
**combinations** 103:13
**come** 22:15 133:21
**comes** 152:12
**coming** 123:19
**comment** 46:8 48:7
49:19 51:18 52:4 53:8
80:8,16 81:25 83:1
88:21
**commented** 48:13,25
**commenting** 52:24
**comments** 81:5,5,10,13
83:22 90:21
**commercially** 127:6
**common** 58:11 59:5
61:3 63:11 73:12 96:5
97:16 127:19
**commonality** 63:20
**commonly** 60:20
**communicate** 65:1
123:10
**communicated** 133:25
**communicating** 132:12
**communication** 127:15
127:17
**communications** 7:9
7:12 18:8 19:8 20:14
22:10,11
**Company** 1:7 4:10
**compare** 78:22
**comparing** 84:19
**complete** 14:3 23:7
37:23 68:9 90:22 99:3
**completed** 146:17
**completely** 138:14
**complicated** 13:22 14:1
102:22,23 157:25
**component** 58:13
**components** 63:9,10
63:10
**compound** 31:11
**comprehensive** 49:9
**comprising** 141:4
142:8,19 145:8,9

**compute** 60:20
**computer** 6:17,25
58:13 119:8 122:6
**computers** 61:21,23
**computing** 58:12,14
61:23 62:11
**concept** 97:23,24 98:1
98:4,6 126:25 127:3
**concluded** 135:22
**concludes** 161:11
**conclusion** 82:8 145:7
**condition** 98:17,18,19
98:24 99:14,15,22,25
100:11,19,20,21,22
101:19,21 124:6
125:7,18,21 126:10
144:8,8,8,9 145:22,25
157:7
**condition's** 145:23
**conditional** 97:4,13,17
98:10 103:13 104:3,9
104:22 105:5,16
**conditionals** 98:5
**conditions** 97:19,21,22
98:10,16 99:23 103:7
105:10 106:23 113:8
131:21 139:22 140:2
140:13,14,15 141:15
141:17 142:7,10,24
143:2,10,12,14
144:20 146:6 155:14
155:16 158:10,11
**conduct** 24:7
**confident** 37:3
**configuration** 122:1
**configured** 143:4
155:13 156:25 158:17
158:22
**confirm** 6:12 15:14
17:15 133:2 134:17
158:17
**confusing** 85:20
**connect** 143:16 144:10
155:14 158:9
**connected** 63:11
134:10 141:24
**connecting** 128:6 140:5
155:15
**connection** 141:10
**consider** 37:9 76:22
80:22 92:4 108:15
109:2 110:6 114:24
135:13 138:7 160:8
**consideration** 37:16
**considered** 42:22 57:21
58:1 72:2 77:6 81:8
89:4,10,20 90:11
91:25 107:15 135:15

138:4
**consistent** 125:22,25
**consisting** 126:4,9
**consists** 103:7 125:13
125:17
**constitute** 30:13
**construct** 114:25 115:3
144:19 145:4
**construction** 3:8 8:22
27:3 36:18 40:18,24
49:12 54:11,13 55:14
80:21 83:4,9,19,22,25
**Constructions** 10:1,5
35:3,5
**construe** 76:15
**construing** 82:25
**contain** 63:8,9
**contained** 152:6,8
**contend** 114:1
**content** 81:10 95:17,25
97:6 105:22 111:6
**contentions** 24:13,17
24:20 25:1,3,6,11
128:20 129:19
**CONTENTS** 3:1
**context** 58:6,11,18 59:3
60:12,17 61:2,8,20
62:4 64:14 71:23 72:2
81:9 102:6 105:19
109:6,7,17 113:2
126:22,23 128:24
129:25 130:15,21
131:2 135:11 136:10
137:3 140:3 145:2
150:25 151:1
**contexts** 68:21
**continue** 19:6 86:11
**continues** 106:19
**contrast** 49:13
**control** 124:1,4,7
**controller** 35:18 51:2
73:1,2 119:7,13
135:16,20 136:5,11
136:15 137:4,13,19
138:4,6,9,10 139:21
140:1,12 141:13
143:9 150:8,17,21,24
151:1,2,12 153:15
155:11,13,18,21
156:4,5,5,20,25 157:6
157:9,10 158:10,16
158:21
**controllers** 150:2,10
**convened** 4:7
**convenience** 9:1
**conventions** 128:12
**cooperation** 127:10
**coordinate** 119:24,24

**copied** 86:21,23
**copies** 86:15
**copy** 69:1
**copyright** 104:17
**correct** 8:24 12:3 14:9
14:13,18 16:6,19 17:9
17:13,17,20 25:14,18
25:22 33:6 37:18
38:25 39:11 40:5,15
40:16 43:1 46:10,12
48:9 54:14,15 55:2,10
66:11 69:18,19 93:3
139:4
**corrected** 17:8
**correcting** 160:8
**corrections** 159:25
**correspond** 78:17
**corresponding** 82:20
109:14
**corresponds** 101:19
**counsel** 1:17 5:10 22:1
22:11,14 28:9 29:17
54:6 59:19 123:3
**counter** 61:11
**country** 127:16
**couple** 124:25
**couples** 119:7
**course** 66:16 83:2
58:11
**court** 1:1 4:3,9 5:1,3,6
5:25 6:5 12:9,16,21
13:23 27:6 41:10
49:13 56:16,21 83:11
122:17,22 154:16,21
160:14,25 161:4,9
**court's** 13:1
**covered** 80:25 82:3
**CPU** 60:19 62:11 119:8
119:10,15,17,20
120:2,8 121:3 122:7
**create** 82:4
**created** 114:19
**criteria** 133:6,15
**critique** 49:9
**CROSS** 3:2 154:23
**Cruz** 8:19
**Ctrl-F** 30:22
**current** 76:21 77:4
148:14
**currently** 6:16
**cursory** 15:17
**customary** 83:12
**cut** 118:23
**Cutting** 1:6 4:5,16,18
55:25 56:2 161:12
**CV** 25:17,20 34:13,14
66:8 111:17,24

**D**

**data** 12:14,17 42:21
106:21,24,25 107:2,6
107:6,8,18,18,21,22
108:8,9,18 109:8,10
109:12 113:9,13,14
113:15 118:1,15
119:10 121:23 122:6
126:21 128:16 129:7
130:24 135:8,13,17
141:19 155:20 157:4
158:20
**date** 4:10 78:15 84:21
85:2 94:6,15 104:14
105:4 118:5 128:13
129:4 130:25 161:13
**dated** 10:1,5 33:21 35:3
35:5 38:18 94:10
**day** 78:2 85:14 161:3
**De** 8:19
**deal** 64:2 65:3
**dealing** 60:1 67:19
**debate** 35:18 160:2
**decade** 106:13
**decades** 125:1
**December** 33:21 38:18
42:3 111:12
**decide** 76:15 80:24
**decided** 34:12 48:4,7
**decision** 22:6 112:21
112:25
**decisions** 104:21 105:7
113:15 124:7
**declaration** 3:5,7,13
8:22 9:7,11,12 10:9
10:13,20 11:11,13
14:13 15:15 16:2,12
16:15,19,22 17:22,25
18:5 19:16,23 20:10
21:12,14 23:9,15,18
23:23 24:7,9,12,22
25:4,10,15,25 26:6,9
27:20 28:17 29:2,4
30:25 33:21 34:3,9,18
34:22 37:2,7 38:16,17
38:23 39:10,16
40:21 41:1,5,21 42:5
42:10,14,19 43:5,7,20
44:7,9,13,16,18,23,25
45:24 46:4,9,10 47:5
47:20,21 48:8,14,15
49:1,6,11 50:22 51:7
51:13,15,19 52:1,2,5
52:9,11,13,17,21,22
52:25 53:3,8,18 55:9
55:20,25 56:3,7 57:7
57:23 59:16,22 75:10
78:19 79:4,7,9 80:7

81:12 82:1 85:22
86:21,24 87:12 88:4
91:7 111:5,11 126:14
128:2 135:3,4,8,14
148:5,10,23 149:11
150:3,16
**declarations** 26:3
**deep** 111:18
**deeper** 132:9
**Defendant's** 10:4 35:4
40:17,19 54:10,13
**Defendants** 1:11 2:9
4:22 9:2
**define** 27:6 109:5,15
133:14
**defined** 67:22 110:2
126:14 133:6
**definitely** 111:6
**definition** 105:15
**definitions** 71:19
150:17,20 151:4,16
**depend** 58:10 60:17
61:8 64:22 72:9 109:6
114:20 131:18,18,20
145:2
**dependent** 127:18
**depending** 59:3 64:13
68:25 100:19 115:10
115:17 121:25 126:22
**depends** 58:6,18 60:12
61:2,19 62:4,21 63:16
71:23 97:15 98:15
100:8 101:8 104:25
105:8 146:13 147:5
151:10
**deposition** 1:15,18 4:4
4:25 5:17 6:9,12 7:5
8:4 9:2,7,10,14,18,25
10:3,13,15 11:6,10,12
11:25 16:15,23 38:2
42:2 161:11
**describe** 58:9,12 73:18
93:10 96:6 98:20
113:7 127:3 145:20
145:21,23 151:19
157:24
**described** 72:16 74:2,7
93:22 96:9 113:19
121:10 126:6 138:3,5
139:7 141:11 144:22
145:5 158:25
**describes** 99:16 103:9
120:19 138:8 140:14
**describing** 65:22 73:20
108:2,4
**description** 72:10 99:4
99:19 101:16 108:14
113:6 114:18 121:8

121:12 144:6 151:25
152:15 155:25 157:21
**descriptions** 151:8
**descriptive** 119:22
**design** 58:25
**designated** 142:3
**detail** 64:2,5,12,13,24
65:3,24 67:4,7 107:11
113:20 138:11
**detailed** 42:24 94:25
96:20,23 97:1 113:6
**detect** 156:25 157:7
158:11
**detected** 139:21 140:1
140:11 141:12 143:8
**detection** 112:25
**detector** 63:5
**determination** 83:18
132:11,13,15
**determine** 13:23 17:5
32:20 72:2 94:20
116:7 131:8,12 132:3
141:19,23 153:12
155:18
**determined** 14:21,25
141:12,25 157:4
158:19
**determines** 132:24
133:18
**determining** 125:7
**developed** 20:17
113:12
**development** 58:25
105:8
**device** 35:19 45:18,22
46:4,22,24 47:3,13
62:11 151:21 152:7
152:15,16
**devices** 62:20,22 118:2
118:2,16,17
**diagram** 73:6,9,14 74:2
74:3,7,8
**diagrams** 73:21,24
**dictionary** 150:16,19
**die** 115:13
**differ** 63:5 120:17
**difference** 60:10,15
83:6 95:4 144:23
**differences** 94:7
**different** 27:1 36:6 53:6
58:14 61:10,14 62:14
62:16,25 80:12 83:25
90:2 101:15 103:11
103:13 104:21,21
105:6,6 114:8 116:15
118:11 121:19 124:17
125:4,5 127:4 146:10
153:9,9,10,10

**differential** 127:13
**differentiate** 61:21
**differs** 85:21
**direct** 3:2 5:13 139:21
**directly** 133:13
**disagree** 49:8 88:13
144:19 149:15 150:4
150:8
**disagreed** 48:25
**disagrees** 81:24
**disclose** 67:4,9,20 94:3
151:14,16,17,18
**disclosed** 14:22 39:20
56:5 93:16 137:17,22
149:20 156:8
**discloses** 94:11,21
**disclosure** 66:19 68:23
69:2,7 75:1 82:5
94:18,20 107:14
109:13
**disclosures** 82:6
**discovered** 16:21
**discuss** 59:15 160:8
**discussed** 11:7 20:17
29:16 50:19 55:19
57:6,24 86:22,24
120:14 121:16
**discussing** 6:11 53:2
57:6 120:1 127:22
154:25 156:16
**discussion** 20:8 35:20
47:3,4 92:9 130:18
**discussions** 18:16 47:9
69:6
**display** 111:19,23
142:3
**displayed** 114:12 115:6
**displays** 111:23
**disputed** 35:17 36:13
**DISTRICT** 1:1,1
**DIVISION** 1:2
**docket** 38:21
**document** 6:11 15:9,21
22:2,4 31:20 34:1,6
38:6,10,11,24 40:20
44:25 53:11 56:1 57:3
57:9,14,17 70:9,20
71:10 77:13,15 84:5
84:15 85:1,17 92:17
92:23 93:5 103:20
104:15 106:2 110:18
110:23 111:3 117:5
117:12 123:17,20
126:20 128:21 147:19
**documents** 5:19,21
6:10,17,20 22:5,18
23:4,14,17 24:12 28:4
28:6 32:9 33:4,5,10

33:14 35:2,10 36:19
37:10 39:15,20 40:2
40:24 42:13,17 44:6
44:15 55:15 56:2,6
77:18
**doing** 49:9 132:9,19
149:18
**dominated** 62:10
**download** 15:6 38:1
110:25 128:17 129:7
130:24
**downloading** 106:7
**Dr** 1:16 4:4,23 5:2,6,14
6:7 9:11 18:8 19:8
20:15 21:16 22:11,21
26:2 31:18 33:21 34:9
34:17 37:25 38:13,18
38:24 39:9 41:9,15,21
42:3,20 43:4 45:4,15
47:20 48:24 49:8,10
49:14 51:7 52:2,5,20
54:23,25 55:1,3,7,9
55:19,24 56:24 57:12
58:2 74:10 77:10 84:2
92:20 103:16 104:23
105:24 107:4 110:20
122:10,24 128:1
135:2 139:11 146:21
148:5,9,22 150:15
152:24 153:20 154:24
161:11
**draft** 18:4,18,21 20:24
21:13 79:20 87:22
**drafted** 19:3,12,17
20:12,19,19 21:5
**drafting** 21:11 39:16
**draw** 65:17,18 113:17
**driver** 119:8,10
**driver/CPU** 121:23
**duly** 5:11
**duty** 66:19 67:18,20,24

**E**

**earlier** 53:2 54:12
**early** 150:24
**easier** 15:7 36:8 55:21
78:14 87:8
**easy** 145:11
**Edge** 1:6 4:5,16,18
55:25 56:2 161:12
**effectively** 126:19
**efficient** 160:4
**effort** 160:13
**eight** 11:15 100:17
102:7,18,19 103:10
**either** 9:19 14:25 28:23
40:25 44:9 45:4,5
56:5 88:21 100:12

105:25 118:13 123:9
125:19 128:9 149:4
151:7 154:5 156:6
**electronic** 60:2,6 62:22
118:1,16
**electronics** 62:20 66:2
66:5
**element** 88:19 91:23
109:20 140:16 143:2
144:3
**elements** 31:13 50:8
60:25 61:5,23 77:5
82:9,10 90:24 135:16
**Elizabeth** 2:10 4:20
**Elizabeth.Weiskopf...**
2:13
**emulated** 59:2 72:1
**enable** 94:23 143:17
144:11
**enables** 67:5
**enabling** 140:6
**encrypt** 108:22,24
**encrypted** 106:23,24,25
107:2,6,7,9,18,19,21
107:23 108:8,9,19
109:8,10,12
**ends** 78:7 120:2,8
**engine** 60:20
**engineer** 59:25 108:2
**English** 145:1 146:5
**ensure** 69:11
**entire** 29:25 31:5 32:19
35:10 102:6 109:20
110:2 129:17
**entirety** 99:4,18 100:9
**environment** 105:9
**equal** 100:11,16
**equals** 95:12,12 99:12
99:13,22,22 100:6,6
101:17,18 102:11,11
108:8 109:10
**equivalent** 65:16 125:6
147:14
**Eric** 4:8 122:16
**error** 17:5,8
**errors** 69:16,19 70:3
**ESQ** 2:3,4,10
**establish** 96:17
**estimate** 19:15 160:23
**evaluate** 94:19 102:5
131:22
**evaluated** 113:10
**evaluates** 125:19
**evaluating** 103:7
**evaluation** 102:16
**evaluations** 103:8,14
**eventually** 91:15
**everybody** 56:9

**evidence** 12:21 13:9,11
13:17 19:17,20 20:3,4
37:15,17 46:17 75:9
81:17
**exact** 83:14
**exactly** 11:14 18:15
40:1 41:3,19 75:6
84:18 110:9
**examination** 1:17 5:13
154:23
**examined** 5:12 89:1
**examiner** 30:17 32:10
32:17,21 66:22 79:23
80:24 81:6,23 82:15
82:17,24 83:23 87:25
88:19,22,23 89:4,7,10
89:13,19 90:8,23 91:3
91:9,15,25 92:6
**examiner's** 80:19 91:20
92:11
**examining** 91:25
**example** 19:22 21:18
21:25 24:14 32:14,22
54:6 65:10 81:12
93:18 99:8 100:5,14
100:15 106:24 108:6
113:16 114:12 124:15
124:23
**examples** 106:21
**exceptions** 59:3
**excerpt** 78:6 85:3
107:21
**excerpts** 10:8 20:1 79:1
79:3
**execute** 124:5
**executed** 125:20
**execution** 124:8
**exemplary** 93:15,22,24
**exercise** 39:19
**exhibit** 3:4 15:5,9,12,14
17:23 22:19 25:25
26:12 31:16,20 33:18
35:7 36:9 38:1,6,19
38:23 39:3,23 41:1
42:12,25 44:10 45:10
45:20 46:1,6 47:16
48:9 50:5,20 51:8
52:10 53:9,11,17,21
54:2,9 55:9,17,24
56:25 57:9,13,15,17
57:20 70:7,9,13,14,15
70:16,20 71:3,7 75:15
75:16 76:2 77:10,15
77:23 78:11,19 80:8
84:3,5,7,14,21,25
85:5,10,11 86:7,19
87:9,11,16 88:5 91:6
91:6 92:14,15,17 99:9

99:10,10 101:18
103:16,17,20 104:4
105:23 106:2,11
110:18,19,20,23
117:2,5,18 119:1
120:2,8,15 121:11
122:25 123:15,17
126:15 135:3 139:10
139:15 148:5 149:12
149:12 155:5 156:13
**exhibits** 77:8 122:25
150:8,12,14
**exist** 98:1 114:7,15
121:17,24 126:4
132:14,21 133:24,24
**existed** 43:6,8 98:5
114:5 116:2,24
121:21 122:4 126:5
126:10 132:2,7,17,19
132:22 134:13,15,18
**existence** 98:14,18
158:1
**existing** 115:5,7,9
116:9 121:17 134:16
**exists** 133:23
**expect** 134:23 152:4
**expectations** 65:22
**expected** 67:3
**experience** 26:14 73:22
111:25 112:16
**expert** 3:5 12:20 25:21
25:24 26:5,9,18 28:4
29:15 33:20 37:9
38:17 54:20 80:7
**expertise** 27:1 111:25
**experts** 12:13
**explain** 44:17,24 51:25
69:7
**explained** 18:17 21:10
59:18 60:3 66:23
**explaining** 141:7
**explanation** 52:8 77:3
**explanations** 69:14
**explicitly** 147:21
**expound** 69:6
**express** 42:23 51:14,25
52:6,21,25 93:20
95:24 97:11 101:14
**expressed** 98:8
**expresses** 76:12,23
96:15
**expressing** 97:8
**expression** 125:18
**extent** 76:11

**F**

**f** 44:16 50:8,8
**f(ii)** 140:17 143:3

**F2** 158:5
**face** 76:5,6
**fact** 53:3,16 68:8 82:4
  120:19 153:8
**factor** 76:22
**factors** 63:6 77:3,6 82:8
  114:24
**facts** 12:14,16,25 13:4
  13:7 153:4
**factual** 134:21
**factually** 134:25
**fair** 53:20 64:19 80:17
  102:24
**faith** 66:19 67:18
**fall** 79:18 87:20 146:7
**falls** 79:24 88:1
**false** 100:12 101:7,25
  102:5,13,16 103:3,9
  124:6 125:7,19
  142:10 145:24
**falses** 103:2
**familiar** 12:11 58:2
  104:1 126:15 127:2
  131:23 145:16
**family** 90:22 150:2,10
**far** 16:20 68:16 69:13
  128:1,21 129:10
**feature** 148:16,18
**February** 10:5 35:5
**feedback** 30:16
**feel** 34:16 37:13 52:3,4
**fees** 30:3 50:6,7,13,16
  141:22 157:3 158:19
**felt** 37:16,21,21 49:20
  51:4,17
**field** 112:16
**figure** 65:2 71:9,13
  72:23 73:4 93:11
  108:13 114:5 120:19
  120:24,25
**Figured** 45:8
**Figures** 93:6
**file** 3:9 9:19 10:16 11:3
  20:1 26:4 29:2,3,8,11
  29:14,18,21,25 30:7
  30:21 32:11,14 40:10
  70:1 77:18 82:16,22
  84:16 85:3 88:18 89:4
  89:6,13,19,23 90:3,17
  91:14 92:11 141:7
  147:7
**filed** 67:1 78:1 85:12
  86:10,12,16,17 94:16
  117:16
**filing** 67:9,17 68:6
  69:11,20 86:6,8 87:3
  87:7 88:6 118:5
**final** 87:12 159:23

161:6
**finalizing** 39:10
**financial** 127:11
**find** 30:22 52:23 64:7,8
**fine** 6:14 7:15 8:18 45:4
  45:5 105:25 154:2,5
**finish** 7:17 29:23 31:5
  34:9 35:10 161:1
**firm** 29:14
**first** 5:11,17,20 6:8
  11:22 18:18,20 19:4
  19:13 20:24 29:20
  84:14 94:14 96:17
  101:7 102:10 117:23
  123:25 136:22
**five** 23:2,4 56:12 111:5
  153:25 154:2,5,8
**flag** 82:17
**flagged** 88:19 89:14
**flow** 124:7
**flowchart** 108:12
**flowcharts** 107:12
  146:3
**focus** 20:5,8 36:20
  97:24 107:5,17
**focused** 49:24
**folder** 5:19,20 6:10,18
  6:21,24 15:4 31:17
  38:2 57:1 70:7 84:8,9
  92:15 110:20 117:1
  122:25
**following** 23:3 85:14
  139:22 140:2,12
  143:9
**follows** 5:12 42:24 78:3
**footnote** 85:15,15,16
  85:25 86:4
**foregoing** 16:5
**form** 16:25 17:10 26:20
  30:10 32:6 34:19
  35:21 36:23 37:11,19
  43:15,19 44:11,21
  47:6 49:3,21 50:23
  51:9,21 52:18 62:12
  64:10,21 67:13 68:15
  73:15 74:4,22 75:17
  76:25 78:20 81:6
  86:14 92:2 95:23 96:8
  106:23,25 107:7,19
  107:24 108:8 109:10
  109:23 110:5,14
  116:4,22 119:17
  124:11 127:17 131:15
  132:5 134:20 136:25
  137:12 140:19,22
  144:16 146:9 147:22
  147:25 152:9,12
**formal** 139:1

**format** 36:16 73:12
  95:10,14,15 96:3
  119:19 122:5 126:16
**formatted** 97:10
**formed** 54:22
**forming** 14:7 21:11
  42:22 149:3
**forward** 108:13
**found** 128:4
**foundation** 96:18
  131:16
**four** 103:11 106:15
  143:12,14 144:2
  158:9
**Fourth** 2:11
**fragment** 108:3
**frankly** 87:7 152:20
**freedom** 37:22
**Friday** 1:13 4:10 161:13
**front** 38:3 49:18 70:23
**full** 8:13 14:3 37:16
**fully** 8:10
**function** 76:16 77:5
  82:18,25 83:17 88:20
  92:6,10 98:21 99:6
  109:3,16,22 137:23
  137:24 138:21 140:4
  140:10 151:12,13,15
  155:16,21,24 156:1
  156:11 157:9,10,13
  157:15,18,24,25
  158:22,24 159:1,4,9
  159:13
**functional** 140:13 144:6
  151:8 153:17
**functionality** 60:22
  99:19 151:9
**functions** 51:1 82:7
  93:16 135:24 136:17
  137:8,18 138:12,12
  138:13 139:6,8 149:7
  149:9 150:11 151:7
  154:25 155:11,18
  156:19 158:6,8,12
**fundamental** 124:1,3
**further** 50:17 159:17

---
**G**

**Garlick** 41:21 42:3
  54:23 55:7
**Garlick's** 54:25 55:2
**Gates** 2:10 4:21
**GeeksforGeeks** 3:15
**general** 58:13 62:13
  67:2 68:2 69:21 76:9
  88:23 97:23,24,25
  98:4,6 101:12 113:5
  120:10 127:24 128:5

148:12 151:5,19
**generally** 67:23,25 73:8
  75:24 81:4 83:10
  96:11 101:6 104:7
  119:15
**gestures** 113:1
**getting** 22:9 68:16
  105:24
**give** 12:4 14:2 17:20
  41:10 64:2 65:8 66:3
  68:1 76:4,9 77:8 83:8
  90:7 117:8 144:13
  154:1
**given** 12:8 37:22 53:21
  77:4 159:19 161:8
**giving** 12:7 68:4 71:18
**go** 5:16,23 29:1 33:13
  38:16 39:18 47:15
  48:14 52:12 64:1,3
  68:20 77:23 78:10
  84:20,24 87:8,8 91:5
  102:18,19,20 109:11
  112:4 118:8 122:15
  135:10 139:13 146:19
  152:1 160:20,25
  161:1,3
**goes** 85:4 112:5
**going** 4:24 5:14 6:7
  7:12 19:6 20:13 26:11
  26:24 41:12 45:2,4,8
  66:8 68:1 70:13 71:18
  122:9 127:25 128:19
  134:22 146:19 153:23
  159:20 160:22 161:7
**gonna** 70:6
**good** 4:14 56:16 66:19
  67:18 154:13
**great** 4:23 22:24 64:2
  65:3 92:22 96:24
  106:8 114:2
**Gross** 4:9
**ground** 4:24 5:15 6:8
**group** 28:5 65:7 140:8
  142:5 143:19 144:14
**grouping** 63:17
**guess** 6:21 20:9 93:21
  95:2 116:9 159:19,22
  159:25
**guidance** 28:8,12 66:4
**guide** 22:7
**guides** 102:16

---
**H**

**h** 40:23
**hand** 5:7
**handheld** 118:2,16
**handled** 18:21
**handling** 120:13

**Hang** 70:12
**happen** 22:3 58:24
    98:24 141:11 144:2
    145:22,23,24,25
    146:15
**happens** 98:16 100:13
    101:8 143:13
**hard** 7:13
**hardware** 136:19,19,23
    137:5,6 156:7 158:3
**heading** 45:17,21
    117:22
**hear** 24:6 27:23
**heard** 5:16 126:21,24
**hearing** 54:4,5,7
**Hello** 4:17
**help** 27:18 39:21 82:8
    105:21
**helpful** 14:5 49:13
    101:5
**helps** 28:5 91:13
**high** 73:21,24 101:16
**histories** 9:19 20:1 29:3
    29:8,11,14,18,21 30:7
    30:22
**history** 3:9 10:16 11:3
    26:4 29:2 30:1 32:11
    32:14 40:4,5,7,10,13
    40:15 77:19 78:5 80:3
    82:16,23 84:17 85:3
    88:18 89:4,7,13,19,23
    90:3,17,22 91:14
    92:11 141:7 147:8
**home** 8:17 128:15
    129:6 130:23
**honest** 12:8 68:7,8
**host** 122:6
**hosting** 140:5,7 142:6
    143:16,18 144:10,12
**hour** 45:2
**hours** 11:15,22
**housekeeping** 56:24
**HOV** 95:12 99:14
**huge** 65:14
**Hughes** 3:7 9:11 26:3
    33:21 34:9,17 38:13
    38:18,24 42:21 48:24
    49:9,14 55:3,24 148:5
    148:10 150:3
**Hughes's** 39:9 43:4
    47:20 49:10 51:7 52:2
    52:5,20 55:9,19 135:2
    148:22 150:15 152:24
**hundred** 33:14
**hundreds** 62:14
**hungry** 105:25
**hypothetically** 94:9
    133:4 146:15

**I**

**i.e** 132:15
**ID** 133:16,20 134:10,19
**idea** 21:4
**identification** 15:10
    31:21 38:7 57:10,18
    70:10,21 77:16 84:6
    92:18 103:21 106:3
    110:24 117:6 123:18
**ignore** 34:24 37:15
    46:14,15 48:1,3,4
    76:24
**ignored** 35:19
**ii** 50:8 144:3
**IL** 2:6
**illness** 8:9
**image** 140:8 143:19
**image-sensor** 144:14
**imagine** 108:2
**impact** 13:1 52:16
    127:11 128:9
**impair** 8:9
**implement** 94:4,24
    135:21
**implemented** 126:1
    133:3
**implying** 76:19
**important** 14:18,20
    47:10 160:1
**impressed** 115:24
**improve** 113:14
**improvements** 113:25
    114:2
**include** 42:23 61:11
    65:14 66:2 73:23
    80:11 127:9,12
**included** 10:8 49:16
    52:1 60:21 65:12 76:1
    79:7,9 86:15 122:5
    147:21
**includes** 67:19 97:7
**including** 30:18 118:2
    118:16 150:1
**incompatible** 127:15
**incorporate** 65:18,19
**incorporated** 147:1,4
    147:20,24,25 148:2
    148:15,18 149:25
**incorporates** 147:19
**incorporation** 148:11
**incorrect** 16:22 17:4
**increased** 50:16 141:22
    157:3 158:18
**indefinite** 47:13
**independent** 24:8
**independently** 54:22
**indicated** 11:3
**indicating** 132:7

**indication** 39:14 89:3,6
    89:9,19 107:2
**individual** 67:16,21
**influenced** 52:10
**inform** 79:23 87:25
    119:15
**information** 37:10
    42:21 67:20 116:12
    119:9 121:22 126:18
    135:25
**informed** 12:8 22:14
**infringement** 24:13,17
    24:20
**initial** 102:13
**initially** 61:20
**innovations** 112:23
**input** 72:4,5,11,13
**input/output** 60:22
**inputting** 118:1,15
**instance** 88:18 89:13
    99:8
**instances** 18:20 81:11
    82:23
**instructed** 48:1,3 76:20
    137:15
**instruction** 75:9
**insufficient** 136:5
**integrated** 60:23,25
**intended** 74:17,19
    93:20 145:12
**intent** 76:12,21,24 77:5
    80:11 82:13
**intentionally** 23:22
**interaction** 69:21
**interchangeable** 63:1
**interesting** 83:16
**interface** 140:8 141:20
    141:25 143:19 144:13
    155:20 157:5,21
    158:1,20
**internet** 140:6,7 141:24
    143:17,18 144:11,13
**interpret** 119:17 141:2
    141:5,6
**interpretation** 148:19
**interviews** 30:19
**intrinsic** 30:13 75:9,14
    75:21,23 76:7 81:6,17
**introduce** 4:12
**introduced** 61:20
    112:24
**introduction** 20:7 114:3
**invalidity** 25:1,3,6,11
    128:12 129:18
**invented** 69:12 95:6
**inventing** 95:8
**invention** 67:4,6,8
    68:23 69:2,7 75:1

**inventions** 68:21
**inventive** 95:20
**inventor** 66:9,14,23
    67:24 68:5 69:17
    70:24 71:5 75:4 92:25
    93:2 106:14 149:25
**inventors** 67:11 70:25
**investigate** 153:6
**investigation** 132:9
**invoke** 74:17
**involve** 30:2 127:14
**involved** 18:24 32:14
    36:4 53:7,22 68:6
**involvement** 66:17
**involving** 53:4 54:7
**iPad** 114:3
**iPhone** 114:3
**IPR2020-00234** 3:13
**irrelevant** 30:9 44:12
    62:7
**issue** 8:8,9 9:14 13:5
    26:21 28:11 53:13,13
    74:23 75:19 83:2
    89:10 92:4 107:18
    148:1,3 160:17
**issued** 10:21 86:1,3,9
    87:4 88:7,11 91:16
    94:17 95:8 117:16,19
**issues** 13:14 26:23,25
    49:12,15,24,25 50:1
    84:11 89:5 91:25
    135:19
**item** 29:1 33:20 48:20
    48:23 54:14,16 58:17
    58:19 62:1 63:23
    71:12,16 72:5,18,19
    72:19,25 74:1,6,7
    99:11 100:3 114:20
    114:21 117:3 136:23
**items** 23:2,5 65:8 72:21
    73:3,9,13

**J**

**J** 2:3,10
**January** 10:1 35:3
**JavaScript** 3:12 104:1
    104:12
**job** 88:22
**Judge** 152:19 153:2
**judgment** 95:21 153:4
    153:12
**Justin** 2:3 4:15 56:11
    154:14
**JustinLesko@patent...**
    2:7

**K**

**K&L** 2:10 4:21

**keep** 45:4,7 55:12 122:9
129:19
**kept** 141:7
**key** 63:5
**kidding** 154:2
**kind** 101:16 113:1
118:14 130:19
**kinds** 61:10 62:7,14
114:8 121:19
**know** 7:21 11:14 12:2
12:11 13:21 15:22
19:15 20:9 22:8,21
23:13 28:15 31:17
38:3,11 45:12 47:7
53:25 54:3 65:6,7
68:10 71:21 73:4
75:18,19 76:16 78:23
83:20 84:10 85:20
95:4,11,15 98:10 99:9
101:13,15 102:1
104:11,12 105:24
107:12,25 109:8
112:10 114:13,16
116:7 125:2 126:17
128:10,25 130:18
133:12 134:4,24
138:24 146:14,21
147:3 150:11 152:7
153:1 160:20,21
**knowledge** 16:5 17:17
**known** 67:21 95:17
98:11 105:14,20
129:5 130:20,22
136:14 150:9,13

**L**

**L** 70:25
**La** 8:19
**label** 158:15
**labeled** 155:8 156:16
**lane** 95:12 99:12,21
100:6,11,16 101:17
102:11
**language** 18:23 19:1
46:21 50:7 81:2,7
83:14,15 93:24 105:1
124:16,21,24 125:2
138:8 139:1,20
140:15 141:3 145:1
145:17 146:4 147:6
148:19
**languages** 105:1 124:4
124:13,18 125:3,4,8
126:1 145:15,19
**large** 62:3 115:13
**law** 2:4 75:2,9 76:10,19
77:4 137:15 148:14
**laws** 16:4

**lawyer** 68:4
**lawyers** 18:4,11,13,16
18:21 19:3,12 20:12
21:5 22:1,7
**leading** 78:1 85:12
**led** 87:3 118:6
**legal** 13:13,22 18:12
19:4,19 20:7 26:21
59:11,18,23 60:3 68:1
68:4 74:23 75:19,20
76:4,9 83:8,15 90:7
90:16 108:1 153:12
**Lesko** 2:3,4 4:14,15,23
5:1,5,14,23 6:7,15
13:16 14:7,11 17:7,15
17:21 18:10,19 19:11
19:21 20:21 21:4,11
21:18,24 22:19,23
23:13,21 24:2,5,18,25
25:8 27:2,13 30:6,20
31:1,15,23 32:13,23
33:17,24 34:23 35:1
36:1,7 37:1,8,13,25
38:9 41:8,14,20 42:2
42:11,20 43:3,24 44:8
44:17 45:2,7,9 46:21
47:2,14 48:20 49:17
50:4,18 51:4,16 52:7
53:1 56:8,12,15,23
59:15,20 62:18 64:15
65:5 66:7 69:16,23
73:19,25 74:9,13 75:8
75:12,22,25 77:7,21
78:24 79:11 86:18
87:1 89:22 90:2,14
91:4 92:5,12 95:1,9
96:16,22 98:9,23 99:2
99:7,20 101:17,23
102:9 103:1,15,23
104:18 105:3 108:6
108:17 110:4,11,17
111:2 116:14 117:1,9
120:12,21 122:8,13
122:15,24 123:5,8,13
124:15,20 126:3,8
128:10 129:4,13,22
130:2,8,13,17 131:4
131:23 132:1,14,21
133:7,20 134:2 135:2
135:6 137:11 138:1
141:2 142:11 144:23
145:6 146:10,18
148:4,8 152:17
153:19 154:1,5,9,11
154:15 155:1 156:17
156:22 157:19 159:10
159:17 160:19 161:2
**let's** 19:24 20:5,8 28:14

29:1 31:2,15 33:17
36:8 40:23 41:20
45:10 47:15,17 55:23
58:8 60:14 63:21
77:22 78:10 90:15
91:5 94:8 100:2,4,5
104:18 106:16 107:5
107:17 115:4,25
117:21 118:8 122:15
127:20 138:25 139:10
139:13 152:18 156:13
158:4 160:9,25
**letter** 39:14
**level** 71:23 73:21,24
94:24 101:16
**Liability** 1:7
**light** 141:6
**limitation** 141:1,11
143:22
**limitations** 110:16
142:20
**limited** 1:6 28:22
**limits** 21:12
**line** 74:11,15 106:18,19
109:12 113:18 129:17
139:19 146:23
**lines** 74:11 96:25 107:5
146:20
**link** 11:17 82:6
**linked** 137:18,23 149:7
**Lisa** 2:4,4 4:17,17
**Lisp** 124:25 125:1
**list** 14:14 23:1,2,7,19
29:3 36:12 39:5,7
40:17 41:18 42:17
43:21 54:14 90:10
**listed** 14:12 23:5,14
27:17 29:21 31:13
33:15,20 35:17 37:17
38:19 44:15 71:4
152:21
**listing** 42:24 56:6
**literature** 113:19
**litigation** 24:11 40:25
53:7,11,14,19,23
55:15
**little** 36:8 96:18 147:6
150:24 153:24 161:10
**LLC** 1:6 2:4 4:6,16,19
**LLP** 2:10
**local** 140:9 143:20
144:15
**locality** 100:10
**location** 71:22
**logic** 61:12
**long** 11:21 56:10 68:10
114:22 115:23 122:14
128:13 142:19 154:3

**longer** 50:11 51:3
**look** 15:4,13 17:2 31:24
36:9 38:15,17 48:5
50:4 52:13 54:9 56:25
71:12 72:18 73:6 74:9
79:12 81:18 86:18
93:6 98:21 100:10
102:24 106:16 107:4
111:11 112:3,22
135:10,18 137:7,8
139:5 146:6,8,11,14
148:21 149:4 151:20
152:14 155:7 158:5
160:24
**looked** 11:2 30:21
35:14 77:17 83:21
88:24 93:12
**looking** 19:23 27:18
39:13 64:19 65:2,10
65:11 70:6 78:16
83:18 93:14 99:9
102:9 111:17 117:17
135:21 138:17 139:3
143:5 149:10 150:15
158:14
**looks** 73:8 78:4
**lost** 118:24
**lot** 61:9,13,13 77:18
100:8 130:17
**lots** 102:21 131:21
**loud** 22:25 79:15
117:24 119:4
**low** 105:12
**lunch** 105:25 122:9,11

**M**

**main** 122:6 125:13,17
126:4
**maintain** 130:4,10
**making** 23:19 95:20
113:15 132:10,12
160:4
**manner** 47:21 79:17,20
87:19,22
**March** 1:14 4:10 94:15
161:13
**mark** 70:14
**marked** 15:9 31:20 38:2
38:6 57:9,17 70:9,13
70:20 77:15 84:5
92:17 103:20 106:2
110:23 117:5 123:17
**market** 62:10
**marking** 77:7 92:13
103:15 105:23 110:17
**Markman** 53:25
**matching** 39:18
**material** 67:21 79:9,21

87:23
**materials** 14:8,12,16,24
   21:13,19,22 23:3,21
   24:8 27:17 37:3,24
   39:5,6 43:10,13,17,21
   43:22,23 44:9 57:22
   57:25 78:17 147:20
   149:24
**matter** 1:5 4:5 6:2 8:23
   10:20 15:15 24:20
   25:2,7,12 26:19 39:17
   46:11 49:2 50:22
   51:20 56:3,18 87:17
   88:24 100:3 115:23
   115:25 122:19 134:21
   135:4 153:16 154:18
   161:12,16
**matters** 13:2
**mean** 6:19,21 7:2,8
   19:15,25 26:17 33:9
   46:17 47:7 59:24 60:8
   62:21,22 65:12 66:1
   72:6 74:21 76:9 95:16
   108:7 109:24 114:17
   119:11 127:23 132:25
   134:16 136:6 139:25
   140:23 141:8 151:20
   152:7
**meaning** 60:3 83:10,12
**meaningless** 97:5
**means** 53:12 66:25
   74:16,19 75:6 76:16
   77:4 82:17,25 83:17
   88:20 92:5,9 119:12
   124:16 141:19 145:4
   147:3 150:22 151:8
**means-plus-function**
   35:18
**meant** 13:6 69:25 128:5
**measure** 119:14
**measurement** 112:21
   112:24 113:13
**measurements** 119:16
**mechanism** 151:21
**meet** 11:16,18,24
   142:19
**meeting** 5:18 6:10,18
   6:24 7:14
**meetings** 11:21
**memories** 65:10,12
**memory** 60:22 71:13,16
   71:21,24,25 72:1
   140:9 143:20 144:15
**mention** 44:8
**mentioned** 9:8 19:5
   80:9 128:3 135:7,9
   136:1,2 139:7 141:16
**mentioning** 44:14,23

**menu** 115:2
**mere** 98:14
**message** 119:22
**met** 37:8 106:24 139:23
   140:2,13,16 141:15
   143:10,13,14 144:21
**Michelle** 2:4 4:17
**Michigan** 2:5
**micro** 61:16,18,25
**microcontroller** 60:1
   60:16,21,24 61:17
   62:2 149:20
**microcontrollers** 62:9
   62:15
**microprocessor** 58:3,5
   58:9,16,21 59:8,14
   60:1,5,8,11,15,18
   61:1,6,17 62:2,19
   63:21 64:1,6,8,17,25
   65:9,23
**microprocessors** 59:1
   61:10 62:9,15,24 63:3
   63:18
**mid-February** 25:19
**millions** 101:14
**mind** 91:1
**mine** 27:1
**minimum** 142:6
**minute** 112:22 118:24
   153:25,25
**minutes** 11:23 15:13
   56:12 154:2
**mischaracterization**
   102:15
**mischaracterizes** 33:8
   35:22 36:24 46:17
   48:11 49:4,22 50:24
   51:10,22 77:1 103:5
**mischaracterizing**
   129:25
**misrepresentations**
   69:13
**missed** 23:19
**mobile** 12:3 118:3,13
   118:17
**Mobile's** 22:7 128:12
**modeled** 59:1
**Mollen** 4:8
**moment** 31:3 41:10
   78:22 145:16
**monitor** 72:19,21
**monitors** 151:21
**morning** 4:14
**motions** 112:25
**move** 37:2
**multiple** 41:4 116:14

**N**

**name** 4:8,14 8:14 70:24
   90:21 96:3,5
**named** 66:9,14 71:4
   92:24 93:2 106:14
**names** 33:4
**narrowly** 109:16
**nature** 17:4 116:12
**Neal** 4:9
**nearly** 160:10
**necessarily** 14:19 49:5
   59:4 63:1,8
**necessary** 43:19 49:20
   52:21,24 81:25
**need** 8:3 52:4 64:16,16
   65:21 66:2 67:9 80:16
   81:1,8 95:24 98:9
   101:3 114:24 116:11
   129:13 131:8 133:5
   133:14 137:6,8
   138:20 151:14 160:2
   160:7,14 161:8
**needed** 17:8 51:12,18
   64:24 112:10 126:18
**needs** 64:4 66:6 72:1
   105:18 140:3 148:17
   148:17
**neither** 46:18 156:8
**Neodron** 3:13
**network** 50:6,7,12,16
   128:15 129:6 130:23
   131:20 134:5,10,19
   141:22 157:3 158:19
**networks** 126:24
   127:22
**never** 55:1 57:21 95:23
   119:23 121:15
**new** 87:17 88:24 95:15
   119:23 121:15
**ninth** 100:20,23
**non** 95:12
**non-** 99:13
**non-HOV** 99:13,22
   100:6,11,16 101:18
   102:11
**non-patent** 113:19
**nonce** 152:16
**normally** 59:25 108:15
   109:4,5 159:23
**noted** 129:15
**notes** 27:25 29:10
**notice** 1:18 73:3
**noticed** 69:16 70:2
**notify** 81:23
**nouns** 97:7
**November** 78:1,16
**number** 10:18 21:3
   25:21 27:19 28:15
   38:21 57:5,24 66:10
   68:21 72:5 82:8 85:22

103:7 113:12 114:24
   115:9,16 127:4,6
**numbering** 85:21
**numbers** 9:15 31:3
   40:12 146:25
**numeral** 158:15

**O**

**O-M-I-T** 13:8
**object** 16:25 17:10 19:7
   20:14 26:20 30:10
   32:6 34:19 35:21
   36:23 37:11,19 41:12
   43:15 44:11,21 47:6
   49:3 50:23 51:9,21
   52:18 59:5,6,8,9
   62:12 64:10,21 68:15
   73:15 74:4,22 75:17
   76:25 78:20 90:8 92:2
   96:8 109:23 110:5,14
   116:4,11,12,18,22
   124:11 127:25 128:19
   131:15 132:5 134:20
   140:19 144:16 146:9
   147:22 152:9
**objection** 13:13,20 18:6
   20:25 21:7,15 22:8
   23:10,24 24:15,23
   29:24 31:11 33:7
   41:24 42:6,15 44:3
   46:16,25 48:10 49:21
   59:10 86:14 89:16,25
   90:5 94:13 98:3 99:1
   101:11 102:2 103:4
   104:10 107:24 120:11
   125:24 129:9,15,19
   129:20,22,23 130:3,3
   130:8,9 133:1,11
   136:25 156:22 157:19
   159:10
**objections** 129:14
**objects** 63:15,15 72:24
   116:15
**obligated** 13:11,18
**obligation** 37:9
**obsolete** 62:8
**obtaining** 127:7
**occurred** 119:18
**October** 58:8 60:14
   61:6 63:22 64:9,18
   65:7 84:21 85:2,13
   86:7,8 94:8,10 113:21
   118:8 120:3
**offer** 45:8
**offered** 52:17
**offering** 128:22 130:7
**office** 8:16,18 9:22
   66:20 67:19,20 68:6,7

79:1,2 82:18 112:10
**Offices** 2:4
**oftentimes** 60:18
**Oh** 13:16 24:6 26:1
85:19 118:24 123:1
123:24 161:2
**okay** 4:23 5:14,23 6:7
6:23 7:5,16,20 8:1,2,7
8:13,21 9:4,13,24
10:11,18,23 11:5,16
12:6,11,19,24 14:23
15:11,12,19,24 16:2,8
18:1,20 20:5,21 22:24
24:6,18 25:9,15 26:7
26:17 27:2,14,25
28:14 29:1,18 30:6
31:22 32:24 35:16
36:18 38:15,22 39:21
40:3,8 41:20 42:11
43:24 45:14,17,20
47:15 48:4 49:17
50:18 56:9,14 57:2,12
57:20 58:2 59:21
64:15 66:16,24 67:11
67:15 70:11,16,23
71:2,6,8,12 74:12
75:12 77:9,22,24
78:10,24 79:12 80:6
84:12,13,24 85:7,20
85:23 86:6,18 87:2,7
88:17 91:5,24 92:13
92:14,19,22 93:1,4,9
93:10,25 96:1,24
100:13 101:5 103:16
104:2,6 106:6,9,10,15
110:17 111:1,7,14,22
112:15,19 117:11,12
117:17 118:8,23,25
120:22 121:6,14
122:13,24 123:8,14
123:24,24 124:21
126:20 129:13,20
130:13,17 132:1
134:8 135:7,12
138:23 139:12,19
147:13,18 148:7,9,24
149:2 154:9,24 155:4
155:7 156:13,15
158:4,14 159:2
160:19 161:4
**omissions** 70:3
**omit** 12:25 13:7
**once** 77:11 135:16
**ones** 18:15 33:11 53:7
80:13
**online** 9:21
**open** 6:17,19,22 7:6
38:1 70:17 77:10,11

77:22 92:20 123:1,15
**Opening** 54:10,13
**operable** 75:6
**operated** 128:6
**operations** 64:6,16
65:9 79:22 87:24
**opine** 36:2 51:5
**opined** 35:15,25 46:23
46:24 51:2 80:13 82:9
**opinion** 18:25 34:21
44:19,20 45:1 46:3
48:23 51:19 52:16
55:2 68:1 76:4,9 82:2
83:8 90:7,16 128:25
130:6 135:13 149:22
149:23 152:23 155:10
155:17,22 156:9,24
157:11,16 158:16,23
159:2,7
**opinions** 12:5,7 14:7
18:17,18 20:17 30:5
42:22 43:19 46:13,20
47:11,11 48:19 49:6
49:10,11 51:14,25
52:6,10,22,25 54:18
54:20,22,25,25 60:4
68:4 82:1 135:15
149:3 152:19,21
153:6 158:6
**opportunity** 49:19
**opposed** 146:4
**option** 114:12,14 115:2
116:1 155:19
**options** 129:2
**oral** 55:14
**order** 3:8 51:14 52:5,24
65:24 82:1 97:9 99:5
100:17 114:24 126:18
131:7 137:9
**ordinary** 26:15 27:4,7
27:10,11 59:12 65:25
67:5 83:12 94:23
96:11 108:1 114:19
115:18 136:8,9,14
137:19 145:21 150:9
153:13 156:5
**original** 86:1,2 157:23
**originally** 20:19
**originated** 18:25
**outside** 50:1 116:8
123:11 128:1,21
129:10 130:6 142:12
146:1,7,7 157:19
159:10
**oval** 115:12
**overall** 98:17 103:6
**overwhelming** 82:7

**P**
**p** 44:16
**P-R-O-C-E-E-D-I-N-G-S**
4:1
**P-S-E-U-D-O** 96:10
**p.m** 122:18,20,21,23
154:11,17,19,20,22
161:14,17
**Pacific** 4:11 56:22
161:15
**page** 3:4 15:20,20,21
15:25 16:3 20:3,10,22
20:22 22:20 25:16,17
31:25,25 33:3 36:9,12
45:12 47:16 50:4
70:24 71:6,9 77:23,23
78:8,12,15,18 79:12
84:19,19,20,25 85:4,4
85:8,9,11,16,18,21,22
86:11,11,12 87:9,10
87:12,15 91:5,7 93:4
97:25 102:10 104:16
111:8,9,9,15,17 112:3
112:19 125:12 139:14
**pages** 3:9 19:23,23,24
20:5,6,8,10,23 21:6
78:13,18 79:4 86:19
86:23 93:5,14 104:3,4
104:8 146:21
**paid** 30:3
**panel** 119:6
**paragraph** 22:20,24
26:12,12 27:15 29:3
29:22 33:18 35:6 37:2
37:4,17 38:19,22 39:2
39:6,7,9,13 41:20
42:25 43:5,14 44:15
45:11,21 54:10 74:18
75:3 77:25 78:5 79:13
79:15,18,25 81:1 85:9
85:10 87:13,14,20
88:2,20 89:3,5,8,15
89:21 91:1,8,8 96:13
96:14 97:7 112:4,6
148:9,21,22 149:21
150:2,4,15 152:18
**paragraph's** 97:8
**paragraphs** 45:25 46:5
46:15 47:17,19 48:5,8
48:13,17,18,21,24
49:18 50:19 51:6,17
52:9 146:5 149:11,16
152:21 153:6
**paraphrase** 69:3
**parent** 10:17
**parentheses** 95:11
102:11 109:10,11
**parenthesis** 102:12

**part** 31:10 32:3 46:22
50:10,21 55:15 57:21
60:5 68:4 75:14,20,22
76:6 81:6 90:10 100:1
121:9 142:4
**partial** 99:15
**particular** 19:16 33:12
40:12 48:17 72:3,17
77:20 82:3 96:2 98:21
100:14,15,24 109:3
114:1 116:11 120:20
120:23 121:3,25
135:1 136:13 141:9
148:1 151:7
**parties** 1:19
**parts** 15:1 21:5 30:8,12
30:14 34:11,23 35:13
35:14 51:2 60:7
125:13,18 126:4
**pass** 159:15
**patent** 3:8,9,11,12,14
9:15,22 10:18,25,25
27:19 28:10,15,16,23
28:24 31:3,5,24 32:8
32:25 33:1 40:7,10,13
40:15 50:9,9,12 57:5
66:20,21,22 67:2,17
68:6,7,11,13,24,24,25
69:1,2,6,9,10,22
71:17 72:8,17 73:17
73:22 74:11 75:4,15
75:23 76:2,15 78:1
82:20,22 85:12 86:2,3
86:10 87:4 88:7,12,17
89:15,24 90:4,17
91:14,16 92:1,1,24
93:13,16 94:6,10,10
94:19 95:8,22 99:11
100:4 101:2 106:13
106:15 107:11 112:10
113:18 117:15,16,19
118:5,6 120:19
121:14 139:16 140:17
147:15,19,21 148:14
150:1 155:5 156:14
156:21
**patentability** 67:22
**patentee** 145:12
**patentee's** 76:12
**patents** 9:14,20 10:22
10:23,24 11:1 22:14
28:9 31:2,7,8 33:12
38:14 39:22 53:5,7,13
53:22 54:7 66:10,10
66:13 68:18 69:17
71:2 73:13,23 74:6
75:20 90:22 127:5

**128:**4,14 148:20
149:1,4,8,19 153:10
**pattern** 153:8
**patterns** 128:9
**paying** 68:19
**PDF** 15:19 22:20 25:16
36:12 47:16 50:4
77:23 78:7 79:12
84:25 85:8,18,22
86:12 87:15 91:7
111:15 112:19 139:14
**pen** 105:20
**penalty** 16:3
**pending** 8:5 88:11
**people** 113:12,19
**percent** 19:16,19
**percentage** 19:11 20:21
20:23
**perform** 58:14 64:7
65:9 99:5 100:20,23
104:20 105:6 138:11
144:21 155:24 157:12
157:15,18 158:22
159:4,9,12
**performed** 37:23 113:9
137:22 140:11
**performing** 93:15
113:10 136:16
**performs** 142:14,17
**period** 139:21,25
140:11 141:3,8,12,21
143:8 144:20,24
158:18
**periods** 35:20 157:2
**perjury** 16:3
**person** 26:14 27:4,6,9
27:10 59:12 65:24
67:5,5 94:23 96:11
114:18,22 115:18
136:7,9,14 137:19
145:20 150:9 153:13
**personal** 8:9
**phase** 42:23
**phases** 58:25
**phone** 131:8,18,24
132:20,22,23 133:16
134:1,4,9,18 142:1
**phones** 118:3,13,17
126:24 127:22 131:5
131:12 132:2,6
**phrase** 46:4 47:12
50:11,14,15 55:22
58:12,16 65:5 75:5
131:11
**phrased** 91:3
**phrases** 50:11 51:3,7
**physical** 58:17,19,22
59:4,6 62:1,6 63:15

**71:**16,22,22,24 72:5
72:11,20,24 74:1,6,7
**physically** 62:3
**pick** 115:14
**picture** 71:19 140:5,7
142:1,5 143:16,18
144:10,12
**pictures** 140:9 142:5,25
143:20,24 144:14
**piece** 61:24
**place** 94:14 118:24
142:21
**placed** 21:12 73:10
**plain** 83:10 145:1
**Plaintiff** 1:8,18 2:2 4:16
4:18 5:11 9:3
**Plaintiff's** 9:25 15:5,9
15:12 31:16,20 33:18
35:3,7 36:9 38:1,6,19
38:23 39:3 41:1 42:12
42:25 44:10 45:10,20
46:1,6 47:15 48:9
50:5,20 51:7 52:10
53:9,10,17,21 54:2,9
55:9,16,24 56:25 57:9
57:13,14,17,20 70:7,9
70:14,15,16,20 71:3,7
75:15 76:2 77:9,15,22
78:11,19 80:7 84:3,5
84:7,14,20,25 85:4,10
85:11 86:7,19 87:9,11
87:15 88:5 91:6 92:15
92:17 101:18 103:15
103:17,20 104:4
105:23 106:2,10
110:18,19,20,23
117:2,5,18 119:1
120:2,8,15 121:11
122:25 123:14,17
126:15 139:10,14
149:12 155:4 156:13
**planning** 161:5
**plans** 129:1
**platform** 132:20,22
**please** 4:12 5:7 7:17 8:4
8:13 19:8 20:14 21:15
22:10 31:18 38:1 57:1
57:13 70:18 74:10
77:10 84:2,10 93:8
103:18 123:1,15
124:2 125:16 148:6
154:8 155:4,7
**plus** 19:16 76:16 77:5
82:17,25 88:20 92:5,9
136:19
**poem** 105:22
**poetry** 105:21,22
**point** 19:2 27:7,8 34:10

**80:**24 91:17
**pointed** 23:2 137:2
**points** 29:16 125:14,15
**pokes** 115:15
**polite** 122:10
**poor** 88:22
**portion** 32:21 40:3
52:20 84:16,18 99:16
99:17 100:25 101:1
101:21 121:7,12
155:7,12 156:20
158:5,7,14
**portions** 9:21,22 10:16
11:2 18:5,10,14 19:3
29:19 30:17 35:24
40:6 52:5,23 68:12
69:1,7
**POSITA** 149:23
**positions** 54:17
**possession** 67:8
**possibility** 133:10
142:13,17
**possible** 15:3 47:2,8,8
50:2 133:4,14,15
160:4
**post-filing** 69:21
**potential** 50:12
**potentially** 50:15
141:21 157:2 158:18
**practice** 67:6 68:12
127:18
**preamble** 35:20
**precise** 146:3
**predecessors** 10:22
**predominantly** 62:8
**Preliminary** 3:7,10 10:4
35:4
**preparation** 9:24 11:13
37:6
**prepare** 10:14 11:24
57:22 79:17 87:19
**prepared** 11:11 17:24
21:10 43:7 81:22
111:5
**preparing** 9:6,10,13,18
10:3 11:6,9 16:15
23:8,15,22 24:7,12,21
25:3,10,25 26:5 27:19
28:16 29:4 30:24 34:3
40:20 41:1,4,22 42:4
42:9,13,18 45:24
47:20 56:3,7 69:25
75:10 135:3
**present** 1:18 4:12 8:12
52:3 122:6 158:11
**presented** 54:19 88:16
112:1 149:8,18
**pretty** 68:16 97:5

**prevent** 128:16 129:7
130:24
**previously** 33:11
144:22
**pricing** 127:13
**primary** 58:12 61:23
128:7
**prior** 24:12 25:3,24 26:5
26:8 31:13 32:15
41:18 53:4,7,11,14,19
54:1 67:10 69:10,20
114:15 116:3 119:12
120:5,6,9,12 129:1
152:19,20
**priority** 128:13 129:4
130:25
**privilege** 22:13 68:20
**privileged** 18:8 19:7,9
20:14,15 21:16 22:9
**probably** 33:14 61:3
64:12 79:5 101:3
112:5 116:17,18,19
116:23 118:10 134:13
134:15 141:6
**problem** 45:8
**problems** 137:2
**proceed** 100:17 102:7
**proceeding** 54:1 55:16
**proceedings** 53:4,20
**process** 113:6
**processing** 113:14
119:8
**processor** 138:10
151:12
**processors** 62:7
**produced** 68:21
**program** 61:11 93:18
93:19,22,23 94:2
98:23 109:9,14 124:8
137:12,16,17,22
138:3,6,16,21,22
139:2,6
**programmed** 58:15
125:1
**programmer** 93:25 94:4
94:12
**programming** 3:14
93:24 97:14 98:11
105:16 124:4,13,16
124:18,21 125:2,3,4,8
125:23 126:1 132:14
136:19,20 139:1
145:15,17,19 151:10
**proper** 130:3
**Proposed** 9:25 10:5
35:3,5 40:18
**prosecuting** 69:18 70:4
**prosecution** 32:2 40:4

40:5,6,13,14 67:17
80:3 81:14
**prosecutor** 69:9
**prosecutors** 69:6
**protocol** 135:1
**protocols** 134:22,24
**provide** 12:15 22:1
26:18,23 46:13,19
49:6 51:12 67:7 68:23
82:1 105:11 107:8
136:21,23
**provided** 10:7 15:5
18:13 21:20,23 22:4
25:20 30:16 38:13
41:17 43:19,20 46:3
47:11,12 51:19 53:18
64:23 74:25 78:4 88:6
110:16 113:11 135:23
137:12 153:3
**provider** 128:7 131:19
**providing** 17:16 26:24
49:11
**provisioning** 131:19
**pseudocode** 93:20
96:10 146:2
**pull** 15:6 31:9,15 32:8
32:25 50:13 57:13
65:8 84:2 103:17
148:4
**pulled** 9:21 32:16 78:4
79:1,3
**punctuation** 95:17
**purchase** 161:5
**purpose** 51:24 58:13
105:17 108:21 149:18
**purposes** 27:2 34:21
37:5 44:7
**pursuant** 1:18
**put** 34:22 70:6,14 73:13
84:8 90:15 104:13
105:18 140:25
**puts** 108:13
**putting** 117:1 135:13

**Q**

**qualifications** 26:13
27:6
**qualified** 26:18,23
50:17
**quality** 113:14
**quantitatively** 63:13
**query** 99:9,12,13
**question** 7:18,21,24,25
8:5 13:16,22 24:3
26:1,8 29:21 41:6,7,9
41:14 48:6,22 55:18
55:22,23 61:15 66:17
82:21 87:10 89:20

90:2 111:16 131:6
136:7 150:24
**questioning** 129:17
**questions** 7:16 14:3
27:16 40:1 41:18
136:8 153:20 159:14
159:18
**quickly** 93:13
**quite** 22:12 62:16 64:13
133:15
**quotations** 32:11
**quote** 32:19 81:12
121:21 128:12,17
**quoted** 19:20 20:2,4

**R**

**R** 4:9
**raise** 5:7 70:3 83:16
160:3
**range** 20:22
**raw** 19:17
**RCS** 149:20
**reach** 82:8
**read** 9:19,22,25 10:4,10
22:25,25 29:22 30:2
30:14 31:4 32:3,5,7
32:16,19 33:3,10 34:8
35:9,10,13 39:9 41:8
41:11 46:2,6 47:19,24
52:22 54:11 69:9
71:17 72:8 74:14
75:14 79:14 87:14
88:6 93:7 104:4,8
106:12,20 108:7,9
113:1,2 117:23 119:3
123:25 125:15 149:4
149:10 151:3 152:20
161:10
**reading** 34:12 67:15
91:20 93:25 108:10
111:24 128:10,11
129:11,18 140:15
150:2
**real** 109:24
**realize** 115:3 120:6
**really** 22:9 63:16 65:21
75:19 90:11 100:3
111:4 115:23,24
117:22 137:2 141:13
141:17
**reason** 80:15 90:12
135:12 153:5
**reasonable** 63:18 65:24
83:4,9,19,21
**reasonably** 106:4
**reasoning** 153:2
**reasons** 90:10,13
**recall** 11:8 14:15 18:10

18:15 19:10 20:11,18
23:11,16,20 27:22,24
29:7 33:11 34:2,4
44:14,23 48:12,16
52:12 56:4 57:19
72:16 80:2,7 83:1
90:20,21 129:1 135:7
154:25 156:16
**receive** 134:9,18
**received** 28:8,13 75:8
**recite** 151:4
**recited** 155:15
**recites** 79:20 87:22
138:12
**recognition** 149:19
**recognize** 57:3 77:12
77:19 84:15 92:22
106:10 111:3,6
114:23 115:15 117:12
**recollection** 55:11
147:16
**record** 4:4,13 5:24 6:1,3
6:6 7:10,13,22 8:14
17:9,13 23:8 30:14
41:11 56:17,19,22
75:15,21,23 76:7
79:15 81:6 104:14
122:15,18,20,23
123:12 154:17,19,22
159:19 160:20,22
161:1,15,17
**recorded** 18:18
**redefine** 76:10
**redirect** 153:24
**reevaluate** 27:8
**refer** 9:2 52:15 58:17,21
59:6,21 62:5 71:25
112:20 120:5
**reference** 32:16,20 85:1
112:19 147:1,4,19
148:11,15 149:25
**referenced** 10:19
**references** 31:7,9 32:1
32:2,15 33:2,15 52:2
**referred** 32:10 33:2
53:3 60:19 80:12
90:18 120:15
**referring** 19:22 20:2
31:12 54:24 59:22
61:18 72:3 86:7 91:19
133:21 136:19,20
**refers** 54:10 62:20 86:8
148:25 150:16 152:18
**reflect** 150:20,25 151:2
**reflected** 69:11
**reflects** 67:23
**refreshed** 117:7
**refreshing** 84:9

**refrigerator** 61:22
**regard** 14:4 116:6
**regarding** 26:9
**Regardless** 130:20
**register** 61:12
**rejected** 91:9,15
**rejecting** 90:10
**rejection** 32:13 90:12
90:13
**rejections** 89:23 90:3
90:14,17 91:18
**related** 10:24 12:6
35:24 54:17,21
**relating** 25:12 38:14
**relationships** 137:20
**relatively** 65:21
**relevance** 13:24 41:13
41:24 42:6,15 43:16
94:15
**relevant** 9:23 12:25
13:4 14:4,17,20,22
15:1,2 24:9 30:4,18
35:15 37:9,24 43:18
44:19,19,25 47:3,9
54:18,21 67:10 76:17
80:21 81:17,24
115:25
**relied** 42:9,18 56:6
**rely** 42:13 46:2
**relying** 48:16
**remainder** 101:3,9,13
**remarks** 78:6,14 86:12
86:17,22 91:20
**remember** 83:14 91:13
135:9
**remotely** 4:8
**renew** 13:20
**repeat** 41:16
**repeated** 55:4
**rephrase** 7:22
**replacements** 63:7
**report** 49:24,25 83:15
131:13
**reporter** 4:3,9 5:1,3,6
5:25 6:5 41:8,10
56:16,21 122:17,22
154:16,21 160:14,25
161:4,9
**represent** 4:13 24:18
24:25 78:25 86:20
127:7
**representations** 30:15
**represents** 73:18,20
**request** 8:4 12:5 21:19
21:22 81:22 82:15
160:13
**requested** 90:23
**requests** 79:22 87:24

**require** 156:6 158:2
**required** 27:1,9
**requirement** 115:20
  125:3
**requirements** 115:17
**requires** 158:21
**requiring** 158:1
**research** 24:8
**respect** 25:6 49:15 75:3
  77:4 81:9 135:16
  148:1,2,15,18
**respective** 1:19
**responded** 90:24
**response** 41:18
**result** 18:15 31:13
  100:19 101:24 102:4
  102:6,12,15,25 103:3
  103:8
**results** 102:22 113:11
**resumed** 6:3 56:19
  122:20 154:19
**retained** 12:4,20
**returned** 100:2,7
**returns** 101:7
**reveal** 18:7 19:8 20:15
  21:16 22:10
**revealing** 22:13 27:17
**review** 9:7,11,14 14:23
  15:17 18:1 21:13,20
  22:2,4,17 24:11,13,21
  25:2,5,24 26:4,8 28:9
  32:9 33:15 34:24
  35:11,23 37:3,14,23
  39:15 40:4,6,20,25
  41:22 42:4,12 43:9,12
  43:23 44:1,6 45:25
  51:5,11 54:12 55:13
  56:1 70:2 76:14 80:2
  82:16,22 109:21
  147:7,13 159:16,23
**reviewed** 10:14,16,21
  10:25 11:6 14:8,16,20
  14:21,24 16:14 18:22
  20:20 22:6 23:3,8,15
  23:18,20 24:16 26:2,3
  29:4 36:20 37:6 38:24
  39:20,22 40:2,10,12
  40:14 41:4,19 42:9,18
  43:4,14,17,22 55:19
  57:22 79:6,10 80:4
  128:20 135:2 148:17
**reviewing** 14:25 23:22
  27:21 28:1,3,6,16,19
  28:23 29:8,11,13
  33:19,25 34:5,17
  47:19 66:8 81:7
  134:22 139:3
**right** 5:7 6:5,25 8:16

10:12 12:22 13:7,12
  16:16 17:18 22:15
  26:7 36:16 39:24
  40:10 43:7 45:7 47:24
  49:20 50:14 55:17
  59:16 63:15 67:12
  68:3,7 69:24 73:22
  74:3 75:10 77:7 79:5
  81:14 88:4 93:2 95:1
  96:1,25 98:12 99:7
  102:9 103:3 104:15
  109:7,22 111:7 112:8
  112:13,17 113:23
  116:25 120:6,9
  125:11 127:20 128:3
  134:6 135:4 137:24
  140:21 143:5,25
  146:24 154:16 160:16
  161:9
**roaming** 126:21,25
  127:3,21 128:16,17
  129:2,6,8,18 130:23
  130:25 131:5,7,9,13
  131:14 132:3,4,8,8,16
  132:16,24 133:10
  134:3 135:8,13,17
  136:1,1
**role** 66:23
**rough** 159:21 160:6,15
  160:19,23 161:3,5
**roughly** 19:13
**round** 115:12
**RSC-164** 149:6 150:1
  150:10
**rule** 12:12,12 18:6 19:7
  108:1
**rules** 4:24 5:15 6:8 7:8
  67:16
**run** 30:20
**running** 7:2
**rushed** 37:14
**Ryan** 41:21 42:3

**S**

**S** 2:5
**Samsung** 3:13
**Santa** 8:20
**save** 32:24
**saw** 17:7 53:17 139:6
  140:21 155:25
**saying** 11:1 90:24
  96:13 97:6 98:6
  114:11 132:23 142:16
  143:1,25 144:2
  152:11,11,12
**says** 12:13 16:2 23:2
  26:13 50:5 67:16
  70:24 71:13 75:7

77:25 78:16 79:13,14
  85:8,10,25 91:8,9
  99:11,12 104:19
  107:5 109:9 123:25
  125:12 128:12 139:20
  140:10 141:9 142:9
  142:21,22,23 143:8
  143:23 144:19 146:24
  149:21,22
**scope** 13:25 128:1
  129:10,22 130:6,9
  142:13,16 156:22
  157:19 159:10
**screen** 6:12 113:16
  114:6,13 115:3,6
  116:10,16 119:5,6,7
  119:13,14 120:20,23
  122:1 123:15
**screens** 117:25 118:15
  119:13 120:13 121:19
  122:4
**scroll** 15:19 25:16
  26:11 27:14 37:1 71:6
  74:10 85:8 93:4 111:8
  117:21 125:11 139:13
  146:20 148:22
**se** 115:5 138:18
**search** 31:14
**searches** 30:20
**Seattle** 2:12
**second** 11:23 70:12
  77:8 117:8
**secondary** 127:14,17
**seconds** 15:13 154:1
**section** 19:4 33:2 67:22
  74:18 79:18,24 81:1
  87:20 88:1 90:18,18
  91:2,10,16 111:14
  112:20 113:3 119:2
**sections** 19:12 20:11
  30:1
**see** 6:20 7:4 15:21,23
  16:6,7 17:12 22:22
  23:5 26:15 33:22 35:6
  36:13 39:5,7 42:20,24
  45:18 70:23,25 71:10
  71:13 72:4 73:1 78:8
  82:17,23 84:22 85:5
  85:15,16,23 86:4
  88:18,21 89:3,6,9,12
  89:18,22 90:3,7,14,16
  91:10,13 92:14
  104:18 110:25 111:9
  123:11 135:10 137:25
  139:5,8,23 140:20
  142:8,21 143:6,21,22
  145:5 147:1,8,14
  154:11 156:19 160:6

**seeing** 80:2 83:1 90:20
**seen** 25:11 40:11 55:1,5
  55:8 57:14,19,21 79:5
  79:6 80:6 88:24 89:2
  103:24 123:20 128:11
  128:20,23 129:11
  153:2,3
**select** 114:20 115:2,4,7
  115:7 116:11,13
  128:15 129:6 130:22
**selected** 14:17 155:19
**semantics** 36:4
**send** 133:17
**sense** 59:23 101:12
  160:5
**sensed** 119:6
**sensing** 111:23 112:7
  112:24 121:5,10,13
  121:15,17
**sensitive** 111:19,22
  142:3
**sensor** 119:7,9,15
  120:18,18 121:22
  140:8 142:2 143:19
**sensory** 149:6
**sent** 5:21 106:22 107:3
  152:1
**sentence** 74:14 75:13
  76:17 87:13 106:18
  108:4,15 112:22
  113:1,4 117:23,23
  119:2,4 125:15
**sentences** 98:7 123:25
**separately** 36:6 77:22
**sequence** 95:18 100:17
  102:7 103:10 113:7
**series** 103:1
**seriousness** 16:9
**served** 24:19 25:1
**service** 127:7 128:7
  140:5,7 142:6 143:16
  143:18 144:11,12
**set** 48:17 49:7,15,24,25
  93:21 102:18,19
  131:20 133:6 134:3
**setting** 105:4
**shape** 114:21 115:24
  116:6
**share** 148:10
**short** 56:9 161:10
**show** 13:14,15 19:25
  67:7
**shown** 25:20
**sign** 159:16,24
**signal** 63:23 133:9
**signals** 119:14,16
**signature** 15:16,21,24
  111:9 161:17

**signed** 16:12 18:2
  111:12
**significant** 111:25
  112:16
**silicon** 61:24
**similar** 36:5 63:13
  77:18 84:17 160:17
**simple** 55:12 98:18
  108:19,20
**simpler** 31:17 104:19
**simply** 30:4 46:18
  98:18 108:3 127:9
  133:16 138:12,21
  142:23 146:12
**simulated** 59:1
**Simultaneous** 36:11
  44:2 85:24 95:13
  102:3
**single** 60:20 61:15,24
  102:24 152:6
**sir** 90:4
**situation** 71:20 115:18
  134:17
**situations** 22:17
**size** 61:22 62:1,6
  114:22
**skill** 26:15 27:4,7,10,11
  59:12 65:25 67:6
  94:23 96:11 114:19
  115:18 136:8,9,15
  137:20 145:21 150:9
  153:13
**skilled** 63:22,23 64:8,17
  65:6 96:6 105:15
  126:13,14 150:21
**skim** 30:7 34:12 38:10
  47:18 77:12
**skimmed** 29:19 30:8,12
  34:13
**skip** 31:9 32:3
**skipped** 30:8
**slightly** 65:18
**slowly** 7:17
**small** 101:21 115:13
**smaller** 65:19
**smoke** 63:5
**software** 72:15 132:23
  137:5,6 138:18 156:7
**solely** 36:20
**somebody** 28:5 64:17
  115:13,14 133:4
**somewhat** 127:18
**soon** 106:4
**sorry** 5:5 21:21 24:2
  27:23 29:20 48:5
  66:18 70:12 79:2
  82:19 85:1,19 86:11
  87:9,10 92:13 97:20

111:16 118:23,24
  123:1 156:23 161:3
**sort** 62:10 77:11 78:7
  100:7 105:14 129:25
  138:2
**sounded** 70:1
**sounds** 55:13 56:16
  131:2 154:13
**speak** 153:22
**speaker** 72:19,22
**speaking** 36:11 44:2
  81:4 85:24 95:13
  101:6 102:3 129:14
**specialized** 151:13,15
  156:7,7 158:2
**specific** 20:22 32:11
  49:7,12,15,24 60:2
  63:23,25 65:22 97:10
  99:5 101:21 107:17
  108:20 109:22 114:15
  114:17,20 115:17
  124:5 135:19 136:14
  136:16 148:16 151:4
  151:18,22,25 153:15
**specifically** 48:18
  79:19 87:21 91:9
  124:22 136:21 149:25
**specification** 11:4
  75:22 76:2,11 81:3
  82:5,11 83:13 90:9,25
  91:22 93:16 109:18
  135:17,22,23 136:2
  137:7 138:15 139:9
  141:18 150:1 153:18
  156:10 157:17,23
  159:9,12
**specifications** 68:13
  153:11
**specificity** 95:18 152:4
**specifics** 96:2 100:4
  115:10
**specified** 158:9
**speculation** 133:11
**speculative** 17:11
**spend** 11:9 27:20 28:23
  33:25
**spent** 27:16 28:16 29:7
  34:16,20
**square** 115:11 116:20
**stand** 160:1
**standard** 59:18 80:10
  80:23 81:2 83:4,5,9
  83:11 84:1
**standards** 18:13 76:21
  83:7
**stands** 44:13
**start** 4:24 5:15 6:8
  29:22 31:5 34:8 35:9

48:6,21 71:18 82:21
  87:11 124:2
**starting** 25:17 31:25
  36:9 47:16 111:14
  112:4
**starts** 33:3 87:14
  112:23 119:3 120:1,7
  149:22
**state** 8:13
**stated** 104:7
**statement** 3:14 16:11
  64:20 74:21 76:1,6
  80:3,8,14 81:19,21
  88:5,9 91:12 96:16,25
  97:3,4 99:14,16 101:6
  104:2,23 107:8 118:4
  118:9,25 119:25
  120:3,7 124:1,3,10,12
  124:16,22 125:12,13
  125:17,22,23 126:3,9
  126:16 128:18,24
  130:1,15 131:2
  138:25 145:14 146:2
  146:16,16,17 147:8
  147:14
**statements** 49:8,14
  75:20 88:14,15 96:4,5
  96:7 97:13,18 104:3,9
  104:22 105:5,16
  124:19 149:16,17
  152:24
**states** 1:1 16:4 42:21
**status** 61:12
**step** 95:20 100:20,23
  102:10,13 109:25
  110:3
**steps** 93:21 95:18,19
  100:18 102:8,17,18
  102:20 103:2,10
  105:11 108:13 113:7
  113:8,8,10
**stop** 106:4
**storage** 71:22,24
  106:22 107:1,7,20
  108:8 109:11
**stored** 106:25 107:6,19
  140:9 143:20 144:14
**straight** 113:18
**structural** 59:8 139:2,6
  151:24 153:17
**structure** 59:9,14,15,21
  59:22 74:1 79:21 82:4
  82:5,6,12 87:23 98:17
  121:25 124:1,4
  135:20 136:4,5,11,14
  136:18,21,24 137:10
  137:11,13,21,25
  138:9,20 141:14

145:10,13 146:11
  150:13 151:5,6,18,22
  152:1,8,10,13 153:14
  155:23 156:2,3,3
  157:12,14,17 158:3
  159:3,5,8,12
**stuff** 7:2
**subject** 89:14
**submission** 79:3,6
**submitted** 8:21 15:15
  39:16 46:10 49:1
  68:14 111:12 160:2
  160:10,10
**Subsections** 44:16
**substantial** 48:16
  113:20,25
**substitutable** 65:15
**sufficient** 12:14,16
  34:17,20 64:11,23
  67:4,7 69:15 91:21
  94:20,23 95:22,23
  98:20 99:4 101:1
  107:13 109:3 135:20
  135:24 137:21 138:11
  153:14,17 155:23
  157:12,14,17,24
  159:3,5,8,11
**suggested** 82:13
**suggesting** 142:15
  159:24
**suggestion** 149:6
**suitability** 150:11
**suitable** 63:1,3,4,7 64:3
  64:7 66:5 114:8,9
**Suite** 2:5,11 8:19
**summaries** 30:19
**supercomputing** 63:4
**support** 79:21 87:23
  91:22 94:22 101:2
  135:24 139:8 153:17
  156:11
**supportable** 107:16
**supported** 82:11 90:9
  90:25 127:8,17
  138:14 141:18 157:23
**suppose** 76:13 109:15
  110:10
**supposed** 12:7,13
  161:2
**sure** 5:15 6:19 7:2,8,14
  17:7 22:12 26:1 50:13
  55:18 78:23 79:16
  106:21 112:12 117:10
  124:3 129:22 130:11
  132:18 145:18 154:15
  155:25
**surrounding** 113:2
**suspect** 112:11

**swear** 5:2,3
**switch** 72:12,13 128:16
  129:6 130:23
**switches** 72:4,6,15
**sworn** 5:12
**system** 60:2,6 94:5
  108:5 120:17,17
  121:3,10 127:15
  141:21 142:14 144:6
  151:21 157:1 158:17
**systems** 129:3 133:24
  133:25 134:13,14

**T**
**T** 39:6,15
**T-** 12:2 22:6 128:11
**T-Mobile** 1:10,10 4:6,6
  4:22 8:22,23 9:3
  13:10,18 14:5 19:18
  19:18 20:12 24:19
  25:1 36:19 161:13
**T-Mobile's** 18:4,11,13
  18:16 22:1
**table** 36:15,15
**take** 8:6 15:12 27:25
  29:10 45:3 56:8 83:24
  93:6,7 102:17 105:11
  108:15 112:21 122:8
  122:11 130:14
**taken** 4:5 42:3 79:16
  87:18 103:3,11 113:7
  140:3 161:12
**takes** 152:12
**talk** 59:13 123:3,5,6
  127:20 136:4 151:5,6
  151:9 160:9,14
**talked** 20:6
**talking** 10:12 20:23
  25:9 40:19 60:14 62:3
  65:25 85:9 94:8 96:12
  110:12 113:3 120:6
  142:12 150:7
**talks** 140:4
**tapped** 113:16
**task** 114:15,17
**tasks** 58:14
**TCL** 40:19,24 54:1
  55:16,25 56:2
**TCL's** 54:17,20
**teachings** 148:2
**team** 19:19
**technical** 13:2 84:11
**technique** 105:13
**technology** 111:19
  112:8 131:24 134:4,5
  134:9
**Teleconference** 1:18
**tell** 39:14 43:9 47:18

69:14 77:12 84:18
  96:14 97:8 98:7,15
  105:10 108:22,24
  113:2 132:10,18
  134:12 137:4 152:13
**tells** 133:9
**ten** 11:23 102:8,18,19
  103:10 154:5
**tens** 63:6
**term** 35:15 46:22,23
  50:6 58:3,21 59:4,6
  59:12,25 61:16 63:21
  71:16 74:16 127:5,21
  128:4 137:18 151:24
  152:16 153:14
**terms** 30:21 35:17,19
  35:24 36:1,13,21
  40:18 47:4,10 50:19
  50:21 51:2 82:11
  92:10 97:5 110:7
  137:10 140:13
**test** 83:17 100:18
  101:20,24 105:10
**testified** 5:12 42:16
  43:21 48:2 52:19
**testify** 8:10
**testimony** 12:13,15,20
  12:25 13:25 14:4
  16:24 17:6,16,20
  25:13,21,24 26:2,5,9
  26:18,23,24 33:8
  35:22 36:24 38:13
  41:22 46:17,20 48:11
  49:4,22 50:24 51:10
  51:13,22 55:7 59:23
  77:1 103:5 128:22
**TEXAS** 1:1
**text** 20:18,19 32:7 69:8
  72:10 73:18,20
**Thank** 9:6 31:24 56:14
  107:4 124:9 153:22
  154:10,13
**thanks** 45:17 56:15
  69:24 84:13 106:8
  123:14 139:13 153:21
**thing** 97:20,21 152:14
  159:18
**things** 30:2,4,19 42:8
  62:25 63:2 65:12,15
  66:2,3 90:8 100:9
  114:9,10 142:20
  144:2 145:21,23,24
  151:7,9
**think** 13:22,25 14:17
  15:20 17:4 19:12,25
  20:6 21:2 30:13,25
  32:1 33:11 46:8 51:12
  53:2 54:12 58:6,10

59:11 61:3 70:13
  71:17 72:11 76:10
  83:12,13,15 88:22,23
  91:2 93:12 94:2,15
  96:10 102:14,23
  106:6 107:10 111:7
  112:2 113:25 116:5
  116:11,23 117:11
  118:12,20 120:5
  127:24 128:25 129:16
  130:2 134:12 137:24
  138:13 139:15 141:9
  144:5,17 148:5
  150:25 151:2,23
  153:5,19 157:22
  159:22 160:13,16,23
**third** 79:13 102:20
**Thirty** 154:1
**thorough** 37:4
**thought** 9:23
**thousands** 44:6 63:6
  101:14 145:18
**three** 11:22 29:3 36:5
  36:12,20 51:1 106:16
  106:17 139:22 140:1
  140:12,14,16 141:14
  141:17 142:23 143:2
  150:16 155:8 156:17
**Thursday** 159:20
**tight** 160:16
**time** 4:11 8:12 11:9
  16:12 22:3 27:16,20
  28:16,22 29:7,17 30:3
  32:25 33:25 34:17,20
  43:6,18 58:11 61:4
  62:15 67:1,9 68:10
  69:14 75:2 76:12
  80:25 88:16 91:17,22
  93:7 99:8,11,13
  116:16 127:18,19
  141:12 143:23 153:21
  153:21 154:12 161:14
**timeframe** 58:7 60:13
  60:18,21,24 61:6,11
  61:19 62:5,25
**times** 11:18 30:6 41:4
  42:8,17 48:3 57:25
**timing** 159:19 160:16
  161:8
**tiny** 100:1
**today** 8:8,11 10:11 17:9
  17:16,20 83:5 95:21
  153:20,22
**today's** 4:10,25 5:17
  9:6,10,13,18,24 10:3
  10:12,15 11:6,10,12
  11:25 16:15,23
  161:13

**told** 28:11 34:24 37:14
  39:19,25 41:3 42:7
  44:22 46:14 57:25
  64:1,24 65:3 66:1
  82:24 152:3 160:23
**topic** 13:5 46:19 48:18
**topics** 46:12 49:7 66:9
**total** 152:15
**totality** 98:22
**touch** 111:19,22,23
  112:7 113:13,22
  114:6,12,14,22,23
  115:21,21 116:1,2,8
  116:10,17,19,20
  117:25 118:15 119:5
  119:6,7,9,12,13,14,18
  119:23 120:12,20,23
  121:9,19,22 122:1,4
  142:3
**touched** 114:13 116:8
**touches** 121:3
**touching** 114:5 119:5
**touchscreen** 33:12
**touchscreens** 111:22
**tower** 128:6 133:9,16
  133:18,19,20 134:1,9
  134:19
**towers** 127:9,9,12
**traffic** 95:11 99:12,21
  100:5,11,16 101:17
  102:11
**transcript** 42:3 159:22
  159:24 160:7
**translated** 119:19
**translates** 119:9
**translating** 119:16
  121:2,22
**translation** 120:14
**transparent** 128:8
**treated** 147:20
**tried** 19:14
**trivially** 109:16
**true** 16:5,19 17:17,20
  18:23 61:4 79:4 87:2
  100:12,13,15,21
  101:7,13,24 102:5,13
  102:16 103:2,3,8
  105:2 112:12 118:9
  120:3 124:6,13,24,25
  125:7,19,21 130:16
  131:3 142:7 144:5,9
  145:25
**try** 7:21,23 8:5,5 30:22
  55:23 84:9 160:3,9,17
**trying** 14:2 110:7,8
  113:17 122:10
**turn** 22:20 33:17 39:2
  45:11 99:6 111:17

129:2 131:7 139:10
152:18 155:4 156:13
158:4
**turned** 69:8
**TV** 72:20,21
**Twice** 11:20
**two** 35:2 38:14 51:1
53:13 55:4,4 104:3,4
104:8 106:16,17
123:25 125:13,14,15
125:17 126:4 140:16
141:17 148:20 153:24
155:8 156:17 158:15
158:15
**type** 63:23,25 72:13
94:1 95:2 97:2 98:25
113:21 125:8 132:15
**types** 96:6
**typical** 73:11
**typically** 58:17,19 59:13
60:8,19 73:10 119:18
119:21

**U**

**U.S** 3:6,6,8,9,11,12,14
9:15 10:18 27:18 31:3
57:5 66:10,20 92:1
146:24
**U.S.C** 74:17 75:3 79:18
79:24 87:20 88:1,19
89:2,20 90:18
**underlying** 105:12
152:14
**underneath** 78:7 97:1
117:22
**understand** 7:20 9:5
12:19 13:3 34:18,21
51:23 55:18 64:18
65:25 68:3 94:1,7
96:12 98:9 99:21
105:21 108:7,10
109:13 136:8,9 137:7
137:9,20 143:25
144:1 147:18 150:5
153:14
**understanding** 12:21
12:23 27:9 38:12
53:10,12 66:24 67:3
67:13,23 68:2 71:15
74:20 75:2,5 76:20
80:20,23 91:20 96:19
96:21,23 97:2,6
111:18 125:23 137:14
140:24 142:18 147:5
147:24 148:11,12,13
150:20 151:11
**understood** 7:25 13:9
**undertaken** 79:19

87:21
**unhelpful** 13:10,17
**unit** 61:12 119:8
**United** 1:1 16:4
**unlimited** 129:1
**unnecessary** 51:5
**Unrelated** 11:13
**untrue** 16:22
**unusual** 73:16
**Updated** 40:17
**upload** 128:16 129:7
130:24 140:6 142:9
142:24 143:17,24
144:12,21 155:18,19
157:1
**uploaded** 77:9 122:25
142:5
**uploading** 141:10
**uploads** 142:14,18
**USA** 1:10 4:6 8:23
**usable** 7:1 119:10,17
121:23
**usage** 61:3 127:20,21
128:9
**usages** 127:19
**use** 56:13 58:12 59:5,25
63:21 74:16 96:6
98:25 100:5 104:22
105:5,15 120:18
126:19 145:3,8,9,21
**user** 114:5,13 115:6
131:7,13
**users** 128:14 129:5
130:22
**uses** 152:15 155:20
**USPTO** 67:15,24
**usually** 59:7 62:1 64:15
125:6 152:5

**V**

**v** 1:9 3:13 54:1 55:15,25
56:2
**vague** 17:1 24:15,23
29:24 32:6 44:12
46:25 47:6 51:21
52:18 55:23 59:10
62:12 64:21 73:15
92:2 94:13 98:3 99:1
101:11 104:10 110:14
124:11,12 125:24
130:5,5,8 133:1
140:19 146:9
**value** 102:24 103:8
**variability** 61:9
**variables** 151:22
**variation** 61:13
**variety** 65:15 118:1,16
121:24 127:7

**various** 32:1 79:22
87:24
**vary** 119:21
**vendor** 127:12
**vendors** 127:6,10,12
**verbal** 69:5
**verbatim** 69:2
**verbs** 97:7 98:6
**verified** 32:18
**verify** 32:12
**versus** 40:24 95:5
**video** 1:18 11:17
**view** 76:23 81:24 83:13
144:24
**viewed** 39:23
**virtual** 71:25
**virtualized** 59:2
**Vision** 1:6 4:5,16,19
55:25 56:2 161:12
**voice** 149:18
**vs** 4:6 161:12

**W**

**WA** 2:12
**WACO** 1:2
**waived** 161:18
**want** 5:2,16 7:14 8:15
8:16 13:4,7,14 39:18
45:3,3 68:17,19 90:6
99:8 104:20 109:7
114:13 115:15 130:4
130:9,18,19 154:3
160:21
**wanted** 98:23 114:22
115:4 116:1,10 152:3
159:18
**wasn't** 14:21 19:17
57:21 58:22 68:19
81:24,25 138:25
153:11
**way** 45:4,5 48:16 52:14
53:6 54:3 55:5,21
61:21 63:12 65:5
67:13 78:14,14 82:14
83:2 87:6 88:21 89:11
90:15 91:3 92:9 97:10
99:24 105:19,25
109:5 112:5,6 123:11
125:25 128:9 131:11
131:20 133:8,13
134:25 136:12 137:19
142:4 145:3,19
**ways** 69:4 125:5 127:4
127:7
**we'll** 37:1 77:23 154:11
160:12
**we're** 5:25 6:5 7:10,11
7:13,14 25:9 26:11

40:18 56:16 60:14
83:5 94:8 117:17
120:6 122:17,22
154:16,21 160:4,16
161:7
**we've** 45:2 48:2 55:19
57:6,24 137:14
**web** 6:22,23
**Weiskopf** 2:10 4:20,20
5:21 7:7 11:16,19
13:13,20 16:25 17:10
18:6 19:6 20:13,25
21:7,15 22:8 23:10,24
24:15,23 26:20 29:24
30:10 31:11 32:6 33:7
34:19 35:21 36:23
37:11,19 41:12,24
42:6,15 43:15 44:3,11
44:21 46:16,25 47:6
48:10 49:3,21 50:23
51:9,21 52:18 56:10
56:14 59:10 62:12
64:10,21 68:15 73:15
74:4,22 75:17 76:25
78:20 86:14 89:16,25
90:5 92:2 94:13 96:8
98:3 99:1 101:11
102:2 103:4 104:10
104:13 107:24 109:23
110:5,14 116:4,22
120:11 122:14 123:3
123:7 124:11 125:24
127:25 128:19 129:9
129:14,16,24 130:5
130:11 131:15 132:5
133:1,11 134:20
136:25 140:19 144:16
146:9 147:22 152:9
153:23 154:4,7,10,13
154:24 155:3 156:24
157:8 158:4,13
159:14 160:12 161:5
161:7
**well-known** 128:14
**well-written** 73:17
**went** 6:3 56:19 122:20
154:19 161:17
**weren't** 21:20 30:4 63:1
83:23
**WESTERN** 1:1
**whichever** 15:6
**wide** 65:14
**widely** 117:25 118:12
**window** 6:20
**wise** 20:21
**withdraw** 29:20 48:6,22
66:17 87:10 111:16
131:6

**witness** 3:2 4:21 5:10
5:22 6:14 13:21 14:10
17:2,12,19 18:9,12
19:10,14 20:16 21:2,9
21:17,21 22:12,22
23:11,16 24:1,4,16,24
25:5 26:22 27:5 29:25
30:12,24 31:12,22
32:7,18 33:9,23 34:20
34:25 35:23 36:3,22
36:25 37:5,12,21 38:8
41:16,25 42:7,16 43:2
43:17 44:5,13,22 45:5
46:18 47:1,7 48:12
49:5,23 50:10,25
51:11,23 52:19 59:11
59:17 62:13 64:11,22
65:11 68:17 69:20
73:16,23 74:5,12,24
75:11,18,24 77:2,17
78:21 79:8 86:15,25
89:18 90:6,20 92:3,8
94:14 95:6 96:9,20
98:4,13 99:3,15
101:12,20 102:4,14
103:6,22 104:11,16
104:25 107:25 108:11
109:24 110:6,15,25
116:5,23 117:7
120:16 122:11 123:4
123:6,10 124:12,18
125:25 126:5 128:3
128:23 130:14 131:1
131:17,25 132:6,17
133:2,12,23 134:21
135:5 137:1,16
140:20 141:4 144:17
144:25 146:12 147:23
148:7 152:10 155:2
156:23 157:6,20
158:8 159:11,15
**Wolfe** 1:16 3:3,5,13 4:5
4:23 5:2,6,9,14 6:7
8:15 13:19 18:8 19:8
20:15 21:16 22:11,21
31:18 37:25 41:9,15
45:4,15 56:25 57:12
58:2 70:25 74:10
77:11 84:2 92:20
103:17 104:24 105:24
107:4 110:21 122:10
122:24 139:11 146:21
153:20 154:24 161:11
**Wolfe's** 128:1
**word** 17:24,25 58:16
61:16,25 74:19
116:19 119:3 120:1,2
135:20 136:10 137:4

140:20,21 145:8,9
152:15
**words** 30:23 46:24
50:10,25 72:3 95:16
96:14 97:9 110:9
138:3,5 151:19 160:6
**work** 125:5
**works** 122:13
**world** 109:25 110:2
**wouldn't** 63:8,9,10,11
63:12 66:3 108:14
133:25 138:17
**write** 17:22,25 68:12,23
74:24 94:1 104:20
109:9 146:2 159:21
**writing** 40:1 41:17
68:11 105:20
**written** 18:11 36:6 81:3
140:22 146:5
**wrong** 70:13 115:14
**wrote** 9:12

_____

**X**
_____

**X** 119:23

_____

**Y**
_____

**Y** 119:24
**yeah** 7:11 11:12 21:25
24:4 34:15 40:9 55:21
56:10 85:21 95:6 98:9
104:18 106:4 115:20
121:1 126:23 154:4,7
160:12,25 161:3
**years** 67:2 71:18 72:9
74:25 93:13 111:5
113:12
**Yep** 6:14 106:7

_____

**Z**
_____

**Zoom** 4:8 5:18 6:10,18
6:20,24 7:14

_____

**0**
_____

_____

**1**
_____

**1** 3:5 15:5,9,12,14 17:23
22:20 25:25 33:18
35:7 36:9 38:19,23
41:2 50:8,9 53:9
70:24 77:23 78:19
80:8 84:25 85:5,10,11
86:1,7 87:9,11,16
88:5 91:6 117:21
119:1 126:15 144:8
146:20,23 156:17,20
**1:19** 122:21,23
**10** 3:11 79:13 92:15,17
99:10,10 101:18

103:12
**10,063,761** 3:6,10 9:15
27:19 31:4
**10:24** 56:19
**10:31** 56:20,22
**103** 3:12
**106** 3:12
**11** 3:12 78:15 103:12,16
103:17,20 104:5
**11,153,472** 3:6,10 9:16
28:15 31:4 57:5
**110** 3:13
**112** 74:18 75:3 76:21
79:18,24 81:1,22 82:3
82:10 87:20 88:1,20
89:2,8,14,20,22 90:3
90:18,19 91:2,10,16
91:25 92:4
**116** 47:17 48:8,24 49:18
50:20 51:6,17 52:9,16
**117** 3:14 111:8
**12** 3:12 11:15 39:2,6,7,9
39:13 42:25 43:5,14
44:15 78:13 103:12
105:24 106:2,5,11
**12:29** 122:18,20
**123** 3:15
**12a** 39:23
**12b** 39:23
**12c** 40:3
**12d** 40:8,9
**12e** 40:8,14
**12f** 40:17 43:24 44:10
**12g** 40:23 44:10
**12h** 54:10,14,16
**12i** 41:21
**12j** 42:2
**12k** 42:11
**12t** 42:11 43:24
**12th** 33:21 38:18
**13** 3:13 103:13 110:18
110:19,20,23
**14** 1:14 3:14 78:18
103:13 117:2,5,19
119:1 120:2,8,15
121:11
**142** 8:19
**14th** 4:10 161:13
**15** 3:5,14 19:24,24 20:3
74:10 75:13 93:13
123:1,15,17
**154** 3:3
**16** 77:23
**164** 149:20
**165** 19:24 20:3
**166** 20:8,10,23 21:6
**168** 36:10
**17** 139:20

**171** 36:12
**175** 91:5,7
**18** 22:21,24 27:15 29:3
29:22 33:18 35:6 37:2
37:4,17 38:19,22
111:15,17 112:3,20
**19** 91:8
**19-10-25** 3:11
**1980s** 61:21
**1996** 150:23
**1999** 104:17

_____

**2**
_____

**2** 3:6 31:16,20,25 33:3
71:9,13 72:23 85:15
85:25 86:2 106:18,18
107:5 125:12 144:8
150:8,12,14 155:5
**2:13** 154:17,19
**2:20** 154:20,22
**2:30** 161:14,17
**20** 71:18 72:9
**2005** 8:19 27:3,12 58:8
58:9 60:14 61:7 62:6
62:10,25 63:22 64:9
64:18 65:7,7 94:8,10
94:17 95:3,5,7 98:1
98:12 99:2 105:4,15
110:12 113:21 114:4
115:8 116:16 118:9
118:11,13,18 120:3,7
122:2,4 126:4,11,13
127:21,23 130:25
131:3,12,24 132:15
134:5,11 150:21
**2009** 94:16 95:5,15
110:13 117:16 120:6
**201** 15:20 20:10,11,23
21:6
**2014** 94:6
**2015** 78:2,16
**2019** 84:21 85:2,13 86:9
111:12
**2022** 33:22 38:18 42:4
**2025** 1:14 4:11 10:1,6
35:4,6 104:17 161:14
**203** 15:20 72:5
**205** 25:16,18
**206** 71:12
**206-623-7580** 2:12
**208** 72:25
**20th** 10:5 35:6
**21** 86:1
**22** 86:1
**220** 72:19
**222** 72:19
**224** 72:18
**23-02-02** 3:7

**24** 26:12,12 139:19
**24th** 78:2,16
**25** 45:12 78:13 86:2
**25th** 84:21 85:2,13 86:8
**26** 18:6 19:7 86:3
  139:19
**278** 148:25 149:19
**2900** 2:11
**2nd** 42:4

---
**3**

**3** 3:6 56:25 57:9 106:19
  107:5,5 108:13
  139:11,15 144:9
  150:8,12,14 156:14
**30** 47:16 50:4 148:9
**31** 3:6
**32** 139:14
**332** 2:5
**338** 148:25 149:19
**34** 78:18
**35** 74:17 75:3 79:18,24
  87:20 88:1,19 89:2,20
  90:18
**36** 74:11,15 75:13 78:8
  112:4
**38** 3:7 75:13
**3rd** 10:1 35:4

---
**4**

**4** 3:7 31:25 38:2,6 39:3
  39:23 42:12 43:1
  44:10 45:10,20 46:1,6
  47:16 48:9 50:5,20
  51:8 52:10 53:11,17
  53:21 54:2,9 55:9,17
  55:24 71:6,9 78:12
  86:19 103:12 106:19
  135:3 144:9 148:6
  149:13
**4,951,079** 146:25
**4:20** 154:11
**41** 148:22 149:11,16
**42** 149:11,16
**44** 149:21 150:2
**45** 150:15
**46** 77:25 152:18,21,24
  153:6
**47** 78:6 152:19,21,24
  153:7
**472** 10:25 28:24 32:25
  33:1 40:15 50:9,13,15
  85:12 86:2,3,9 87:4
  88:7,11,17 89:15,23
  90:4,17 91:14,16 92:1
  92:10 139:16 140:17
  146:19 147:9 156:14
  156:21

---
**5**

**5** 3:3,7 50:9 57:13,15,17
  57:20 86:3 103:12
  143:6,6 158:5,25
**50** 84:25
**53** 112:7
**54** 85:9,11
**55** 146:20,23
**57** 3:6,8
**58** 85:8,9,11,17,18,22
**5th** 111:12

---
**6**

**6** 3:8 70:7,9,15 74:18
  75:3 76:21 79:19,25
  81:1,22 82:4,10 86:3
  86:19 87:21 88:2,20
  89:3,8,15,21 103:12
**6,021,278** 146:25
**6,101,338** 146:25
**6:24-CV-270-AM-DTG**
  1:9 4:7
**60** 85:1,4 146:20
**60604** 2:6
**61** 86:11
**62** 87:12,15
**63** 85:4 86:12 87:9
**66** 106:19
**67** 45:11,21,25 46:15
**6b** 120:19,24,25 121:4,9

---
**7**

**7** 3:9 22:20 70:14,16,20
  71:3,7 75:16 76:3
  86:23 93:4,6 103:12
**7,555,006** 3:9
**70** 3:8,9
**702** 12:12
**761** 10:24 28:23 32:8
  40:10,13 50:9,12 78:1
  82:20,22 147:14
  155:5
**77** 3:10
**774-484-3285** 2:6
**7B** 93:6,11
**7C** 93:7,11

---
**8**

**8** 3:9 77:10,15 78:11
  93:6 103:12
**8,243,045** 3:14
**8,508,498** 3:8
**8,726,043** 3:12
**8,838,370** 3:11
**8,847,898** 3:13
**80** 19:16,19
**83** 45:21,25 46:15

**84** 3:11 47:17 48:8,21
  48:24 49:18 50:19
  51:6,17 52:9,15

---
**9**

**9** 3:10 78:12 84:3,5,7,14
  84:20,21 86:19,23
  103:12
**9,936,116** 10:19 40:7
**9:01** 4:2
**9:02** 4:11
**9:04** 6:3
**9:05** 6:4,6
**90-some** 66:15
**900** 2:5
**90s** 128:25
**92** 3:11 91:8
**925** 2:11
**95050** 8:20
**98104** 2:12
**9th** 94:16

C E R T I F I C A T E

This is to certify that the foregoing transcript

Deposition of: Dr. Andrew Wolfe

In the matter of: Cutting Edge Vision v T-Mobile

Before: US District Court

Date: 03-14-25

Place: teleconference

were duly recorded and accurately transcribed under
my direction; further, that said transcript is a
true and accurate record of the proceedings; and
that I am neither counsel for, related to, nor
employed by any of the parties to this action in
which this deposition was taken; and further that I
am not a relative nor an employee of any of the
parties nor counsel employed by the parties, and I
am not financially or otherwise interested in the
outcome of the action.

------------------------
Court Reporter

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1716 14TH ST., N.W., STE. 200
(202) 234-4433        WASHINGTON, D.C.  20009-7831        www.nealrgross.com

Page ____ of ____

| **ERRATA** | **ERRATA** |
|---|---|

| DEPOSITION/TESTIMONY OF: | Dr. Andrew Wolfe | |
|---|---|---|
| IN THE MATTER OF: | Cutting Edge Vision, LLC v. T-Mobile US, Inc., and T-Mobile USA, Inc. | |
| DOCKET NO.: | 6:24-cv-270 | TAKEN ON: Friday, March 14, 2025 |

**INSTRUCTIONS:**

1. Review the transcript for any corrections.  Please make NO marks on the transcript itself.
2. On this form only, at places you feel ought to be looked at: List page number, line number, proposed alternative version and reason for change.
3. Sign the signature page before a notary public and have the page notarized.
4. Return the notarized signature page and completed errata sheets to the designated officer.

| PAGE # | LINE # | CHANGE | REASON |
|---|---|---|---|
| 7 | 9 | from "don't" to "won't" | typographical/transcription error |
| 13 | 4 | from "admit" to "omit" | typographical/transcription error |
| 76 | 19 | from "implying" to "applying" | typographical/transcription error |
| 133 | 25 | from "wouldn't be" to "would be" | typographical/transcription error |
| 140 | 3 | from "into context" to "in context" | typographical/transcription error |
| 146 | 5 | from "than in written" to "when written in" | typographical/transcription error |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| PAGE # | LINE # | CHANGE | REASON |
|--------|--------|--------|--------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Page _____ of _____

| PAGE # | LINE # | CHANGE | REASON |
|--------|--------|--------|--------|
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |

Page _____ of _____

| PAGE # | LINE # | CHANGE | REASON |
|--------|--------|--------|--------|
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |
|        |        |        |        |